BETHLEHEM STEEL CO. et al. (PLAN OF EMPLOYERS' REPRESENTATION AT THE STEELTON, PA., PLANT OF BETHLEHEM STEEL CO. et al., Interveners) v. NATIONAL LABOR RELATIONS BOARD.

ASSOCIATION OF EMPLOYEES AT THE MARYLAND PLANT OF BETHLEHEM STEEL CO. v. SAME.

Nos. 7503, 7538.

United States Court of Appeals for the District of Columbia.

Argued Feb. 17, 1941.

Decided May 12, 1941.

Alfred McCormack, of New York City, pro hac vice, by special leave of court (Richard H. Wilmer, of Washington, D. C., and Fontaine Broun, of New York City, on the brief), for petitioners Bethlehem Steel Co. et al.

S. Ralph Warnken, of Baltimore, Md., for petitioner Association of Employees at Maryland Plant of Bethlehem Steel Co.

Ruth Weyand, Atty., National Labor Relations Board (Robert B. Watts, Gen. Counsel, Laurence A. Knapp, Associate Gen. Counsel, and Ernest A. Gross, Asst. Gen. Counsel, all of Washington, D. C., on the brief), for respondent.

Douglass D. Storey, of Harrisburg, Pa., for intervener Plan of Employees' Representation at Steelton, Pa., Plant.

Robert H. Driskill, of Washington, D. C., for intervener Plan of Employees' Representation at the Cambria Plant.

Lee Pressman, of Washington, D. C. (Joseph Kovner and Anthony Wayne Smith, both of Washington, D. C., on the brief), for intervener Steel Workers Organizing Committee.

Before STEPHENS, VINSON, and EDGERTON, Associate Justices.

EDGERTON, Associate Justice.

Bethlehem Steel Corporation and its iron and steel producing subsidiary Bethlehem Steel Company, here called petitioners, ask us to review and set aside[1] an order of the National Labor Relations Board.[2]  Charges

STEPHENS, Associate Justice, dissenting.

---

[1] Under Section 10(f) of the National Labor Relations Act, 49 Stat. 455, U.S.C. Tit. 29, Section 160(f), 29 U.S.C.A. § 160 (f).

[2] 14 N.L.R.B. 539.

of unfair practices were filed with the Board by the Steel Workers Organizing Committee (S.W.O.C.), a union affiliated with the Congress of Industrial Organizations (C.I.O.), and a complaint was issued. Hearings before a Trial Examiner occupied several months. The Examiner issued an intermediate report, to which petitioners filed exceptions, and the case was argued orally before the Board.

The Board dismissed a number of charges, including violence, discriminatory discharge, offering inducements not to join S.W.O.C., and conducting a "back-to-work" movement so as to interfere with employees in the exercise of their rights. But the Board found that petitioners had dominated, interfered with, and contributed support to ten labor organizations, called "Plans of Employees' Representation," located respectively at the Company's Cambria, Lackawanna, Lebanon, Steelton, Maryland, Bethlehem, and Concentrator Plants, Rankin Works, Leetsdale Works No. 1 and Leetsdale Works No. 2, and had expressed to employees their animus against S.W.O.C.; that the Company petitioner had surreptitiously given money to the Mayor of Johnstown, Pennsylvania, to insure continuance of his anti-union attitude and conduct, and that the Corporation petitioner must be held responsible therefor; that petitioners had employed detectives to obtain, by surveillance, information about union activities; and that by this conduct petitioners had interfered with, restrained, and coerced employees in the exercise of the rights, guaranteed by Section 7 of the Act, 29 U.S.C.A. § 157, to form or join labor organizations and to engage in concerted activities for the purposes of collective bargaining, etc. The Board concluded as matter of law that by dominating, etc., the Plans, petitioners had engaged and were engaging in unfair labor practices within the meaning of Section 8(2) of the Act, 29 U.S.C.A. § 158(2), and that by interfering with, restraining and coercing their employees in the exercise of rights guaranteed by Section 7, petitioners had engaged and were engaging in unfair labor practices within the meaning of Section 8(1) of the Act. The Board's order directs petitioners and their officers, agents, successors and assigns to cease from dominating or interfering with, or contributing support to, the Plans of Employee Representation at the ten named plants; from interfering with the formation or administration of any other labor organization; from recognizing the Plans as representing employees; and from in any other manner interfering with, restraining, or coercing employees in the exercise of their rights guaranteed in Section 7 of the Act, to form or join labor organizations and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection. The order also requires petitioners to withdraw all recognition from the Plans and completely disestablish them as employee representatives for bargaining purposes, and to post notices of compliance.

In its answer to the petition, the Board asks enforcement of its order. Two of the Plans intervene in support of the petition. S.W.O.C. intervenes in support of the order. A petition of the Plan (now the Association of Employees) at the Maryland Plant, to set aside the order, is consolidated with these proceedings.

The Board's ultimate findings, which are succinctly stated, rest on basic findings which occupy 100 pages of the record. These basic findings meet all tests except brevity, and their length does not invalidate them. We shall not undertake to summarize all of these basic findings. Some of them, together with some items of evidence, inferences, and comments, are to approximately the following effect:

(1) Petitioners created most of the Plans and issued their charters. In material respects, the charters are nearly identical. In 1918, petitioners devised them, and distributed copies to employees at some of the plants together with an announcement that the Plan "is to be established." In the course of a few years the charters were put into operation by the Company, at its various plants. For years the Company recognized that the Plans were created by it, or by it and the Corporation, as a unilateral act. Thus a pamphlet entitled "Hints to Foremen in Meeting the New Employee," which the Company distributed at some of the plants about 1920, instructed foremen to explain to new men that "the Company * * * has adopted the Plan of Employees' Representation" and that it "is one of the most important policies of the Company."

(2) Although majorities have voted in various Plan elections, it is not found, and there is no evidence, that a majority of the men in any of the plants have ever approved of the Plans, or have ever been giv-

en an opportunity to vote for or against them.[3]

(3) Petitioners have continued not merely to hold out the Plans as a part of Company policy but to facilitate and encourage voting in the Plans; to represent to employees that the Plans are beneficial to them; and to advise employees to support the Plans and not to join other unions—specifically, not to join the C.I.O. (S.W.O.C.). Up to 1937 the charters required the Company to pay all the expenses involved in the conduct of nominations and elections, and to pay Employees' Representatives, for time spent in Plan meetings or in any Plan activities, at the rate they ordinarily received for their work.

(4) The charters of the Plans preclude independence and embody Company dominance. The Plans have no power to admit, exclude, expel, control or discipline members. All non-supervisory employees, whatever their characters, abilities, or sympathies, automatically become members as soon as they have worked for the Company for 60 days. The charters severely limit the power of the Plans to choose their own representatives. "Employees' Representatives" must be (1) employees of the Company, (2) of at least one year's standing, (3) working in the department which elects them, and (4) adult American citizens. However much Plan members may wish to select as their representative a good bargainer or administrator who does not meet all four of those requirements, the Plan charters prevent it. The charters authorize practically no action by the membership, other than voting for Employees' Representatives. While the Employees' Representatives meet as a "General Body" or "Committee of Representatives" and choose committees, the charters also provide for Joint Committees composed of a group of Employees' Representatives and a group of Management Representatives. The two groups have equal voting power in the Joint Committees. There is a "Management's Special Representative", who may be and sometimes is invited to attend meetings of the Employees' Representatives. The charters provide for no meetings of members and set up no machinery for formulating demands or for controlling or instructing representatives. Meetings are not held in practice. The charters made no provision for the raising of funds, by dues or otherwise. Independent action in such circumstances is obviously impossible.

(5) Until 1935, the charters of the Plans could not be amended without the concurrence of Management Representatives in the Joint Committees on Rules. In 1935 and 1936, the charters were amended to permit further amendment by a two-thirds vote of the Employees' Representatives; but with important exceptions. One exception is that no amendment which "might prevent the Plan from operating as a fair method of *selecting representatives* of the *whole body of employees* of the Company and as a *fair method of collective bargaining*"[4] can be made without the approval of the Joint Committee on Rules, in which the Company has half the voting power. Counsel for petitioners, and also counsel for the Association of Employees at the Maryland Plant, in identical language in their respective briefs, describe the exception which we have just quoted as being "in effect, a condition upon which the Company Petitioner will deal with the representatives of its employees in accordance with the procedure outlined." In other words, the Company requires, as a condition of dealing with a Plan, (1) that the Plan shall continue to receive and retain as a member, regardless of his conduct, principles, or views, every non-supervisory employee whom the Company sees fit to employ, and (2) that the Company shall have a voice in determining the fairness of any desired changes in the method of choosing Plan representatives or of Plan bargaining. This insures the permanence of a large degree of control by petitioners over the subjects of Plan membership, choice of representatives, and bargaining methods. Obviously no labor organization is independent when management shares control over such matters.

In 1937, the Management's Special Representatives at various plants sent identical letters to Plan officers in response to

---

[3] "Their only choice is to vote or not to vote, under the Plan. If they do not vote, representatives will be chosen by those who do, and these representatives will be recognized by the company as the sole bargaining agents for the employees." Bethlehem Shipbuilding Corp., Limited, et al. v. National Labor Relations Board, 1 Cir., 114 F.2d 930, 938.

At Midvale (now Cambria), Bethlehem, and perhaps some of the other plants, elected representatives of the employees approved the charters.

[4] Italics supplied.

inquiries regarding the effect of National Labor Relations Board v. Jones & Laughlin Steel Corporation.[5] These letters called attention to the necessity, under the Act, of limiting the Company's financial support of the Plans, and assured the Plan officers that no other changes in the charters were necessary. In the course of 1937, accordingly, substantially identical amendments were made in the charters, but the Company continues to pay Employees' Representatives for time spent in conference with Management Representatives[6] during working hours. At the Cambria plant it pays them for the time (within working hours) during which a Management Representative is present at meetings of the General Body of Employees' Representatives. It thereby pays them, in effect, to have him present at their meetings. There is no evidence that a different practice is followed at the other plants. Apart from the amendment clauses and the financial support clauses, the charters, at the time of the hearing, retained substantially their original form. The amendments could not erase from the minds of the employees the well-known and long-continued Company encouragement and approval of the Plans.

Testimony was taken and findings were made with regard to the practical operation of the Cambria Plan. It was stipulated that the other Plans operated in all material respects substantially in accordance with their respective provisions.

(6) The Company employed Pinkerton's National Detective Agency, Inc., for the purpose, among others, of obtaining through labor spies information regarding union activity and organization. The Agency was first employed before 1936. It was reengaged in June, 1936, following the formation of S.W.O.C., and was employed until some time in 1937; for the purposes among others, according to the evidence, of informing the Company on "the activities of various men who are trying to annoy and disturb their employees," on "the arrival and activities of ·radicals and outside disturbers," and on what was going on in the vicinity of the plants, including the activities of the C.I.O.; also of protecting plants and employees from violence by "outside communists, labor racketeers," defined as "people that get control of legitimate labor organizations and shake down the employer and the employee too." The Board found, despite the denial of a Pinkerton officer, that these descriptions included within their scope the activities of the union organization. Pinkerton "operatives" and "correspondents," several of whom were members of one union or another, proceeded to inform the Agency on union sentiment and activity among the Company's employees. Petitioners concede that the Company obtained from the agency frequent oral reports in which the progress or lack of progress of the S.W.O.C. was discussed.

(7) During a strike at the Cambria (Johnstown) plant in 1937, the Mayor of Johnstown made a speech in which he referred to the fact that violence had broken out and promised to suppress it. He also spoke in hostile terms of the "dictation of outsiders" and sharply criticised strike leaders. Evans, Management's Special Representative at the Cambria plant, through intermediaries, afterwards turned over several thousand dollars to the Mayor; and Ellicott, General Manager of the plant, turned over several thousand dollars directly to the Mayor. The money was not paid by check, but in cash. The Board did not find, and it does not clearly appear, what the Mayor did with the money. It is not found or shown that he applied it to the purposes of a "Citizens' Committee." The Board found that the Company's payments to the Mayor were calculated to insure the continuance of his hostility to S.W.O.C. and so to deprive the union of an impartial city administration. It also found that the Company promised money to a "Citizens' Committee" which, in the name of law and order, sought to break the strike.

## I.

██ Section 8(2) of the Act makes it an unfair labor practice for an employer "to dominate or interfere with the formation or administration of any labor organization or contribute financial *or other* support to it."[7] Thus support, to be prohibited, need not take financial forms. It is clear that the Company dominated, interfered with, and supported the Plans. The Board's other findings to which we have referred are supported by substantial evi-

5 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

6 The Act does not forbid such pay-

ments. U.S.C. Tit. 29, Sec. 158(2), 29 U.S.C.A. § 158(2).

7 U.S.C. Tit. 29, Section 158(2), 29 U.S.C.A. § 158(2). Italics supplied.

dence. Its conclusions of law follow. Board orders disestablishing similarly dominated unions have repeatedly been upheld by the Supreme Court.[8] A Board order disestablishing similarly dominated Plans in other plants of the Company has been upheld by the Circuit Court of Appeals for the First Circuit;[9] and the Company's petition for certiorari has been dismissed on its own motion.[10]

■ The employment of labor spies to report on the growth of a new union, in a context of support of a company union and interference with independent organization, is a part of that support and interference.[11] It need not be shown that specific use was made of the spies' information, or that the employees knew they were being watched. But many employees must have known it prior to the Board's hearing, for testimony before the La Follette Civil Liberties Committee, early in 1937, made public the Company's employment of Pinkerton's.

## II.

■ Petitioners attack the breadth of the order. Having found that they had dominated, interfered with, and contributed support to the Plans, had expressed to the men their animus against S.W.O.C., and had interfered with, restrained, and coerced the Company's employees in the exercise of the rights guaranteed by Section 7 of the Act, the Board ordered petitioners to cease from dominating, interfering with, or contributing support to either the Plans or "any other labor organization," and to cease from "in any other manner interfering with, restraining, or coercing the employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing," etc., as guaranteed by Section 7. The order is in substantially the language of Sections 7, 8(1) and 8(2), the subdivisions which petitioners are found to have violated. Violation of Sections 8(3), 8(4) and 8(5) is neither found nor forbidden. The act would be ineffectual if each new example of interference, domination, etc., required a new hearing and a new order. Under the Railway Labor Act, a similar statutory purpose[12] was enforced by a similar order, which the Supreme Court upheld over the protest of the employer.[13] Accordingly, Labor Board orders in the form used here have repeatedly been enforced by the Supreme Court.[14]

National Labor Relations Board v. Express Publishing Co.[15] does not overrule

---

[8] National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Company, 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; National Labor Relations Board v. Link-Belt Co., Jan. 6, 1941, 61 S.Ct. 358, 85 L.Ed. —; H. J. Heinz Company v. National Labor Relations Board, Jan. 6, 1941, 61 S.Ct. 320, 85 L.Ed. —; Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, March 10, 1941, 61 S.Ct. 736, 85 L.Ed. —, affirming, 2 Cir., 112 F.2d 657.

[9] Bethlehem Shipbuilding Corp., Limited, et al. v. National Labor Relations Board, 1 Cir., 114 F.2d 930.

[10] Jan. 13, 1941, 61 S.Ct. 448, 85 L.Ed. —.

[11] Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 231, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 251, 59 S.Ct. 490, 83 L.Ed. 627, 123 A. L.R. 599; National Labor Relations Board v. Link-Belt Co., Jan. 6, 1941, 61 S.Ct. 358, 85 L.Ed. —.

[12] National Labor Relations Board v.

Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 266, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307.

[13] Texas & N. O. R. Co. v. Brotherhood of Railway & S. S. Clerks, 281 U.S. 548, 552, 571, 50 S.Ct. 427, 74 L.Ed. 1034; cf. Id., 5 Cir., 33 F.2d 13, 15.

[14] "The Board's order properly requires respondent to desist from interfering in any manner with its employees in the exercise of their right to self-organization and to bargain collectively through representatives of their own choosing." National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 262, 59 S.Ct. 490, 499, 83 L. Ed. 627, 123 A.L.R. 599; Board's Order, 5. N.L.R.B. 930, 952. Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 231, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L. Ed. 219; Board's Order, 8 N.L.R.B. 866, 877; National Labor Relations Board v. Link-Belt Company, Jan. 6, 1941, 61 S. Ct. 358, 85 L.Ed. —; Board's Order, 12 N.L.R.B. 854, 883.

[15] March 3, 1941, 61 S.Ct. 693, 85 L. Ed. —.

those cases.[16] The Court there held that a mere refusal to bargain with representatives of employees, in violation of Section 8(5) of the Act, though it might constitute a technical interference with collective bargaining in violation of Section 8(1), did not justify an order forbidding an entirely different type of unfair labor practice which the employer had not committed or threatened, viz., interference with the right to form or join unions, etc., guranteed by Section 7. There was no evidence of such interference, or of union domination. The Court held that the Board's order must be limited to unlawful acts of the "same type or class" as the acts which the employer had committed. The Court expressly recognized that "Having found the acts which constitute the unfair labor practice the Board is free to restrain the practice and other like or related unlawful acts * * * the purpose being to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed by the employer in the past." That is what the Board has done here.

■ Petitioners contend that a part of the Board's order by its terms would extend to every plant and works of the Company throughout the United States, and is therefore invalid. As we understand the order, its effect is limited to the ten named plants.[17] We express no opinion on the question whether it might not properly have been extended to the Company's other plants.

III.

■ The Corporation petitioner, which operates no physical properties, contends that the Board's order is, at all events, invalid as to it. Though the Company is a wholly-owned subsidiary of the Corporation, and to a large extent both have the same officers, the Corporation's responsibility does not turn on those facts. Section 2(2) of the Act, 29 U.S.C.A. § 152(2), defines "employer" as including "any person acting in the interest of an employer. * * *" The Board found that the Corporation, as well as the Company, had

dominated, interfered with, and contributed support to the Plans, and had expressed to the Company's employees an animus against the S.W.O.C. These findings are supported by substantial evidence. Labor relations of the Corporation's subsidiaries have long been subject to a uniform policy emanating from it. Support of the Plans, with opposition to other unions, has been the essence of this policy. In 1918, when the Plans were new, a pamphlet distributed to employees of the Company was entitled "Representation of Employees in Plants of the Bethlehem Steel Corporation." On the inside of the cover was a chart entitled: "Chart Illustrative of Representation of Employees of the Bethlehem Steel Corporation and Subsidiary Companies." When McClintic-Marshall, now merged in the Company petitioner, first became a subsidiary of the Corporation petitioner in 1931, the subsidiary's president distributed to its employees a leaflet containing a facsimile of a letter to him from E. G. Grace, the president of the Corporation petitioner, as such. This letter said: "I desire to call to your attention certain advantages now available to your organization as a subsidiary of Bethlehem Steel Corporation. Bethlehem, over a period of years, has developed a program of industrial relations embracing many plans for the économic betterment of the employee. Among these are plans that provide a common meeting ground for the adjustment of questions affecting the employee's work. * * * It is a pleasure to extend * * * the * * * privileges to the McClintic-Marshall organization, on the same basis as now enjoyed by other members of the Bethlehem family." Accordingly, McClintic-Marshall's President said to its employees: "New advantages in working conditions and financial protection are now available to the employees of the McClintic-Marshall Corporation, as communicated to our organization by a letter from Eugene G. Grace, President of Bethlehem Steel Corporation. As a subsidiary of the Bethlehem Steel Corporation, McClintic-Marshall employees are entitled to a series of benefits which have been developed suc-

[16] Since the decision in the Express case, the Court has enforced an order as broad, based on findings as narrow, as those now before us. Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, March 10, 1941, 61 S.Ct. 736, 85 L.Ed. ——, affirming, 2 Cir., 112 F.2d 657; Board's order, 18 N.L.R.B. No. 46. Cf. National Labor Relations Board v. Reed & Prince Manufacturing Co., 1 Cir., April 2, 1941, 118 F.2d 874.

[17] Cf. National Labor Relations Board v. American Oil Co., Inc. (Curtis Bay Plant), 4 Cir., 114 F.2d 1009.

cessfully in other companies of the Bethlehem family over a period of years. These privileges include: Plan of Employees Representation * * * Relief Plan * * * The Corporation will assume the entire cost of administration * * * Pension Plan financed entirely by the Corporation * * * Saving and Stock Ownership Plan."

The Corporation petitioner, in its Bethlehem Review, which carries the subtitle "A Bulletin of News for the Employees of the Subsidiary Companies of the Bethlehem Steel Corporation", has repeatedly represented to those employees that the Plans are a part of the Corporation's policy. The first issue of the Review, in April, 1924, begins with the statement, over the signature "E. G. Grace, President," that "The officers of the Bethlehem Steel Corporation and its Subsidiary Companies have long felt the need of some means of direct communication with their employees by which facts of general interest could be brought to the attention of everyone in the Corporation." The Corporation's Bethlehem Review for September 25, 1933, states: "Fifteen years ago Bethlehem started its Employees' Representation Plan. Today the Plan is in effect in the various operating units in steel manufacturing, ship building, mining, and McClintic-Marshall."

A booklet entitled "Ten Years' Progress in Human Relations—A Review of Some Accomplishments under the Bethlehem Plan of Employee Representation" was, according to its title page, "Distributed at 1928 annual joint conferences of employee representatives and management representatives of Bethlehem Steel Corporation." This same booklet contains a heading "Employment Policy" followed by "This is the policy of Bethlehem Steel Corporation."

Although the Corporation's conduct prior to the passage of the National Labor Relations Act obviously could not violate the Act, that conduct goes to show that intervention in the management, and specifically in the labor relations, of the Corporation's subsidiaries was an established Corporation practice. The Act was passed on July 5, 1935. On July 3, 1936, the Bethlehem Review printed a letter from Grace, as president of the Corporation, to the employees of the Corporation's subsidiaries, which said: " * * * Anything that disturbs our present condition will imperil the interests of all. Undoubtedly you have seen that professional labor leaders have publicly announced a campaign to unionize the employees of the steel industry. * * * We believe that no worker should be required to pay tribute to anyone or to any organization for the right to work. * * * The industry issued through the American Iron and Steel Institute the statement reprinted in this number of the Review. Our management firmly believes in the views expressed in that statement. They express the policies which have controlled our dealings and relationships for many years. The effectiveness of your existing Representation Plans, for the proper settlement of all questions arising between any of you and the management throughout 17 years of uninterrupted operation has been outstanding, and the results speak for themselves. * * * We will assist you in every way to continue the present proven method of dealing with our mutual problems." The Institute statement which the Corporation's president, on behalf of its management, thus adopted and commended to the employees of the Company, included the following language: "The overwhelming majority of the employees in the Steel Industry recently participated in annual elections under their own representation plans and elected their representatives for collective bargaining. The elections were conducted by the employees themselves by secret ballot. One of the purposes of the announced campaign is to overthrow those plans and the representatives so elected. The Steel Industry is recovering from six years of depression and huge losses, and the employees are now beginning to receive the benefits of increased operations. Any interruption of the forward movement will seriously injure the employees and their families and all businesses dependent upon the Industry, and will endanger the welfare of the country. The announced drive, with its accompanying agitation for industrial strife, threatens such interruption." In the Review for March, 1937, Grace, as president of the Corporation, said to the employees of the subsidiaries:[18] "The Employees' Rep-

---

[18] The subtitle of this number of the Bethlehem Review was "A bulletin of News for the Employees of Bethlehem Steel Corporation." Since the Corporation is a holding company which operates no physical properties, the employees of the subsidiaries, including the Company petitioner, were obviously the persons intended.

resentation Plans which were established in our plants nearly twenty years ago continue to operate with ever-increasing effectiveness." In the Review for January 15, 1938, Grace, again as president of the Corporation, said to the employees of the subsidiaries: "As you know, we take great pride, and justly I feel, in the fact that nearly 20 years ago we accepted the principle of collective bargaining which is much discussed today. In the application of that principle during those years we have dealt with you through the Representatives whom you have elected under your Plans of Employees' Representation on all questions having to do with wages, hours and working conditions. For the last several months that long-established method of dealing with you has been the subject of hearings before the National Labor Relations Board. The Company is defending itself, and at considerable expense, against what we believe to be an unfounded charge, made by the Steel Workers Organizing Committee, that the Company is dominating your collective bargaining Plans. It is regrettable that your Plans are being put to like expense in defending at those hearings their independence and the type of collective bargaining which has been in effect under them for many years."

In short, the Corporation, over a long period, actively supported the Plans and actively opposed efforts of the men to join other labor organizations. It thereby made the Company's domination, interference, restraint, etc., its own. From 1935 to the time of the hearing, the Corporation was a persistent violator of Sections 8(1) and 8(2) of the Act. It follows that the Board's order directing it to refrain from similar violations was valid. Petitioners apparently concede that the Corporation pays the entire cost of a Pension Plan, and the entire administrative expense of a Relief Plan, for the employees of its subsidiaries;

also that a Vacation Plan and a Savings and Stock Ownership Plan, as well as the Plans of Employees' Representation, have been put into effect in all the subsidiaries[19]. In our opinion the evidence of the Corporation's habitual intervention in the Company's labor relations justified the Board in finding that the Corporation was responsible for the Company's dealings with the Pinkertons and the Mayor of Johnstown; but the order is valid irrespective of that finding.

In Gannett Company, Inc., v. National Labor Relations Board, Dec. 9, 1940, —— App.D.C. ——, 118 F.2d 937, on which the Corporation relies, this court held that there was no evidence that the holding corporation had affirmatively participated in the unfair practices of its subsidiary; the record indicated that it had merely failed "to assert its corrective powers after the event." The contrast with the facts here is obvious. Here, as in National Labor Relations Board v. Lund, 8 Cir., 103 F.2d 815, which we distinguished in the Gannett case, the sole stockholder (in this case the Corporation) personally interfered with unionization. Because it interfered, the stockholder is an "employer" within the definition in the Act and subject to the Board's order.[20]

## IV.

The order is directed not only against petitioners but also against their officers, agents, successors, and assigns. Petitioners object to the inclusion of "successors and assigns." The Supreme Court has repeatedly enforced orders of the Board which include that term.[21] " * * * The strife which is sought to be averted is no less an object of legislative solicitude when contract, death, or operation of law brings about change of ownership in the employing agency."[22] An

[19] In Bethlehem Shipbuilding Corporation, Ltd., v. National Labor Relations Board, 1 Cir., 114 F.2d 930, it was found that the Bethlehem Shipbuilding Corporation, another wholly-owned subsidiary of the Bethlehem Steel Corporation, had used a Plan substantially identical with the Plans here involved.

[20] Cf. National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; Consolidated Edison Company v. National Labor Relations Board, 305 U.S. 197, 59 S.Ct. 206, 83 L. Ed. 126.

[21] e.g. National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219, enforcing 8 N.L.R.B. 866, 877; National Labor Relations Board v. Link-Belt Company, Jan. 6, 1941, 61 S. Ct. 358, 85 L.Ed. ——, enforcing 12 N.L.R.B. 854, 883. Cf. National Labor Relations Board v. Hopwood Retinning Co., Inc., 2 Cir., 104 F.2d 302, 303.

[22] National Labor Relations Board v. Colten, 6 Cir., 105 F.2d 179, 183.

employer cannot be permitted, by reorganization or transfer, to nullify the Board's order and make it necessary to start new proceedings against the new owner of the business.[23] The order, of course, is not intended, and will not be interpreted, to bind persons who have no notice of it, or who have not acted in concert with petitioners.[24]

## V.

Petitioners contend that they did not have a fair hearing, largely on the ground that Trial Examiner Bloom was biased and prejudiced. As an example of bias, they complain that their applications for subpoenas directed to one McDonald, an S.W.O.C. officer, were denied. They wished to question him regarding the dates, scope, duration and terms of the agreements entered into since January 1, 1937, between S.W.O.C. and the United States Steel Corporation or any of its subsidiaries. They also sought to require him to produce the documents themselves. Later, Board counsel supplied petitioners' counsel with the documents, petitioners' counsel accepted them and offered them in evidence, and the Examiner excluded them. As the Board found, these agreements were irrelevant; the United States Steel Corporation, its subsidiaries, S.W.O.C., and the agreements were not on trial. A hearing is not made unfair by a refusal to summon a witness in order that he may be asked irrelevant questions.[25] Though the Board did not apply to its own attorneys its rule that applications for subpoenas must specify the nature of the facts to be proved, no unfairness to petitioners is shown to have resulted. The Board's supervisory power over its own agents enables it, irrespective of such a rule, to prevent obstructive tactics on their part.

Petitioners say that the Trial Examiner badgered their witnesses and subjected them to sharp cross examination. The record does not sustain this charge. We quote in full one example of what pe-titioners describe as sharp cross examination:

"Q. (By Trial Examiner Bloom) I think you have told us in general the conditions after that Saturday when the mills were closed. Were you reasonably familiar with the general conditions the following week, say beginning with that Saturday and going until the following week? A. Perhaps fairly so.

"Q. When were the mills reopened? A. That I don't remember, now, wait a minute, I can place it approximately, but I can't place it exactly.

"Q. If you— A. The newspaper ad. appeared Thursday.

"Q. You mean the Thursday— A. The 'We protest' ad.

"Q. You mean the Thursday following the closing of the mills? A. I think that is it, I would have to refer—

"Q. I am assuming that it was Thursday. . A. Yes.

"Q. I mean, assuming that was Thursday; with that in mind, when did the mills reopen? A. Perhaps it was late Thursday, perhaps it was Friday, I would not, I can't, maybe it was Saturday, I can't just tell.

"Q. How were things in Johnstown during that period, from the time of the closing of the mills to the time of the reopening of the mills? A. All right."

The foregoing colloquy, of which petitioners complain, was immediately followed by this:

"Trial Examiner Bloom: That is all, thank you. Anything further?

"Mr. Shawe: Nothing further.

"Mr. Moore [of petitioners' counsel]: No.

"Trial Examiner Bloom: All right, thank you very much. You are excused."

Petitioners object particularly to the "cross examination" of the witness Williams. The part of the record of which they complain includes this colloquy be-

---

[23] Cf. Federal Trade Comm. v. Standard Education Society, 302 U.S. 112, 119, 58 S.Ct. 113, 82 L.Ed. 141. In Scott v. Donald, 165 U.S. 107, 110, 17 S.Ct. 262, 41 L.Ed. 648, and Chase National Bank v. City of Norwalk, 291 U.S. 431, 434, 54 S.Ct. 475, 78 L.Ed. 894, to which petitioners refer, the reversed decrees enjoined persons who were in no sort of privity with the parties to the suit.

[24] Cf. 38 Stat. 738, U.S.C. Tit. 28, Section 383, 28 U.S.C.A. § 383.

[25] Cf. North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 109 F.2d 76, 83, certiorari denied 310 U.S. 632, 60 S.Ct. 1075, 84 L.Ed. 1402; National Labor Relations Board v. Ed. Friedrich, Inc., 5 Cir., 116 F.2d 888, 889; contra, Inland Steel Co. v. National Labor Relations Board, 7 Cir., 109 F.2d 9, 18-20.

tween the Examiner, the witness, and Mr. Broun of petitioners' counsel:

"Trial Examiner Bloom: What were the circumstances under which you saw the minutes, please?

"The Witness: I sat right on the other side of the secretary when he was writing them.

"Trial Examiner Bloom: I see.

"Mr. Broun: Mr. Examiner, I would like to have you develop the matter, I didn't know that Mr. Williams was present at the meeting.

"Trial Examiner Bloom: Well, it states right here at the top.

"Mr. Broun: I didn't look at the minutes, as a matter of fact, I would be glad to develop it myself or have you go ahead.

"Trial Examiner Bloom: As long as I started I might as well finish it, there are just a few points.

"Mr. Broun: Very well, sir."

Some other questioning by the Examiner, to which petitioners now object, was likewise undertaken and carried on with the approval of petitioners' counsel.

Petitioners complain of such questions and remarks as "Why did you care if the men voted or not?"; "What particular affair was it of yours?" "This man is secretary of the Plan and doesn't even know who kept the minutes of the Plan"; "He couldn't possibly know that accurately." They complain that after the decision in the Greyhound case, the Examiner expressed the view that time and expense might be saved by discovering whether or not the Bethlehem Plan and the Greyhound Plan were substantially identical. He did not assume to decide the question.[25a] When the Examiner rejected questions asked by counsel for petitioners, and framed substitutes, petitioners urge this as showing the Examiner's bias against them. But when the Examiner rejected questions asked by counsel for the Board, and framed substitutes, petitioners urge this also as showing his bias against petitioners. We are then told that "he associated himself with the attorney for the Board in the prosecution of the Board's case * * * taking over the cross examination on behalf of the attorney for the Board when the latter found himself in difficulty." Petitioners make other comparable complaints. It is the function of an examiner, just as it is the recognized function of a trial judge, to see that facts are clearly and fully developed. He is not required to sit idly by and permit a confused or meaningless record to be made. If the spirit and conduct of the Examiner throughout this case were reversible error, few administrative and few judicial proceedings could withstand attack. The alleged manifestations of feeling on the part of the Examiner, which petitioners have culled from a record of 11,000 pages, are mild indeed.[25b] They did petitioners no harm; for undisputed testimony, adduced with unquestioned propriety, conclusively proved the Board's case. There is no suggestion that the Examiner committed any gross breach of decorum. The mere existence and reflection of feeling in the course of a trial[25c] does not disqualify a presiding officer or call for reversal.[25d] It does not constitute "bias and prejudice." Petitioners' charge of bias and prejudice is without foundation.

It is also an afterthought. If petitioners had thought the Examiner biased or prejudiced they should, and doubt-

---

[25a] This is made clear, we think, by the colloquy quoted in note 3 of the dissenting opinion herein.

[25b] Men seldom conduct themselves throughout a long and provocative hearing with so close an approximation to uniform fairness and good temper. In the course of the colloquy mentioned in the preceding note, for example, petitioners' counsel said: "It is a most disgraceful thing that an Examiner will allow stuff such as this." The Examiner's reply was: "Mr. Moore, since you think it is outrageous for me to allow things like that, I am going to ask you specifically, have you read the Greyhound opinion of the United States Supreme Court?"

[25c] Even "highly improper" statements by counsel for the government in the course of a long trial are not necessarily prejudicial, or reversible when "reversal would not promote the ends of justice." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 239, 240, 60 S.Ct. 811, 84 L.Ed. 1129.

[25d] "Judges cannot be forbidden to feel sympathy or aversion for one party or the other. Mild expressions of feeling are as hard to avoid as the feeling itself." Whitaker v. McLean, — App.D.C. —, 118 F.2d 596.

"The great tides and currents which engulf the rest of men, do not turn aside in their course, and pass the judges by." Cardozo, The Nature of the Judicial Process, 168.

less would, have said so and demanded that the Board appoint a different examiner. They raised no such contention during the hearing, although they promptly appealed to the Board from the Examiner's refusal of the subpoenas referred to above. By raising the contention later they make, in effect, an unwarranted charge of negligence against their trial counsel.

Petitioners complain of the extent to which the Board availed itself of the services of subordinates in the process of considering the case and reaching a conclusion. The petition alleges that the Board "did not judicially consider, weigh or appraise the evidence" in making its decision, but relied upon conclusions of fact and law made by subordinates, and that petitioners were given no opportunity to inspect or argue against these conclusions. The Board's answer neither admits nor denies these allegations, on the ground that they are irrelevant and beyond the scope of judicial inquiry.[26] Petitioners' contention was presented in the same way, and rejected, in Bethlehem Shipbuilding Corp., Limited, v. National Labor Relations Board.[27] There are other cases to like effect.[28] The Act requires only a hearing, before the Board or an agent designated by the Board, and findings by the Board which are supported by evidence. It is not the function of a court to "probe the mental processes" of an administrative officer "in reaching his conclusions if he gave the hearing which the law required." [29]

## VI.

Petitioners have moved [30] for leave to adduce, as additional evidence, items excluded by the Examiner and the Board. (a) The S.W.O.C. agreements with the United States Steel Corporation and its subsidiaries we have dealt with above, in connection with the Examiner's refusal to issue certain subpoenas. (b) Petitioners sought to ask the Employees' Representatives at the Cambria Plant a series of about 150 questions, designed to elicit whether the witnesses were conscious of being (or, as petitioners put it, were) influenced, restrained, interfered with, coerced, or dominated by petitioners. It was stipulated between counsel and the Examiner that the witnesses would have answered in the negative. Since the organization, structure, and Company support of the Plans ensure Company dominance and violate the Act, this testimony would have been irrelevant. (c) Petitioners object to the following ruling of the Examiner, which we quote from the record, with reference to the Cambria strike: "Certain testimony was adduced by the Board to the general effect that no violence occurred during the strike, that no disorders took place on the picket lines, that no stones were thrown. It is apparent from the testimony of some twenty-five witnesses produced by the Respondents [the present petitioners] that the testimony offered by the Board does not accurately reflect the facts. I find as a fact that violence did occur during the strike, that there was disorder, that stones were thrown on the picket lines. The Board, on this state of the record cannot find as a fact that there was no violence, no disorder during the strike. In my opinion it would be a needless waste of time, considerable expense to all persons concerned, and for no useful purpose, to have further testimony concerning the fact that violence occurred during the strike, and I accordingly bar further testimony along such line." The Board, in turn, found "that the existence of violence and the apprehension of violence induced by newspaper reports of violence in strikes at other steel plants were two of the factors leading to the

[26] The Board does, however, deny paragraphs 14 and 20 of the petition, which allege that the Board did not itself consider all the evidence, did not itself make the purported findings of fact, and did not act in a judicial or quasijudicial manner.

[27] 1 Cir., 114 F.2d 930, 942.

[28] Cupples Company Manufacturers v. National Labor Relations Board, 8 Cir., 103 F.2d 953, 957, 958, where the court said: "The allegations of the petition here do not go beyond showing a proper reliance by the members of the Board on administrative assistance"; National Labor Relations Board v. Botany Worsted Mills, Inc., 3 Cir., 106 F.2d 263, 265, 266;

National Labor Relations Board v. Biles Coleman Lumber Co., 9 Cir., 98 F.2d 16; Inland Steel Co. v. National Labor Relations Board, 7 Cir., 105 F.2d 246, 251, 252; National Labor Relations Board v. Lane Cotton Mills Co., 5 Cir., 108 F.2d 568.

The petition for certiorari in Louisville Refining Co. v. National Labor Relations Board, which the Supreme Court denied, 308 U.S. 568, 60 S.Ct. 81, 84 L. Ed. 477, urged a similar contention.

[29] Morgan v. United States, 304 U.S. 1, 18, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

[30] Under Section 10(e) of the National Labor Relations Act, U.S.C. Tit. 29, Section 160(e), 29 U.S.C.A. § 160(e).

formation of the Citizens' Committee" at Johnstown. It is not clear that violence in the strike was relevant. Even if it was relevant, the Examiner's refusal to admit cumulative testimony was within his discretion and did not injure petitioners. (d) Petitioners sought to ask members of the Citizens' Committee, and the manager and assistant manager of the Cambria plant, a series of questions calling for their conclusions as to whether the Citizens' Committee was connected with the Company, or acted at the behest or for the benefit of the Company, or had any business transactions or connections with the Company, other than financial contributions from it. It is not clear that the evidence was relevant. In any case, its exclusion did not injure petitioners, for the Board expressly refused to find that petitioners induced or participated in the formation of the Citizens' Committee. We find no prejudicial error in any of the Examiner's rulings. No procedural incident in the entire case had any conceivable effect upon the result of the case. The motion for leave to adduce additional evidence is denied.

We have considered the other contentions of the petitioners, but it is not necessary to discuss them. The proceedings were conducted with careful regard for fairness and the law. Petitioners' defiance of the law as stated in the Wagner Act and plain decisions of the Supreme Court was clearly shown. The Board's order provides the only lawful remedy and will be enforced.

So ordered.

STEPHENS, Associate Justice (dissenting).

In my opinion the order of the Board should be set aside and the cause remanded for a new hearing. I think the hearing was vitiated by bias of the examiner, and by the Board's requirements concerning subpoenas, and that prejudicial error was committed by the denial to the petitioners of the right to adduce certain testimony in defense of the Board's charges, and that the findings are defectively framed. Even if a fair hearing and the admission of all necessary and relevant testimony and properly drawn findings be assumed—assuming, that is, that the case can properly be decided on this record—I think that there was no substantial evidence of domination or interference with the formation or administration of labor organizations of the petitioners' employees, in violation of Section 8(2) of the National Labor Relations Act, and in consequence no basis in the case for an order of disestablishment; and in my view there is no basis in the record for a cease and desist order in respect of contribution to the support of labor organizations of the employees, in violation of Section 8(2); and I think there is no substantial evidence of interference with the rights of self-organization and collective bargaining of the employees, through contribution to the Johnstown Citizens' Committee or through surveillance, in violation of Section 8(1); and assuming substantial evidence of domination and interference, in violation of Section 8(2) and 8(1), in my opinion the present order is nevertheless too broad.

I

BIAS OF THE EXAMINER AND SUBPOENA REQUIREMENTS

*Bias of the examiner.* The examiner who presides at a Board hearing and by determination of the issues and by rulings as to the admissibility of evidence makes up the record for the consideration of the Board, and who by his intermediate report gives guidance to the Board in respect of its decision of the case, acts in a judicial capacity. As was stated in Oakley v. Aspinwall, 1850, 3 N.Y. 547, 549, and reiterated in People v. Naimark, 1913, 154 App. Div. 760, 763, 139 N.Y.S. 418, 420, "the first idea in the administration of justice . . . is that a judge must necessarily be free from all bias and partiality. He cannot be both judge and party, arbiter and advocate in the same cause." A trial by a biased judicial officer is not in conformity with due process. Tumey v. Ohio, 1927, 273 U.S. 510, 535, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243, 1256; Whitaker v. McLean, 1941, —— App.D.C. ——, 118 F.2d 596. And see Morgan v. United States, 1938, 304 U.S. 1, 58 S.Ct. 773, 999, 82 L.Ed. 1129.

The record discloses the following concerning the conduct of the examiner at the hearing in this case:

(1) Extent and method of examination of witnesses: The examiner interrogated about 40% of the witnesses called for the petitioners. His examination covered approximately 400 pages of the record, including some 20 or more in the examination of each of the petitioners' witnesses Stanton and Campbell, some 75 in the examination of the petitioners' witness Williams. Much

of this questioning was in the nature of cross-examination. In contrast with this the examiner did not, except in isolated instances, question the witnesses for the Board, and in such instances he refrained from cross-examination. The examiner's questioning of the petitioners' witnesses often occurred at the end of cross-examination (frequently after one or more re-cross-examinations) by the Board's counsel —after it was apparent that the latter did not desire to examine further. At times the examiner interrupted cross-examination of the petitioners' witnesses by counsel for the Board and continued the examination himself. He interrupted direct examination by counsel for the petitioners to interpose cross-examination. He pursued a line of questioning which had not been pursued by counsel for the Board during the latter's cross-examination. He suggested a possible avenue of cross-examination to counsel for the Board, promptly adopted by such counsel. The examiner conducted a lengthy and searching examination of the petitioners' witness Stanton in an obvious effort to impair the credibility of his testimony and to put a more favorable light upon the action of the Governor of Pennsylvania in ordering a shut-down of the Cambria Plant after the Johnstown strike had failed to achieve that end. The examiner made a similar effort in his cross-examination of the petitioners' witness Nicely.

It is of course not as such improper— indeed it is at times necessary—for an examiner or judge to examine or cross-examine, and he may even on his own motion call witnesses. It is his duty to get at the truth of the case. His own examination may in some instances aid in ascertaining the truth. But this alone should be his objective. He should exercise with restraint his authority to conduct an examination himself. He must not be advocate for the one side or the other. He must be judge, and that only, never a partisan. Montgomery Ward & Co. v. National Labor Relations Board, 8 Cir., 1939, 103 F.2d 147, 156. The Board was represented in the hearing before its examiner by several members of its own legal staff. There is no contention by the Board that the examiner's questioning of the petitioners' witnesses was made necessary by any lack of competency on the part of the Board's counsel. Cf. National Labor Relations Board v. Washington Dehydrated Food Company, 9 Cir., 1941, 118 F.2d 980.

(2) Improper questions: The examiner extensively cross-examined witnesses who were employees of the Company petitioner concerning the provisions of the Cambria Plan and their operation, despite the fact that most of such witnesses admitted that they did not have any technical knowledge of the provisions of the Plan, and despite the fact that some of them were not eligible to participate in the Cambria organization and that none had testified under direct examination concerning the matters as to which the examiner was cross-examining them. The examiner was apparently attempting to demonstrate that the Plan would not work as a satisfactory collective bargaining method. The questions by the examiner following direct examination by counsel for the petitioners frequently far exceeded the scope of the direct examination, and in one instance went beyond the issues in the case. Often the examiner's questions sought inadmissible testimony, for example, when he asked a non-expert witness if he considered the Plan of Employees' Representation at the Cambria Plant a labor union. Obviously such a question could be answered in factual aspect only by an expert, in legal aspect only by the Board or the courts. Again, the examiner asked questions, of a lay witness for the petitioners, concerning the legal effect of provisions of the Cambria Plan, despite the fact that the Plan itself was in evidence—therefore the examiner and Board could determine its legal meaning— and numerous hypothetical questions calling for the witness' opinion concerning various states of facts which had never existed. This examination sought to put into the record a non-expert interpretation of a written document. In one instance the examiner attempted to get a witness to supply a word in his testimony which would be prejudicial to the petitioners' case.[1]

---

[1] During the course of examination of one Ryan, called by the petitioners, the witness testified that the men in the mill at the Cambria Plant had talked about one Fetzko against whom discrimination after the strike had been charged. The examiner thereupon took over the cross-examination as follows:

"Trial Examiner Bloom: What was the discussion about?

"The Witness: Well, they all wanted to know what George [Fetzko] intend-

Often counsel for the petitioners were obliged to interpose objections to the examiner's questions and the examiner was then in the position of being obliged to pass upon the propriety of the very questions which he himself was asking.

(3) Discrimination in rulings: The examiner discriminated between the petitioners and the Board in respect of cross-examination by permitting counsel for the Board to go beyond the scope of the direct examination but confining the petitioners' counsel to the limits of the direct. The examiner forbade the petitioners to put into the record written offers of proof with respect to violence and general lawlessness at the Johnstown strike, refusing even to permit a final offer on this subject to be marked as an exhibit, thus apparently attempting to deny the petitioners the right to perfect a foundation for review of the ruling that the offered testimony was inadmissible. I do not say that the ruling itself because incorrect (as I point out in topic II that it was) necessarily evidences bias. A judge or examiner may make a mistaken ruling on the admissibility of evidence without convicting himself of unfairness. But he cannot fairly deny to a party against whom he rules the right to make a record of the ruling for the purpose of an appeal.

During cross-examination of the petitioners' witness Campbell, counsel for the Board offered in evidence an unsigned article clipped from the editorial page of a Johnstown newspaper. The author was not produced by counsel for the Board to identify the article, but the examiner stated that he was "satisfied" that the alleged author, one Andrews, had in fact written it, and the examiner received it in evidence over the objection of the petitioners. Yet a later effort by counsel for the petitioners to introduce similar matter during presentation of the Board's case was not successful: During his cross-examination of the Board's witness Jordan, counsel for the petitioners offered in evidence a newspaper article (parts of which had been read into the record by counsel for the Board) which had been written by Jordan himself, and which in part at least bore on the same subject matter as portions of the above mentioned editorial article attributed to Andrews, and which had appeared in the same newspaper as the Andrews editorial. Nevertheless the exam-

---

ed to do if they come out on strike, whether he would stick with the men or stick with the C.I.O.—

"Mr. Ford [counsel for the Board]: Could I have that?

"(The reporter repeated the last question as above set forth.)

"Trial Examiner Bloom: Repeat the answer, please.

"(The reporter repeated the last answer as above set forth.)

"Trial Examiner Bloom: You don't recall saying, 'the company'?

"Mr. Shawe [counsel for the Board]: You don't recall the men saying whether George would stick with the men—

"The Witness: Stick with the men, not with the company.

"Q. (By Mr. Shawe) The men never said anything about that? A. About sticking with the company, no."

Later, after redirect examination on different subject matter had been completed, the examiner referred to the foregoing and stated that it was his recollection that the witness had said that the matter discussed was whether Fetzko would "stick with the company or stick with the men." The apparent purpose of the examiner was to prejudice the Company petitioner by implying that its employees regarded its interests as opposed to their own.

The trial examiner then stated that a "fairly substantial time elapsed" between the time when the witness said what the examiner claimed he had said and the time when the witness made the first and only statement in that regard recorded by the official reporter of the hearing. Whether or not the witness said in the first instance what the examiner claimed he had said, the incident illustrates the effort of the examiner to assist the Board in the prosecution of its case. If the witness did say what the examiner claimed he had said, the witness subsequently made it clear that he had not intended to say it, for, in response to a question of counsel for the Board as to whether the men had ever said anything about "sticking" with the company, the witness responded, "About sticking with the company, no." If, on the other hand, the witness did not say what the examiner claimed he had said, the examiner went further than did the trial examiners in the Inland Steel and Montgomery Ward cases referred to in the text in this topic. There the trial examiners kept matters out of the record. In this incident, the examiner was attempting to add prejudicial matter to the record which would not otherwise have appeared therein.

iner, upon objection by the Board's counsel, excluded this article. Moreover, although the examiner stated when he admitted the Andrews article that it was received simply to show that Andrews had made the statements (that is to say, merely as proof of the fact that the statements were made and not as proof of their truth), yet in the intermediate report the examiner used this article as proof of the facts contained in it, and the Board's decision did likewise. Thus both the examiner's limitation and the hearsay rule were ignored. It is further noteworthy that upon the faith of the contents of the Andrews article as true, rested one of the findings of the Board with respect to the Citizens' Committee, which is the subject of discussion in topic VII below.[2]

(4) Prejudging the case: Before the principal case for the petitioners was complete on the facts the examiner abetted and joined with counsel for the Board in contending that National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, decided during the progress of the hearing, was determinative of the instant case. I set out the colloquy in the margin.[3] I do not by this suggest

---

[2] The Board found "that the existence of violence and the apprehension of violence induced by newspaper reports of violence in strikes at other steel plants were two of the factors leading to the formation of the Citizens' Committee ...." In explanation of this finding, the Board said:

"It is evident from the foregoing account of the activities of the Citizens' Committee that its prime function was that of vilifying the union organization and engendering public hostility and opposition to the strikers. The Citizens' Committee considered that it could best achieve its objectives by directing its attack against the union organization and by ending the strike as soon as possible.

"This was perhaps most pungently expressed by H. G. Andrews on February 24, 1939, months after the Citizens' Committee had been active, in 'The Round Table,' a column appearing on the editorial page of the Johnstown Democrat. The column states, inter alia:

" 'There hasn't been very much testimony concerning the fact the Citizens' Committee was organized for the purpose of breaking the strike and for no other purpose. Bethlehem's Mr. Evans was never under any misapprehension as to the actual purposes for which the committee was formed. That there were at least some members of the committee who knew what they were about must be taken for granted. The job on hand, from the Citizens' Committee standpoint, was the breaking of the strike and the resumption of work in the mills. The academic members of the committee did the talking about the constitutional right of the men to work. However, that right didn't amount to two whoops in Hades unless the strike was broken.' "

[3] Mr. Shawe [counsel for the Board]: Mr. Examiner, there is also evidence in this record that the respondents have informed their employees that the Employees' Representation Plan was a legal method of collective bargaining. Now, I want to know why the respondents don't notify their employees that the Supreme Court has outlawed all those company unions. They told them it was legal. Now, since the Greyhound decision I think the respondents owe a duty to all their employees to notify them that these employee representation plans are illegal and have been outlawed by the Supreme Court of the United States.

Mr. Moore [counsel for the petitioners]: I say, Mr. Examiner, that is positively false and misleading.

Mr. Shawe: The Government will tell them.

Mr. Moore: The Supreme Court has not decided that the plan is illegal, there is nothing in the Greyhound Case that says it is.

Mr. Shawe: I would like to read from the Greyhound Case.

Mr. Moore: When the time comes, we will argue the Greyhound Case, but we are now putting in evidence, we are not arguing now.

Mr. Shawe: I would like to read this from the Supreme Court decision—

Mr. Moore: I object to it.

Mr. Shawe: "There is no provisions in the Employees' Associations made for meetings of members, nor was the procedure established whereby employees might instruct their representatives or whereby these representatives might disseminate information or reports—"

Mr. Broun [counsel for the petitioners]: Mr. Examiner—

Mr. Shawe: I would like for respondents to show me if there are any provisions in the Employees' Representation Plan which permits their employees to meet, which allows their employees to meet to discuss their problems? Why, this man has been working for the mill for twenty-eight years and I bet he has never attended a meeting under the Employees' Representation Plan.

that a judge or examiner may not properly suggest to counsel that a Supreme Court decision may bear vitally upon the issues involved in the hearing; but certainly he should not decide that such a decision is controlling on the facts before he has heard all the evidence.

I conclude that the order of the Board was vitiated by the unfairness of the examiner. I bear in mind the burden upon an examiner, especially where—as in the instant case—a hearing is lengthy, ill feeling is exhibited between counsel for the respective parties, and where the factual aspect of the case is complex and the testimony and documentary evidence voluminous. It is not easy for an examiner through such a proceeding to maintain his composure at all times and to accomplish full consistency of ruling. I bear in mind also that an examiner has—must have—broad discretion in respect of the manner of conducting a hearing, extent of cross-examination, and the like. I do not say that the examiner in this case was malevolent; and his partisanship did not especially evidence itself in sarcastic and rough treatment of witnesses, as did that of the examiners in Inland Steel Co. v. National Labor Relations Board, 7 Cir., 1940, 109 F.2d 9, and in Montgomery Ward & Co. v. National Labor Relations Board, cited above, from both of which I quote below. But that the examiner in this case was a partisan anxious for the success, and actively aiding in the development, of the Board's case, I am with regret obliged to conclude.

The Board contends that even if the examiner was biased, his bias was waived by the petitioners by failure to object and by the absence of a showing of actual prejudice. These contentions are, I think, not supportable. Objection to the bias of the examiner was made by the petitioners at the earliest time that it could be made to

---

Q. (By Mr. Shawe) Have you ever attended a meeting under the Employees' Representation Plan, Mr. Cover?

Mr. Moore: When are we going to start from argument and get down to the basis—

Mr. Shawe: It is outrageous.

Mr. Moore: The statements made by counsel are absolutely childish in every sense.

Mr. Shawe: If anything is childish it is for respondents to continue this outrage of prolonging this suit.

Mr. Moore: It is a most disgraceful thing that an Examiner will allow stuff such as this.

Mr. Shawe: I submit the Supreme Court decision handed down on February 28th covers this case like a blanket.

Trial Examiner Bloom: Mr. Moore, since you think it is outrageous for me to allow things like that, I am going to ask you specifically, have you read the Greyhound opinion of the United States Supreme Court?

Mr. Moore: I have, sir.

Trial Examiner Bloom: Would you tell me wherein the Plan—

Mr. Moore: I am not called upon to argue the case now and I am not going to. I say I studied the Plan and I know the facts in this case and I think, and I say the Greyhound Case has no bearing upon this case whatever.

Trial Examiner Bloom: All right, we will find out.

Mr. Moore: I am not called upon to argue my case now.

Trial Examiner Bloom: At the same time, I am the Examiner in this case and I am not going to sit here for another six months and take 24,000 pages of testimony on a point that may or may not be completely decided by the Supreme Court.

Mr. Moore: That's right, it is your job to rule and we will—when I have concluded—

Trial Examiner Bloom: If the respondents' counsel care to answer some questions which I am going to ask them, they may answer them. If they don't care to answer them, they don't have to answer now, that is obvious. All I want to know is, in what respect, since you have read the decision of the Greyhound opinion, since I assume you are familiar with the Plan—we will take the Cambria Plan—I would like to know in what material respects you conceive the Cambria Plan to differ from the Plan in issue in the Greyhound Case?

Mr. Moore: In the first place, I have not read the Plan in the Greyhound Case, I haven't had it. If I had had it, I am not going to express an opinion one way or the other in so far as that is concerned until I know what the differences are, but when I know what the differences are, then I will be able to find out whether, in my mind, there is any application whatever.

At the moment, I have not seen it from what is stated in the case, the facts have not been compared and this is all bunk, in my judgment, to say that the Greyhound Case decides this case. So did the Meyers Case decide this case.

Trial Examiner Bloom: No, I don't think the Meyers Case did.

anyone who might be willing, and who had the power, to correct it by ordering a rehearing before another examiner, to wit, to the Board at the time of the filing of the exceptions to the examiner's intermediate report. The requirement that in legal proceedings an objection shall be made at the time of an asserted error or otherwise be waived, is to give the judge or trial examiner, as the case may be, an opportunity to correct the error at the time of its commission and thus save a retrial. But the law does not require the doing of a futile thing. A biased examiner cannot correct his own bias. There is no cure for bias except rehearing before a fair officer. On this subject, the Circuit Court of Appeals for the Eighth Circuit said in Montgomery Ward & Co. v. National Labor Relations Board, cited above:

" . . . These matters were called to the attention of the Board in exceptions filed to the intermediate report of the examiner. They were not recognized nor rectified in any instance. We see no way in which the injustice done by this character of hearing can be righted except by setting aside the order of the Board in entirety and remanding the case to it for a new hearing before another examiner and a determination by the Board upon the record to be made upon such new hearing. The delay necessary to a new hearing is regrettable but avoidance of delay cannot justify a tolerance of violation of rights fundamental in the administration of justice." [103 F.2d at pages 156, 157.]

It was discerningly remarked in National Labor Relations Board v. Washington Dehydrated Food Company, cited above, that:

"It may truly be said that respondent made no strenuous objection to such conduct of the Trial Examiner during the course of the hearing, but such objection may not always be necessary—especially where it would be of no avail. Furthermore, 'failure of counsel . . . to object may well have been due to their feeling that that course might antagonize the Examiner to the detriment of their clients.' Cupples Co. Mfrs. v. National Labor Relations Board, 8 Cir., 103 F.2d 100, 113."

As to the contention that there was no showing of prejudice: There is a showing of prejudice in the use by the examiner and the Board of the Andrews article above described. But the law does not require objective demonstration of actual prejudice from the bias of a judge or examiner. The bias is itself prejudice, because the due process clause of the Fifth Amendment to the Constitution guarantees a fair hearing and there can be no fair hearing before a biased officer. The law does not speculate as to the consequences of bias, once it is shown. On this subject it was said in In-

land Steel Co. v. National Labor Relations Board, cited above:

"The Board argues that even though the criticism directed at the Trial Examiner be justified, yet the order should not be set aside because petitioner has failed to prove that its case was prejudiced, or that any evidence favorable to it was kept from the record. . . . To say that petitioner was not prejudiced because of the unfair and biased manner in which the case was tried by the Trial Examiner, is purely a matter of speculation." [109 F.2d at page 21.]

The Board further defends the order by pointing out that the examination of witnesses by the trial examiner covered but a small portion of the record—on a basis of pages—excluding documentary evidence, some 5%. This contention is also, I think, without merit. Once bias exists in a judicial officer, hearings before him are vitiated no matter how short the time during which the bias happened to disclose itself.

*Subpoena requirements.* The rules of the Board (Article II, Section 21) in effect at the time of the hearing in this case provided in respect of applications for subpoenas:

"Such applications [for subpoenas] shall be timely and shall specify the name of the witness and *the nature of the facts to be proved* by him, and must specify the documents, the production of which is desired, with such particularity as will enable them to be identified for purposes of production." [Rules and Regulations, Series 1, as amended, April 27, 1936] [Italics supplied]

The examiner applied this requirement in respect of a subpoena *duces tecum* and a subpoena *ad testificandum* to one McDonald, who was an official of the Steel Workers Organizing Committee, hereafter for convenience referred to as S.W.O.C. and a person therefore not likely to be willing to be a voluntary witness for the petitioners. And not only was the requirement of specification of the nature of the facts to be proved enforced by the examiner as a condition precedent to the issuance of the subpoenas, but also the examiner declined to issue the subpoena to McDonald for the reason that he, the examiner, did not "think the matters sought to be proven are particularly relevant to these proceedings." The ruling by the examiner was sustained by the Board. Moreover, the requirement that subpoenas should state the nature of the facts to be proved was applied unilaterally, that is, against the petitioners, and not in respect of subpoenas issued at the instance of the Board itself.

The right of every citizen in both civil and criminal cases to have compulsory

process for the attendance of witnesses is an essential feature of the Anglo-American legal system. 8 Wigmore, Evidence (3d ed.1940) §§ 2190-1. The Sixth Amendment to the Constitution expressly preserves that right in criminal cases. And in both civil and criminal cases the right to compulsory process is one which inheres in the concept of due process of law preserved to all persons under the Fifth Amendment. Cf. Powell v. Alabama, 1932, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527. So absolute is the duty of every person to appear and give testimony on matters within his knowledge when subpoenaed that the witness himself cannot refuse to appear and testify on the ground that the evidence sought of him is immaterial or irrelevant. Nelson v. United States, 1906, 201 U.S. 92, 115, 26 S.Ct. 358, 50 L.Ed. 673. It is of course true that the right to process, like other rights, guaranteed by the Constitution, is not absolute. Reasonable conditions can be attached to constitutional rights. A familiar example is the requirement of the payment by persons not appearing *in forma pauperis* of a moderate fee as a condition of the right to a jury trial, and the requirement that a demand for a jury be made seasonably in advance of the date of trial. These requirements of fee and seasonable demand are made, respectively, in order to assist the state in meeting the expense of jury trials, and to serve the convenience of both court and jury. Seasonable application for the issuance of process may be required, again, for the purpose of avoiding delay in trials. Neufield v. United States, 1941, —— App.D.C. ——, 118 F.2d 375. And the condition requiring specification of documents in the subpoena *duces tecum* was not an unreasonable protection of the convenience of the custodian of the documents.

But no conditions can be attached to a constitutional right which will defeat or materially limit it. And to require statement of the nature of a witness' testimony or the nature of documents as a condition precedent to obtaining a subpoena will in many instances defeat the right to process, especially where a witness is probably hostile. Parties or their counsel seeking evidence are not always able to know the nature of supposedly available testimony without first talking to the proposed witness, and may not be able to talk with him unless his attendance can be compelled by process. Moreover, to require a party applying for a subpoena to disclose the nature of the facts to be proved has the necessary effect of compelling such a party either to rely upon voluntary witnesses or to disclose to the Board in advance the strategy and plans for the conduct of his defense. A lawsuit or Board hearing is of course not a game, but it is certainly a controversy. For the Board thus to obtain advance knowledge of the case of a party on trial before the Board, when that party can have no advance knowledge of the Board's case, is contrary to elementary principles of fair play. Under the National Labor Relations Act the Board is not only judge, it is also party and prosecutor. It signs the complaint charging the unfair labor practices and then through its counsel prosecutes the case before its examiner and itself. In order to perpetuate testimony or to prevent surprise and to save the time of parties and tribunal by eliminating unnecessary issues discovery of evidence in advance of trial is permitted in civil proceedings in many states and under the Federal Rules of Civil Procedure for the District Courts of the United States (Rules 26 and 34), 28 U.S. C.A. following section 723c, but it is allowed to both parties to the suit.

To attach as a condition precedent to the obtaining of process a showing of the relevancy of the testimony sought is to put the issuance of subpoenas within the discretion of the issuing officer or Board because—and this is especially true in cases where issues are as broad as in the instant type of case—whether testimony is relevant or not is often a close question. I point out later in this opinion that the offered testimony of McDonald was relevant; but because the examiner and the Board thought it was not, the petitioners were denied process against McDonald, and thus denied the right of presenting a proper part of their defense to the Board's charges.

The unilateral application of the rules with respect to subpoenas is also, in my opinion, indefensible. There is no more elementary proposition in Anglo-American law than that the Government itself in its prosecution in its own tribunals of cases against the citizen shall be on terms of equality with the citizen before the law; and this applies not only to substantive but also to procedural rules. In Inland Steel Co. v. National Labor Relations Board, cited above, the Seventh Circuit Court of Appeals, in referring to the requirement of the Board that an application for subpoenas

made by a party must state the nature of the facts to be proved by the witness, said:

". . . a burden was placed upon one side which did not exist as to the other in the matter of obtaining witnesses. The situation may be aptly stated thus: Petitioner, in order to obtain a subpoena, was required to present to its opponent an application therefor with notice as to what it expected to prove by the witness desired to be subpoenaed. Thus, it was within the discretion of the Board (the prosecutor, if not a party) to determine when process should issue in favor of the one to be condemned." [109 F.2d at page 19.]

The court held the requirement unwarranted, and in part a basis for reversal for denial of fair hearing.

The Board defends the subpoena requirements not as such but by asserting that there was no showing of prejudice as a result of them. It is true that so far as the subpoena *duces tecum* was concerned, the documents were otherwise obtained. But to require a showing of prejudice would put the party applying for a subpoena in an impossible situation. Often he would be unable to show the prejudice unless he could obtain the witness and thereby ascertain the nature of his testimony; and often he would not be able to obtain the witness without the process. This same point was made by the Board in Inland Steel Co. v. National Labor Relations Board, and was disposed of as follows:

". . . It is further argued by the Board that petitioner's complaint is without merit because there is no showing that evidence favorable to it was excluded. This argument begs the question. We are not now considering the extent to which petitioner was prejudiced, but whether it was, by such procedure, deprived of a substantial right, or whether the procedure employed placed it at a disadvantage in contrast with its opponent." [109 F.2d at page 19.]

It is further urged by the Board that the conditions attached to the issuance of subpoenas are designed to prevent "obstructive tactics" and other abuse of the Board's subpoena power by parties, and that it is not necessary to apply such conditions to the Board's agents because the Board has ample supervisory power to prevent improper conduct by them. This is the familiar argument that the king can do no wrong. It has not met with favor in Anglo-American courts.

I therefore conclude that the order of the Board was vitiated not only by the unfairness of the examiner but also by the requirements concerning subpoenas, and that therefore, no matter what the inconvenience or delay, the order should be set aside and a new hearing had before another examiner and in the absence of the subpoena requirements mentioned. The essentials of justice can not be foregone for sake of expediency.

## II

### MOTION TO ADDUCE EVIDENCE

(1) As a part of its defense to the charge of domination and interference with the formation and administration of the Cambria Plan the petitioners sought to ask a series of 150 questions of each of a number of Employees' Representatives including one who was also Chairman of the General Body at the Cambria Plant, one who was also Secretary of the General Body, and one who was a former Secretary. These questions were intended to adduce testimony to the effect that no domination or interference occurred under the Plan.

By the first 126 of these questions the petitioners sought to prove that the witness was not influenced in any way in taking, or in refraining from taking, any action relating to the terms or conditions of employment of the employees—or relating to the formation or amendment of the Plan or to its administration or operation, or relating to the self-organization of the employees for the purpose of bargaining collectively or for other mutual aid or protection, or to the engaging by the employees in concerted activities for such purposes, or to bargaining collectively by such employees through representatives of their own choosing—by any one of 21 different facts, such as the fact that the witness was at any time paid by the petitioners, and not by the Plan or by someone else, for time spent conferring with other employees or with other Employees' Representatives or with representatives of the management, on matters relating to the employment of the witness or anyone else. There are set out in the margin the 20 other facts which were alluded to in the first 126 questions.[4] By questions

---

[4] These facts were:

1. That the witness was at any time paid by Bethlehem Steel Company and not by the Plan or by someone else for time spent by him in attending meetings held under the Plan.

2. That the witness was paid at any time by Bethlehem Steel Company and not by the Plan or by someone else for time spent by him in working on nominations and elections.

3. That Bethlehem Steel Company and not the Plan or someone else furnished a dinner without charge to those who at-

127 to 150 the petitioners sought to prove that no one whom the witness knew, or thought, was a representative of the petitioners or was acting in a supervisory capacity for them, ever in any way interfered with, restrained, coerced or dominated the witness in taking, or refraining from taking, any action relating to the terms or conditions of employment of the employees or relating to the formation or amendment of the Cambria Plan or to its administration or operation, or relating to the self-organization of the employees for the purpose of bargaining collectively or for other mutual aid or protection, or relating to the engaging by the employees in concerted activities for such purposes, or to the bargaining collectively by such employees through representatives of their own choosing. To these questions, upon the ground that they called for a conclusion of the witness, the examiner sustained objections made by counsel for the Board.

I think this ruling was erroneous. State of mind, intent, motive, reason for action and the like, when as a matter of substantive law in issue, can be testified to by a lay witness possessed of knowledge on the subject, and though there is some division of authority, such testimony is under the better view not objectionable upon the theory that it "usurps the function" of the trier of fact in respect of the ultimate issue in the case. 7 Wigmore, Evidence (3d ed.1940) §§ 1917–29; and see id. § 1963. And the state of mind, intent, motive, reason for action

---

tended the Annual Conferences and paid the witness and other employees for time spent there.

4. That the witness was paid at any time by Bethlehem Steel Company and not by the Plan or by someone else for time spent by him in connection with any action taken by him under the Plan.

5. That representatives of the management of Bethlehem Steel Company were at any time present at any Annual Conference or meeting of any Committee, Joint Committee, or the General Body, under the Plan.

6. That meetings of the General Body and of the various committees under the Plan were at any time held on property of Bethlehem Steel Company without charge to the Plan.

7. That meetings of the General Body and of the various committees under the Plan were at any time held on the property of Bethlehem Steel Company instead of off such property.

8. That Bethlehem Steel Company and not the Plan or someone else at any time provided one or more rooms for use as headquarters of the Plan.

9. That the headquarters of the Plan were located on property of Bethlehem Steel Company instead of off such property.

10. That at any time the printing or typewriting of notices, ballots and other printed or typewritten material for use in connection with nominations and elections held under the Plan was done at the expense of Bethlehem Steel Company and not of the Plan or someone else—and the fact that all other materials that were used in connection with the holding of such nominations and elections in any year were furnished by that Company and not by the Plan or someone else.

11. That Bethlehem Steel Company furnished voting lists for use at nominations and elections held under the Plan in any year.

12. That Bethlehem Steel Company and not the Plan or someone else paid for transportation and labor in connection with the setting up of voting places within the Plant for nominations and elections held under the Plan in any year.

13. That Bethlehem Steel Company and not the Plan or someone else at any time mimeographed or paid for the mimeographing of minutes of meetings held under the Plan.

14. That Bethlehem Steel Company and not the Plan or someone else at any time paid for the time of a stenographer or a clerk who took notes at meetings held under the Plan and used them in writing up minutes of such meetings.

15. That Bethlehem Steel Company at any time permitted minutes of meetings to be delivered through the interplant delivery service at the Cambria Plant.

16. That minutes of meetings held under the Plan were at any time posted on bulletin boards in the Cambria Plant.

17. That Bethlehem Steel Company and not the Plan at any time printed or paid for the printing of schedules of meetings to be held under the Plan.

18. That Bethlehem Steel Company and not the Plan or someone else at any time printed the Plan.

19. That Bethlehem Steel Company and not the Plan or someone else furnished all stationery and other supplies that were used by the Plan.

20. That nominations and elections held under the Plan were at any time held on the property of Bethlehem Steel Company instead of off such property.

and the like of a particular person may be established not only by the testimony of other persons but also by the testimony of that person himself. And see Note (1910) 23 L.R.A.,N.S., 367, 372 et seq. Objection made to this class of testimony, when given by the person himself, on the ground that, since his own state of mind can be known only to him, his possible falsification cannot be refuted, is without sound foundation. Wigmore, op. cit. supra, § 1965. Such an objection goes to weight, not to competency. Similarly, an objection that such a person cannot be an accurate judge of his own state of mind goes to weight alone. "The state of mind of a person, like the state or condition of the body, is a fact to be proved like any other fact when it is relevant to an issue in a case, and the person himself may testify directly thereto." 20 Am.Jur. 312, § 335. And cf. Crawford v. United States, 1909, 212 U.S. 183, 202, 29 S.Ct. 260, 53 L.Ed. 465, 15 Ann.Cas. 392. Under this general principle a witness may testify as to the existence of influence on his mind. 22 C.J. 610-1, § 704. International Land Co. v. Parmer, 1909, 58 Tex. Civ.App. 70, 123 S.W. 196; Grever v. Taylor, 1895, 53 Ohio St. 621, 42 N.E. 829. In the instant case, whether the Employees' Representatives were wrongfully influenced in respect of and by the matters or persons referred to in the questions, was in issue under the charge of domination and interference with the formation and administration of the Cambria Plan. The gist of this issue was: What was the state of the will of the Employees' Representatives—was it in subjection to the will of the petitioners, or was it not? I point out under topic IV below that by "domination" and "interference" in the National Labor Relations Act is meant corruption or overriding of the will.

That the error in excluding this testimony was prejudicial cannot I think be doubted. The Board introduced evidence intended to prove actual domination under the Cambria Plan. The petitioners had a right to rebut it.

(2) In partial defense to the charge of domination and interference with the labor organizations comprised in the Plans the petitioners attempted to introduce in evidence exhibits marked for identification Nos. 251 and 252, and sought also to obtain the issuance of a subpoena *ad testificandum* to one David J. McDonald, Secretary-Treasurer of S.W.O.C. Exhibit No. 251 purported to be a collective bargaining agreement between S.W.O.C. and the Carnegie Illinois Steel Corporation. The petitioners asserted that the Board in National Labor Relations Board v. Republic Steel Company, 1938, 9 N.L.R.B. 219,[5] had characterized the signing of that agreement as an "event of historic importance in the steel industry," and had quoted Clinton Golden, Regional Director of S.W.O.C. and the person who signed the charge in the instant case, as having referred to the agreement as the "standard collective bargaining contract" of S.W.O.C. Exhibit No. 252 purported to be an agreement between the United Automobile Workers and the General Motors Corporation and to be in terms substantially identical with the agreement Exhibit No. 251. The petitioners sought to prove by McDonald the date of execution, scope, duration, terms, and other provisions of each of these agreements and any amendments or modifications or supplements thereof, and the meaning and application of the provisions as construed and applied by the parties to such agreements; and the petitioners sought to show that the procedure provided for in the Plans was similar in essential elements to that under these agreements. The examiner refused to receive the exhibits in evidence and refused to issue the subpoena to McDonald. The Board affirmed this ruling upon two grounds: first, upon the theory that the contents of the agreements and the testimony of McDonald were irrelevant to the issue in the instant case as to domination and interference by the petitioners, since the Carnegie Illinois Steel Corporation and the General Motors Corporation were not parties in the instant case; and second, upon the theory that the Board was considering the provisions of the Plans in the light of the Plans as a whole and in the light of the history of their origin and of a long course of interference, and that similarity of the provisions of the Plans to any of the provisions of the Carnegie Illinois Steel Corporation or General Motors Corporation agreements would be of little value. The Board did not exclude the two exhibits or the testimony of McDonald upon the ground that collateral issues would be raised.

I think the examiner's ruling and the Board's confirmation thereof were erroneous. As to the first ground of exclusion—

---

[5] See pages 243, 246.

if, as the petitioners sought to prove, the Board in the Republic Steel case had given its *imprimatur* to the Carnegie Illinois Steel Corporation and General Motors Corporation agreements, and if, as the petitioners sought further to show, the provisions and practices under such agreements were essentially the same as the provisions in and the practices under the Plans, then the approval given by the Board to the Carnegie Illinois Steel Corporation and General Motors Corporation agreements constituted in effect relevant expert approval of the Plans and their application as standard collective bargaining agreements and thus tended to confute the Board's charge against them. The second ground of exclusion was not meritorious because the offered testimony of McDonald would have shown not merely the structure of the agreements referred to, but also their application. This objection went to weight, not to admissibility. The Board having introduced evidence intended to prove that the Plans and the procedure thereunder dominated and interfered with the labor organizations comprised in the Plans, the exclusion of the exhibits and of the testimony of McDonald was denial of the right of the petitioners to rebut the Board's case, and was hence prejudicial error.

(3) In paragraph 15 of the complaint the Board charged that the petitioners, through their officers, agents and representatives had, during the strike of employees called by S.W.O.C. at the Cambria Plant, Johnstown, Pennsylvania, engendered, expressed and publicized opposition and hostility to S.W.O.C., its leaders, organizers and members; and the Board introduced evidence intended to prove that this was done by the petitioners through the formation and activities of a Citizens' Committee at Johnstown. To rebut this evidence the petitioners endeavored to introduce testimony showing general and extreme violence in Johnstown and vicinity during the period of the strike. When certain testimony had been elicited from the petitioners' witness Lawrence to the effect that there had been some civil disorder at Johnstown, the trial examiner interrupted and ruled that no further evidence would be received in the case concerning violence. The petitioners' counsel objected to the ruling and attempted to make a written offer of proof. The examiner would not even permit this to be marked or to go into the record. In several other instances during the hearing, the examiner forbade the petitioners to introduce testimony intended to show general and extreme violence in Johnstown and vicinity. The examiner's rulings were confirmed by the Board. As shown by an offer of proof printed in an appendix to the motion to adduce, the petitioners intended to call witnesses to show that there was a complete breakdown in law and order in Johnstown and vicinity. The items of violence sought to be proved were assaults and batteries of various types, trespasses on Company and other property, dynamiting, shooting, overturning automobiles, throwing stones and other missiles, breaking windows, stripping one man of all of his clothes in the middle of the night and ejecting him from an automobile into a public street, and general vandalism, together with an absence of adequate police protection. The ruling of the examiner was apparently made upon the ground that he had already determined in his own mind, and would recommend a finding by the Board, that there had been violence in Johnstown. He did so recommend and the Board did so find. The reasoning apparently was that a finding of violence in favor of the contention of the petitioners that there was violence—the Board having originally contended to the contrary—made further testimony on the subject unnecessary.

This ruling against the petitioners by the examiner and the Board was in my view erroneous for the reason that it failed to distinguish between the issue as to the mere fact of violence and the issue as to the extent and generality thereof. This the petitioners desired, and had a right, to show in rebuttal as tending to prove that the formation and activities of the Citizens' Committee were the natural response of citizens to the extreme and general violence and the breakdown in law enforcement, rather than to the influence of the petitioners.[6] Since the Board introduced ev-

---

[6] Peculiarities of the rulings of the examiner in this aspect of the case may be illustrated: One Stein, an employee of and witness for the petitioners, described upon direct examination an attack made on him while on his way to work. It appeared from cross-examination that he was not able to identify his assailants, and for that reason the examiner struck out all of his testimony and refused to allow counsel for the petitioners to make an argument in opposition to that ruling. Since the purpose of the testimony was to show merely the extent and sev-

dence to prove the charge, and ultimately, as I point out in topic VII below, found against the petitioners under the charge, the exclusion of the offered testimony was prejudicial.

(4) In further rebuttal of the evidence introduced by the Board under its charge in paragraph 15 of the complaint, the petitioners produced as witnesses members of the Citizens' Committee and representatives of the Company petitioner and asked them questions designed to elicit testimony to the effect that there was no accessory connection between the petitioners and the Citizens' Committee. Objections to some of these questions were sustained by the examiner upon the ground that they called for an inadmissible conclusion. Some of the rulings made on such ground were technically correct. For example, the question was asked: "Was there any connection in any way between Bethlehem Steel Company or Bethlehem Steel Corporation and the Citizens' Committee?" Whether there was such a connection was a conclusion to be drawn by the trier of fact from the evidence concerning the activities of the Committee, and concerning its contacts or transactions or the absence thereof, with the petitioners. By inference therefrom the issue as to accessory connection would be determined.

But many of the questions did seek testimony as to the activities of the Committee, and as to its contacts or transactions or the absence thereof, with the petitioners. Thus: "Did the Citizens' Committee or the Executive Committee, acting for the Citizens' Committee, or any official acting for the Citizens' Committee, have any business transactions with the Bethlehem Steel Company or Bethlehem Steel Corporation?"; "Did Mr. Evans [Management's Representative at the Cambria Plant] or Mr. Ellicott [the general manager of the Cambria Plant] or any other Representative of Bethlehem Steel Company or Bethlehem Steel Corporation at any time take any part in the transaction of any business that was transacted by the Citizens' Committee or the Executive Committee?" The answers to such questions were improperly excluded so far as competency was concerned.

Again, the examiner excluded the answer to such questions as the following: "Did the Citizens' Committee directly or through any committee at any time take any action or do anything for the purpose or with the intent of helping [or designed to help] Bethlehem Steel Company as distinguished from any other business interest or property owner whether located in Johnstown or elsewhere?"; "In taking any action or in doing anything or in refraining from taking any action or doing anything did you, as a member of the Johnstown Citizens' Committee or of its Executive Committee, ever act for the purpose of aiding, helping or benefiting Bethlehem Steel Company or Bethlehem Steel Corporation as distinguished from any other interest or other property owner whether located in Johnstown or elsewhere?" The examiner's rulings were confirmed by the Board. Such questions were permissible, so far as competency was concerned, within the rule alluded to in subtopic (1) of this topic wherein it is pointed out that the testimony of a witness as to state of mind, intent, motive, reason for action and the like, is not an inadmissible conclusion. The examiner did not rule against any of the questions, which I have above indicated were proper, upon the ground that the answers were not within the knowledge of the witness.

The testimony sought to be elicited by these questions was relevant under the issue of accessory connection between the petitioners and the Citizens' Committee and its activities. Therefore the rulings were prejudicial in denying the petitioners an opportunity to rebut the evidence introduced against them. The Board ultimately found that:

"... The Company was thus implementing and strengthening an agency which was seeking to defeat the efforts of the union organization and to destroy that organization by creating hostility toward it.

"... the Company tried to utilize the apparent impartiality of the Citizens' Committee as a means of interfering with the self-organization and concerted activities of its employees. ..."

The Board defends its action and that of the examiner in respect of the foregoing rulings by pointing out that in its decision it stated: "We do not find that the respondents [petitioners] induced or participated in the formation of the Citizens' Committee." But this evades the real question in this aspect of the case. The rejected testimony was not offered merely to defend

---

erity of the violence and not to fix personal responsibility therefor, the identity of the witness' assailants was immaterial

and should not have operated to exclude the testimony.

against the charge that the petitioners had induced or participated in the formation of the Citizens' Committee, but also and particularly to defend against the charge that the petitioners had actuated the activities of the Committee after its formation.

In respect of the rulings of the examiner and their confirmation by the Board concerning the admissibility of evidence, it is to be commented that the National Labor Relations Act provides that in proceedings before the Board "the rules of evidence prevailing in courts of law or equity shall not be controlling." (Section 10(b) ) The record is filled with hearsay and opinion evidence, cross-examination beyond the scope of the direct, and other matter admitted in violation of the rules of evidence, in support of the Board's case. This is to be contrasted with the application of the strict rules of evidence against the petitioners— sometimes with technical correctness (as I comment above in subtopic (4) of this topic II) and at other times incorrectly. If the rules of evidence are to be relaxed in the proceedings of an administrative tribunal such as the Board, the relaxation should in fairness be equal. The Board should not lower adjective requirements to aid its own case and put them up again with the effect of keeping out of the record the evidence offered by a party charged with violation of the Act. Section 10(b) does not purport to apply to the Board's case only. It is worthy of note in this connection that although the examiner excluded the inadmissible conclusions of the witnesses which I have just alluded to, he nevertheless, as I point out in topic I, permitted counsel for the Board to cross-examine lay witnesses as to the meaning of provisions of the Plans, and thus to ask them to determine questions of law.

The objection of the Board that the motion to adduce was not timely filed is not, I think, well taken. On October 7, 1940, this court denied the motion of the petitioners to supplement the record. The nature and purpose of that motion, and the allegations in the petition for review upon which it was based were such that if the motion to supplement was sustained the order of the Board must have been set aside and the hearing held over again before the Board, in which event the motion to adduce would have been unnecessary. It was therefore not possible to file the motion to adduce until after action upon the motion to supplement. The motion to adduce was filed on November 9, 1940, thus within approximately one month after the court denied the motion to supplement.

I think, therefore, that the order of the Board should be set aside because of the denial to the petitioners of a right to present evidence material to their defense of the Board's charges, and that a rehearing should be ordered with directions to admit therein the testimony erroneously excluded in the present hearing.

### III

#### FORM OF THE FINDINGS

Section 10(c) of the Act requires the Board to state findings of fact. I think the decision of the Board does not comply with the requirements of the Supreme Court and of this court in respect of findings of fact, and accordingly I think that its form should not have the approval of the court. The decision is an intermixture of charges, evidence, argument, inference, opinion, recitals of underlying facts and findings of ultimate facts. It is further rendered confusing by failure almost wholly to distinguish between the several Plans, although the evidence with respect to most of them is limited and there is no testimony except with respect to one of them. The requirements concerning the form of findings, stated by the Supreme Court in United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., 1935, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023, United States v. Baltimore & Ohio Railroad, 1935, 293 U.S. 454, 465, 55 S.Ct. 268, 79 L.Ed. 587, and Florida v. United States, 1931, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291, and stated by this court in Saginaw Broadcasting Company v. Federal Communications Commission, 1938, 68 App.D.C. 282, 96 F.2d 554, certiorari denied 1938, Gross v. Saginaw Broadcasting Co., 305 U.S. 613, 59 S.Ct. 72, 83 L.Ed. 391, and in Tri-State Broadcasting Company v. Federal Communications Commission, 1938, 68 App.D.C. 292, 96 F.2d 564, are not formalistic in purpose. On the contrary, as said by Mr. Justice Cardozo, speaking for the Supreme Court in United States v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co., supra: "We must know what a decision means before the duty becomes ours to say whether it is right or wrong." And as this court said in the Saginaw Broadcasting case, the requirement that findings be made in terms of both basic and ultimate facts "is . . . far from a technicality. On the contrary, it is to insure against Star Chamber meth-

ods, to make certain that justice shall be administered according to facts and law." Such findings as were made in the instant case were condemned in National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 1938, 97 F.2d 13, where the court said:

"The finding of facts of the Board is not in the proper form. It has mingled therein statements of witnesses and expressions of opinion. No reference should be made to the evidence nor any discussion injected into the ultimate finding of facts upon which the Board rests its order. There should be a clean-cut statement of the ultimate facts without incorporating therein the evidence or the reasoning by which the Board arrived at its finding. If the Board desires to discuss or emphasize any part of the evidence or give its reason for its findings, it should do so in the form of an opinion or memorandum which should not be incorporated into, or connected with, the special finding of facts." [97 F.2d at page 13.]

I think proper findings should be required of the Board before a decision in this court.

## IV

### Principles of Proof and Review

In the foregoing topics I have indicated that in my opinion the case ought not be decided on the present record but should be returned to the Board for a rehearing and properly cast findings. But, as stated at the outset, it is my further view that even if fair hearing, proper admission of testimony in support of the petitioners' defense, and findings in proper form be assumed—assuming, that is, a basis on the present record for consideration of the case on its merits—still there is no foundation for the findings and order of the Board. And I proceed now to set out my reasons for this view. But before doing so, I think it necessary to state certain well established principles governing the determination of such cases as the instant case and judicial review thereof:

In determining whether or not charges have been proved, that is, in determining the questions of fact in a case, a trier of fact takes two steps: one, determination, from consideration of the evidence, of the underlying or subsidiary facts in the case; the other, determination from such facts of the question whether the ultimate facts charged have been established. And, under the system of law guaranteed by our Constitution, the subsidiary facts must be reached from the evidence and the ultimate facts from the subsidiary facts, not arbitrarily or by assumption or conjecture or by a process contrary to reason, but according

to reason. Although, as said in National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 271, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307, inferences are to be drawn by the trier of fact and not by the courts, the inferences must nevertheless be reasoned inferences. And it is the duty of the reviewing tribunal to see that they are, otherwise the case is not decided according to law. "The primary question presented for our determination is whether or not the findings of the Board find support in the record and are not arbitrary and capricious." Union Drawn Steel Co. v. National Labor Relations Board, 3 Cir., 1940, 109 F.2d 587, 589. Under the Federal rule findings must be supported by substantial evidence, and substantial evidence is "more than a scintilla and must do more than create a suspicion of the existence of the fact to be established." National Labor Relations Board v. Columbian Enameling & Stamping Co., 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660. In Consolidated Edison Company v. National Labor Relations Board, 1938, 305 U.S. 197, 229, 330, 59 S.Ct. 206, 83 L.Ed. 126, the Supreme Court put it thus:

". . . the statute, in providing that 'the findings of the Board as to the facts, if supported by evidence, shall be conclusive,' means supported by substantial evidence. Washington, V. & M. Coach Co. v. National Labor Relations Board [1937] 301 U.S. 142, 147, 57 S.Ct. 648, 81 L.Ed. 965. Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. [Citing authorities] . . .

". . . desirable flexibility in administrative procedure does not go so far as to justify orders without a basis in evidence having rational probative force. . . ."

There are of course cases, and the instant case is one such, in which, because the subsidiary facts are undisputed, the function of the trier of fact is limited to the second step above mentioned of determining whether from the admitted subsidiary facts the ultimate facts are reasonably to be inferred. To safeguard the integrity of findings of ultimate fact arrived at by inference, the law has established certain principles with reference to the dependability of inferences: (1) An inference to be reasonable must be warranted from all the evidence, otherwise a fact reasonably inferable from a single fact or group of facts might be inconsistent with the totality of proven or conceded subsidiary facts. As said in National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 1938, 99 F.2d 153,

177, where the court interpreted the meaning of Section 10(e) of the National Labor Relations Act, providing that "the findings of the Board as to the facts, if supported by evidence, shall be conclusive":

"But the courts have not construed this language 'as compelling the acceptance of findings arrived at by accepting part of the evidence and totally disregarding other convincing evidence."

In short, a trier of fact may not ignore a part of the evidence.[7] (2) If two equally probable but inconsistent inferences may be drawn from the same facts, a finding of fact cannot reasonably be based upon either of them; in such a situation the evidence is equivocal. Pennsylvania Railroad Co. v. Chamberlain, Administratrix, 1933, 288 U. S. 333, 53 S.Ct. 391, 77 L.Ed. 819;[8] Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 1939, 106 F.2d 100. As illustrated in the Cupples Co. case:

"The evidence that the Company welcomed the organization of an independent union of its employees and preferred such a union to any other, and made haste to recognize the Association as the sole bargaining representative for all of its employees, is not a sufficient factual basis for the finding of interference, domination and support. This for the reason that, while such evidence is consistent with the hypothesis that the formation and administration of the independent union was interfered with, dominated and supported by the Company, it is not inconsistent with the contrary hypothesis, and therefore supports neither." [106 F.2d at page 114.]

(3) Where two different inferences may be drawn from undisputed facts, that which is the more probable is the one which must be drawn. National Labor Relations Board v. Sands Mfg. Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 1938, 93 F.2d 985. (4) A fact may not be inferred from a proven fact or facts where unimpeached and uncontradicted testimony consistent with such proven fact or facts but inconsistent with the fact sought to be inferred, is in the record. Pennsylvania Railroad Co. v. Chamberlain, Administratrix, supra; Cupples Co. Manufacturers v. National Labor Relations Board, supra;[9] Foote Bros. Gear & Machine Corporation v. National Labor Relations Board, 7 Cir., 1940, 114 F.2d 611.[10] This proposition was phrased as follows in the Pennsylvania Railroad case:

"And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts, and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist. . . . A rebuttable inference of fact, as said by the court in the Wabash Railroad case [Wabash R. Co. v. De Tar, 8 Cir., 1905, 141 F. 932, 935, 4 L.R.A.,N.S., 352], 'must necessarily yield to credible evidence of the actual occurrence.' And, as stated by the court in George v. Missouri Pac. R. Co. . . . [1923, 213 Mo.App. 668, 674, 251 S.W. 729, 732], 'It is well settled that where plaintiff's case is based upon an inference or inferences, that the case must fail upon proof of undisputed facts inconsistent with such inferences.' . . ." [288 U. S. at page 340, 53 S.Ct. at page 394, 77 L.Ed. 819.]

It is true as commented in topic II that under the National Labor Relations Act the rules of evidence prevailing in courts of law are not to be controlling in the hearings conducted by the Board. But the rules of

---

[7] In National Labor Relations Board v. Thompson Products, Inc., 6 Cir., 1938, 97 F.2d 13, 15, the court said in respect of Section 10(e) of the Act: "It means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction. . . . Testimony is the raw material out of which we construct truth, and, unless all of it is weighed in its totality, errors will result and great injustices be wrought."

[8] In this case the Court said: "We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover [citing authorities]." 288 U.S. at page 339, 53 S.Ct. at page 393, 77 L.Ed. 819.

[9] The court there stated: "evidence which merely furnishes grounds for suspicion and conjecture proves nothing, and . . . the Board, like a jury, may not disregard the uncontradicted testimony of unimpeached and credible witnesses." (106 F.2d at page 105.)

[10] The court said in that case: "In reaching our conclusion we wish to make it clear that . . . (c) A statement which alone may afford substantial support for a fact finding may lose its weight entirely in the face of uncontradicted facts inconsistent with it. . . ." (114 F.2d at page 622.)

logic and reasoning which are necessary to the accomplishment of the type of adjudication guaranteed under our system of law must be applied by the Board, as by any trier of fact, in reaching its findings. Consolidated Edison Company v. National Labor Relations Board, 1938, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 1938, 97 F.2d 951; National Labor Relations Board v. Bell Oil & Gas Co., 5 Cir., 1938, 98 F.2d 406; Cupples Co. Manufacturers v. National Labor Relations Board, supra; Magnolia Petroleum Company v. National Labor Relations Board, 5 Cir., 1940, 112 F.2d 545.

It is further to be borne in mind, in considering the merits of the instant case on the present record, that the words "interference," "restraint," "coercion," and "domination," as used in such a statute as the National Labor Relations Act, have an established meaning. As was said by the Supreme Court, speaking through Chief Justice Hughes, in Texas & New Orleans Railroad Company v. Brotherhood of Railway & Steamship Clerks, 1930, 281 U.S. 548, 568, 50 S.Ct. 427, 74 L.Ed. 1034, concerning the meaning of the words "interference," "influence" and "coercion" in the Railway Labor Act of 1926, 45 U.S.C.A. § 151 et seq., of which the National Labor Relations Act is an outgrowth, and which in respect of carriers and their employees provided that representatives "shall be designated by the respective parties . . . without interference, influence, or coercion exercised by either party over the self-organization or designation of representatives by the other":

"The intent of Congress is clear with respect to the sort of conduct that is prohibited. 'Interference' with freedom of action and 'coercion' refer to well understood concepts of the law. The meaning of the word 'influence' in this clause may be gathered from the context. *Noscitur a sociis.* Virginia v. Tennessee, 148 U.S. 503, 519, 13 S.Ct. 728, 37 L.Ed. 537. The use of the word is not to be taken as interdicting the normal relations and innocent communications which are a part of all friendly intercourse, albeit between employer and employee. 'Influence' in this context plainly means pressure, the use of the authority or power of either party to induce action by the other in derogation of what the statute calls 'self-organiza-

tion.' The phrase covers the abuse of relation or opportunity so as to corrupt or override the will, and it is no more difficult to appraise conduct of this sort in connection with the selection of representatives for the purposes of this Act than in relation to well-known applications of the law with respect to fraud, duress and undue influence."

I have been at pains to set out the foregoing principles—which are so well settled that their iteration would ordinarily be supererogation—because in my opinion it is for lack of due recognition and application of them that the instant case was wrongly decided by the Board on its merits on the present record.

## V

### DOMINATION AND INTERFERENCE

I think there is no lawful foundation for the ultimate finding of the Board that the petitioners dominated and interfered with the formation and administration of labor organizations of their employees, in contravention of Section 8(2) of the Act. I think that there is therefore no warrant for the order to cease and desist from domination and interference and no warrant for the order of disestablishment.

The subsidiary facts by inference from which the Board's ultimate finding must be justified are largely without dispute. They relate to three main topics, the origin, the structure, and the operation of the Plans.

*Origin of the Plans.* The Plans at the Bethlehem, Maryland, Steelton, and Lebanon Plants came into existence as the result of a proceeding before the War Labor Board, an agency of the Government during World War I. On July 31, 1918, that Board found that the absence of a system of collective bargaining at the Bethlehem Plant had been productive of unrest among certain employees, and made a finding that such a system should be instituted at that Plant. The Company petitioner therefore set about formulating and introducing not only into the Bethlehem Plant but also into its other Plants above named, a plan of employees' representation intended to serve as a method of collective bargaining. With the advice and assistance of W. L. Mackenzie King,[11] who had been Minister of Labor of Canada and is now Prime Minister, the Company prepared a form of plan and,

---

[11] William Lyon Mackenzie King, Deputy Minister of Labour of Canada, and Editor of the Labour Gazette, 1900–08; Minister of Labour of Canada, 1908–11; President of General Reform Association of Ontario, 1912–14; engaged upon investigation of industrial relations under auspices of Rockefeller Foundation, 1914–17; author of "Industry and Humanity—A Study in the Principles underlying Industrial Reconstruction," published in 1918.

prior to October 1, 1918, posted the following notice in the Bethlehem, Maryland, Steelton, and Lebanon Plants:

"Effective October 1, all employees of this plant in hourly, turn, tonnage contract and piecework rates, will be paid on a basis of time and half time for work in excess of eight hours on any day.

"It is also desired to provide ways and means of meeting with and bringing before the management problems affecting their working conditions, and to accomplish this the company proposes to establish a system of employee representation consisting of representatives elected by the employees to serve on various committees to deal with working conditions.

"The general principles of this system have been developed, and will be immediately submitted to the employees."

During the same month the Company distributed among the employees at the Maryland, Steelton, and Lebanon Plants copies of a printed booklet entitled "Representation of Employees in Plants of Bethlehem Steel Corporation" containing the form of plan thus suggested. Prior to November 11, 1918, this form of plan became effective as the Plan of Employees' Representation at each of these three Plants, and elections of Employees' Representatives were held thereunder in each of such Plants.

The form of plan prepared as just described was not, however, at this time presented by the Company petitioner to the employees at the Bethlehem Plant for reasons which were stated in the following terms by a representative of the War Labor Board in charge of administering the Board's finding of July 31, 1918:

"A considerable divergence of opinion developed between the Company on the one hand, and the staff of the War Labor Board on the other, with reference to what type of shop elections fulfilled the requirements of the Board's findings. After a series of interchanges of view on this subject, and conferences between the Chief Administrator and Mr. [Eugene G.] Grace [president of the Bethlehem Company], it was finally decided that the plan which the Company was perfecting, involving as it did a multiplicity of committees and much detail of organization, had best be waived for the present, and simple craft committees be elected immediately by the electricians and machinists, the two classes of employees most insistent upon a presentation of their grievances."

To this the Company petitioner agreed. Prior to October 9, 1918, a representative of the Board who had gone to Bethlehem, Pennsylvania, to administer the finding of July 31, 1918, prepared a plan for the election of committees, including a form of ballots, posters, and other details, and on October 9, 1918, he issued a bulletin entitled "A statement to the workers of the Bethlehem Steel Company of the purposes of the War Labor Board Award[12] and of the plans for the election of the shop committees to carry out the principles of collective bargaining provided for in the award." The bulletin stated the purposes of the award in part to be as follows:

"1. To give the employees a direct voice in determining their working conditions.

"2. To provide a method of mutual bargaining between the Company and the chosen representatives of shop and craft groups.

"3. To provide ready means for conferences between employees and management on all matters affecting common interests.

"4. To provide an agency for the prompt adjustment of all differences that may arise between the employees and the management, either groups or individuals."

The Board then held elections on the Plant property—as the most practical way of holding them—during October and November of 1918 under the supervision of a Board examiner.

After the Armistice of November 11, 1918, Mr. Grace wrote a letter to the War Labor Board requesting that its examiners be withdrawn so as to allow the Company to proceed with the installation of the Mackenzie King plan. This letter was in the following terms:

"November 27, 1918

"Gentlemen:—

"On the 19th of November your Examiners announced a finding applicable to our Machine Shop employees at Bethlehem. This we are unable to adopt, as it was preceded by the cessation of hostilities, with the consequent cancellation of, or restrictions on, the greater part of our orders on which these employees were engaged. As to back-pay from August 1st to the date of change in the munitions program, we are willing, as we have before stated to you (in our letter of September 13th) and the War and Navy Departments, to pay over to the employees any increase covered by this departure in the form of additional compensation to us for the purpose.

"In view of the problems which confront us at Bethlehem (our force there being four times as much as at the outbreak of the European War), may we suggest the desirability of withdrawing your Examiners which are still at our plant, thus permitting us to proceed to make the necessary adjustments and rearrangements of our working forces to meet the new peacetime competitive conditions, and also to enable us to proceed with the installation of the practical, comprehensive, and permanent plan of employees' representation (providing for collective

12 By "award" is meant the finding of July 31, 1918, which directed the institution of a collective bargaining system at the Bethlehem plant.

bargaining) which is now in successful operation at our other Plants.

"Respectfully,

"*President*

"National War Labor Board
"Washington, D. C."

On December 6, 1918, the War Labor Board answered in a letter signed by William H. Taft and Basil M. Manly, Joint Chairmen for the Board, stating that Mr. Grace's letter amounted to refusal to apply the finding (announced by the examiner on November 19, 1918)[13] on the ground that hostilities had ceased, and insisting that the then means of collective bargaining be maintained, apparently thinking that the Company intended to do away with collective bargaining. The Board's letter charged that the Company, having agreed to the installation of a system of collective bargaining satisfactory to the Board upon condition of the establishment of which the employees had remained at work during the War, now wished to repudiate that system. And the letter asserted that as a matter of good faith on the part of the Company and the Government the collective bargaining system should be maintained. The terms of this letter are printed in the margin.[14] On

---

[13] This finding is not in the record. It was apparently a determination of classifications among Machine Shop employees, minimum hourly rates, and revision of piece rates, made according to "Methods of Procedure for Determining Classifications and Rates and Making Other Adjustments," Bulletin No. 2 of the War Labor Board, November 1918, Stipulated Exhibit No. 12.

[14] National War Labor Board

Washington

December 6, 1918.

Mr. E. G. Grace, President,
Bethlehem Steel Company,
South Bethlehem, Pa.

Sir:—

The National War Labor Board has considered your letter of Nov. 27th, and has directed the Joint Chairmen to make the following reply on behalf of the entire Board:

Your letter, in our opinion, amounts to a refusal to apply the findings of the National War Labor Board or to respect its authority, on the ground that hostilities have ceased.

It has been officially ruled that, so far as this Board is concerned, its authority and powers are to continue unabated until the President has formally proclaimed the ratification of the peace treaties.

This action by your Company presents a situation of grave importance to the Nation. Last July when the outcome of the war was hanging in the balance, upon the representation of officials of the War Department that conditions in the Bethlehem Steel Company were gravely endangering the successful prosecution of the war and in order that our troops might not be left short of guns and ammunition, the War Labor Board exerted every resource to keep the employees of the Bethlehem Steel Company at work to secure maximum production. Relying upon the War Labor Board to bring about an equitable adjustment of conditions in the Bethlehem Steel Company, the workmen remained at their tasks, and, we are informed, greatly increased the production of war supplies over what they had been prior to the intervention of the Board.

You, personally, agreed to the installation of a system of collective bargaining satisfactory to the Board, and under the supervision of the Board's examiners. You now wish to repudiate that system of collective bargaining, and ask that the Board's examiners be withdrawn. Your Company asked and received the assistance of the Board in securing increased compensation from the War and Navy Departments to meet whatever increase in wages were brought about by the Board's award. You now without application to us announce the annulment of the Board's findings on the ground that hostilities have ceased and certain of your war contracts are being cancelled. The findings of the Board do not require that you continue in your employment any man whose services are no longer needed because of the cancellation of war contracts. The Board, however, does require that you carry out, in good faith, the findings of the Board upon the basis of which your employees consented to remain at work, and thus maintained the production and the profits of your Company.

This is a question of the good faith of your Company and of the Government itself. If the award of the Board should now be repudiated, your workmen would have every right to feel that they had been deceived and grossly imposed upon by your Company, by the War Labor Board, and by the other officials of the Government who prevailed upon them to remain at work on the assurance that they would be justly dealt with.

We must, therefore, insist that the machinery of collective bargaining already established be maintained and permitted to function, and that the other

December 12, 1918, Mr. Grace answered, stating that the Board had misinterpreted the attitude of the Company toward collective bargaining if it thought that the Company intended to do away with the principle thereof. His letter is set out in the margin.[15] Conferences were then held be-

findings of the Board be carried out fully and promptly.

If there are any matters in the findings of the Board which you deem to be inequitable because of the change of conditions, it will be proper for you to apply to the Board for a rehearing, and your motion will be given attention.

Very truly yours,

(Signed) WM. H. TAFT
(Signed) BASIL M. MANLY
*Joint Chairmen*

[15] Bethlehem Steel Company
South Bethlehem, Pa.

E. G. Grace          December 12, 1918
President

Sirs:—

Replying to your letter of December 6th;—You are mistaken as to our attitude toward collective bargaining. We have definitely adopted it. We now have Shop Committees in all our plants. The representatives are chosen by secret ballot in elections conducted by the employees. We enclose you a printed copy of "Representation of Employees in Plants of the Bethlehem Steel Corporation" which is the arrangement in effect in all our steel plants except Bethlehem —as large in the aggregate as the Bethlehem plant. We hope to extend the principles of collective bargaining and of committee functions beyond any scope which has been attempted on a large scale in this country.

As to the committee system at Bethlehem, my agreement to which you refer is represented by the following quotation from my letter of September 13th, which I left with the Board at the time as a formal statement of our position:—

"We are now ready to provide for a collective bargaining and labor representation by an arrangement in accordance with the declared principles of your Board, the details of which I have been over with Examiner Chaney. We are ready for the first elections and so that there may be no doubt as to their fairness we prefer to have them supervised under your authority and direction."

We have not repudiated this in any respect. Your examiners delayed the elections and changed the contemplated plan until it is no longer recognizable, nor is it practical. For instance, under the supervision of the examiners there has been formed a committee on mediation and conciliation of three members (not employees) to be joined by three members nominated by the Company and to be presided over by a chairman to be selected by and representing the Secretary of War. It is plain that this arrangement is not suitable for peace conditions. In many other particulars the examiners' plan is unworkable and unacceptable. The plan originally proposed and which we enclose has been most favorably received by the employees of our other plants and is in successful operation there.

As to the other findings of your Board, there seems to us to be a clear understanding expressed by our letter to you of September 13th, your letters to the War and Navy Departments and our correspondence and interviews with them. We are not attempting to change this understanding in the least. If good faith with any of our employees requires a readjustment of their wages up to the abandonment of the Government munitions program, we are quite ready to take up the matter under the terms of this understanding, which calls for compensation to us by the Departments.

We cannot expect compensation from Government Departments to take care of any deficit resulting from peace time or competitive operations upon which we are now entering, and consequently we feel that future wages, or schedules necessarily affecting the same, should no longer be the subject of Governmental regulation.

The cancellations of Government orders have been so rapid and so extensive that practically all our work for the war program is finished. We have not on hand what would have amounted to two weeks work at the rate of production before the cessation of hostilities. We were then making more war material in a day than we made in any year before the war. We do not wish to be understood as meaning to take advantage of this situation to reduce wages. We realize that the readjustment which the country faces should be made gradually and slowly and that any lowering of the present scale of wages should be preceded as far as possible by a reduction in the prices of commodities. We intend to do our full share toward meeting the responsibilities which this places on employers.

Much has been said in the course of the proceedings before your Board, and in fact for the purpose of bringing about these proceedings, relative to production

tween the War Labor Board and representatives of the Company. At a conference on February 4, 1919, Paul D. Cravath, counsel for the Company, made a statement to the effect, among other things, that "real progress has been made in removing the misunderstandings which seem to have developed between the War Labor Board and the Bethlehem Steel Company" out of Mr. Grace's letter of November 27; and that:

"It has not been the disposition of Bethlehem to disregard the findings of your Board nor to take advantage of the signing of the armistice to withdraw from the assurances which it gave you during the war period. On the contrary, the Company authorizes me to say that it recognizes that you are entitled to its loyal cooperation in carrying through the two important measures with which your findings dealt.

"First: The inauguration of an effective plan for collective bargaining between the management and the employees. and, second, the doing of all that can be done to secure from the War and Navy Departments, and the other procurement departments of the Government, an allowance to cover such additional compensation as may be necessary to give Bethlehem employees the retroactive pay recommended by your findings.

"At no time since the armistice has it been the purpose of Mr. Grace and his associates in any way to withdraw from these commitments. . . ."

After this statement by Mr. Cravath, Mr. Taft then said:

"Mr. Grace through Mr. Cravath has been conferring with the Board and has now made a statement of the intention of the Bethlehem Company in dealing with its men to put in a full and fair collective bargaining system in accordance with the suggestions of the Board and the elections already had. I have every hope that this will go through as the company hopes it may and says that it is going to put it through, and if and when it does so in the full spirit of its present purpose, it will justify a full withdrawal of the statements made by me with reference to Mr. Grace. I shall be glad then to say there has been a misunderstanding and to withdraw my former criticism of Mr. Grace.[16]"

After this conditional recognition of the good faith of the Company had been made by the War Labor Board, it was agreed

that the Company should negotiate with Bethlehem employees' committeemen, that is, employees' representatives who had been selected under the War Labor Board craft plan, with a view to agreeing upon a mutually satisfactory plan of collective bargaining. Certain differences of opinion arose between the Company and a drafting committee appointed by the employees' representatives and these differences were submitted on behalf of the latter to the War Labor Board about April, 1919. Representatives of the Company, the drafting committee and the Board held meetings at which these differences were discussed. As a result the Company and the drafting committee reached an agreement on a form of plan of collective bargaining and submitted it to the Board, which at a meeting on April 11, 1919, voted to receive and approve a report concerning this form of plan. The report stated:

"The accompanying plan . . . was mutually agreed to by the parties, with the exception of minor details which were added by your Section [of the War Labor Board].

"Said plan, in substance, is a modification of other plans in effect in other cases, some voluntary and others installed through and by this board.

"Your Section therefore reports that in its judgment the company has demonstrated the good faith stated by its counsel, Mr. Cravath, February 4 last."

The minor additions proposed by the Board were accepted by the employees' drafting committee and by the Company, and the Plan went into effect on May 1, 1919. The Board caused the Plan to be printed, and later the Company caused to be printed and distributed among all of the employees at the Bethlehem Plant a booklet setting forth the Plan together with the names of the employees' representatives who had signed it. The War Labor Board went out of existence in August, 1919. In January, 1920, by mutual agreement between the Company and a Temporary Rules Committee appointed by the Employees' Repre-

---

at Bethlehem, which a careful examination of the facts will not bear out. These statements we have not publicly denied, believing that the facts would eventually be known and would be the best answer. We should not refer to this now except that our silence in respect to the reference to these matters in your published letter might otherwise be taken for acquiescence.

Very respectfully,

E G GRACE
*President*

Messrs. Wm. H. Taft and B. M. Manly,
    Joint Chairmen,
National War Labor Board,
Washington, D. C.

· 16 These statements by Mr. Cravath and Mr. Taft appear in the minutes of the Board of February 4, 1919.

sentatives a revision of the Plan was prepared and this was submitted to a meeting of the Representatives and approved by them January 28, 1920. This became in substance the Bethlehem Plan down to the amendments of 1935 referred to below, and it was in its essentials like the Maryland, Steelton and Lebanon Plans devised by Mackenzie King, and like the Cambria Plan which had the direct approval of the War Labor Board as will appear below.

The Plan at the Cambria Plant of the Company petitioner was in effect at the time the Company acquired that Plant on March 30, 1923, and it came into existence in the following manner: In 1918 the Plant was being operated by the Cambria Steel Company as a subsidiary of the Midvale Steel and Ordnance Company. On September 19, 1918, the Plan was suggested to the employees by a notice posted at the Plant, authorized by the Board of Directors and signed by the President, reading as follows:

"Midvale Steel and Ordnance Company
"Cambria Steel Company

"The Board of Directors and Officers of Midvale Steel and Ordnance Company, Cambria Steel Company and Subsidiary Companies, recognizing the fact that the prosperity of their Companies is inseparably bound up with the general welfare of their employes, propose, with the co-operation and assent of their employes, and for their mutual interests, to establish a plan for representation of employes, which will hereafter govern all relations between the Companies and their employes.

"The past history of these Companies has been remarkably free from disputes with their wage-earners, due, it is sincerely believed, to the fair dealing which it has always been the aim of the Management to maintain in all matters affecting the relation of the Company to their employes.

"We recognize the right of wage-earners to bargain collectively with their employers, and we hereby invite all employes to meet with the officers of their respective Companies for the purpose of considering, and if practicable, adopting a plan of representation by the employes, which shall be thoroughly democratic and entirely free from interference by the Companies, or any official or agent thereof.

"It is hoped that every employe will respond to this invitation, and meet with the officers of the Company in the Spirit of fair dealing and mutual helpfulness.

"For the mutual convenience of officers and employes, these meetings are called as per schedule attached hereto.

"A. C. Dinkey,
"President"

The Plan, then known as the "Plan of Representation of Employees of Midvale Steel and Ordnance Company, Cambria Steel Company, and Subsidiary Companies, Effective October 1, 1918," was negotiated between the Cambria Steel Company and representatives of the employees who had been elected by all of its employees for that purpose; and after an amendment of the Cambria Plan as it thus came into existence, it was approved by the War Labor Board.

The Lackawanna, Leetsdale and Rankin Plans were established after the acquisition on October 10, 1922, by the Company petitioner of the Lackawanna Plant and after acquisition on February 10, 1931, by an affiliate[17] of the Company petitioner of the Leetsdale and Rankin Works. The Concentrator Plan was established after the Concentrator Plant in March, 1929, became a separate manufacturing unit operated by an affiliate[18] of the Company petitioner. After the Lackawanna Plant and the Leetsdale and Rankin Works were acquired, and after the Concentrator Plant became such a separate manufacturing unit, the Company petitioner at the Lackawanna Plant, and the affiliates above referred to at the Leetsdale and Rankin Works and at the Concentrator Plant, submitted to the employees at the various Plants and Works mentioned, a form of plan of employees' representation which contained provisions based largely on those of the Plans already in existence, to wit, the Maryland, Steelton, Lebanon and Bethlehem Plans. Sometimes with and sometimes without modification such form of plan was accepted by the employees through their designated representatives and by voting in the first nominations and elections held thereunder.

*Structure of the Plans.* Although they are not separately stated, there are two classes of provisions in each of the Plans, those which relate to the organic principles of the labor organization of the employees and those which have to do with the principles governing the relations between the labor organization and the Company petitioner, including the stipulation of grievance adjustment and collective bargaining procedures. The organic provisions of the Plans are those usually found in the constitution of a labor organization. According to them, employees are represented in the government of the organization by elected Employees' Representatives, the voting privilege being limited to those employees who have been on the Company payroll for sixty days immediately preced-

---

[17] McClintic-Marshall Construction Company.

[18] Bethlehem Mines Corporation.

ing an election, and who neither regularly hold any supervisory position nor have the power to recommend the hiring or discharging of other employees. Employees' Representatives must themselves possess the qualifications stipulated for voters, and the additional qualification of being adult American citizens employed in the Company for one year; they are chosen in secret balloting conducted by the employees under regulations prescribed by a Rules Committee composed of Employees' Representatives. In respect of balloting the Plans provide:

"Nominations and elections shall be by secret ballot and so conducted as to avoid undue influence or interference with voters in any manner whatsoever, and to prevent any fraud in the casting or counting of ballots."

The tenure of Employees' Representatives is one year. Collectively they compose the General Body (or Committee of Representatives as the assembly thereof is called under some of the Plans). Representation in the latter is proportional, on the basis of one Employees' Representative for a specified number of employees—the number varying in the different Plants. The provisions of the Plans prescribe in detail a method to be followed in recalling Representatives and in filling vacancies.

After the annual election of Employees' Representatives, the General Body holds an organization meeting and elects officers and Committees. These Committees and the jurisdictions thereof, taking the Cambria Plan as typical, are as follows: the Finance Committee, which deals with meeting the expenses of the labor organization; the No. 1 Standing Committee, which acts in respect of rules, ways and means, and the conduct of elections; the No. 2 Standing Committee, having jurisdiction over wages, piece work, bonus and tonnage schedules, hours, employment and working conditions; the No. 3 Standing Committee, which concerns itself with pensions and relief, athletics and recreation, safety and prevention of accidents; the No. 4 Standing Committee, dealing with employees' transportation, housing, domestic economies and living conditions, health and works sanitation, education and publications, continuous employment and condition of industry; the No. 5 Standing Committee, which is occupied with all other matters not falling within the scope of the above. The Plans detail provisions for regular and special meetings of the General Body or of any Committee thereunder. They provide that

Representatives of the Company may not, except upon invitation of the General Body or Committee, attend such meetings.

Each of the Plans expressly states that representation thereunder "shall in no way discriminate against any employee because of race, sex or creed or abridge or conflict with his or her right to belong or not to belong to any lawful society, fraternity, union or other organization." And each Plan further provides that if any Employees' Representative deems himself discriminated against by reason of any action he may have taken in his representative capacity, he may take the matter by successive stages to the Plant manager, to the General Joint Committee on Appeals, to the president of the Company, and to the Department of Labor of the State or to the Secretary of Labor of the United States, in which case the decision rendered is to be final and binding.

The Plans contain no express provisions for general meetings of employees for discussions or for the hearing of reports from Representatives and the instruction of Representatives, and contain no provisions for applications for membership, membership cards, or dues. Membership results from becoming an employee.

Those provisions of the Plans which govern the collective bargaining relations between the employees' labor organization and the Company in the aggregate constitute an agreement between the Company and the employees with respect to the procedure to be followed in bargaining. Under this agreement Joint Committees are set up. They are composed—taking the Cambria Plan as typical—of the members of the Nos. 1, 2, 3, 4, and 5 Standing Committees set up under the labor organization aspect of the Plans, together with an equal number of Management's Regular Representatives. The two sets of Representatives on these Joint Committees have equal voting power. The Joint Committees are known as the No. 1 Joint Committee (the Joint Committee on Rules), the No. 2 Joint Committee, the No. 3 Joint Committee, the No. 4 Joint Committee, and the No. 5 Joint Committee (the General Joint Committee on Appeals). Their function is to consider and discuss and attempt to reach agreement in respect of matters of mutual interest to the employees and the Company, and in such respect they severally and respectively deal with the subject matter committed to the Nos. 1, 2, 3, 4, and 5 Commit-

tees under the labor organization aspect of the Plans.

The Plans make provision for regular and special meetings of the Joint Committees. They provide that the Company shall appoint a Management's Special Representative who shall have no vote but whose duty it is to keep the management in touch with the Employees' Representatives and represent the management in negotiations with such Employees' Representatives. He is authorized to attend any Joint Committee meeting, but only when invited. The Plans make provision for an annual conference of all Employees' Representatives and of representatives of management.[19] The principle of equal representation of employees and management on committees for collective bargaining was agreed to by the War Labor Board and the Company during the conferences which took place after receipt by the Board of the letter of President E. G. Grace of the Bethlehem Company dated December 12, 1918, referred to above.[20]

The Plans specifically outline a procedure for the adjustment of grievances. An individual employee unable to obtain satisfactory adjustment of his grievance presented first to his immediate foreman may then second take the matter up with the superintendent of his department, third with the Management's Special Representative, fourth with the Plant manager. If he does not obtain relief in the fourth stage, he may then, through his Employees' Representative, require the matter to be referred to the General Joint Committee on Appeals. If this General Joint Committee on Appeals fails to effect a settlement satisfactory to the aggrieved employee, then the Company president may be notified and the matter referred to arbitration, if the president and a majority of the Employees'

Representatives on the Joint Committee on Appeals agree. In addition to this method of dealing with individual grievances, the Plans provide for the adjustment of matters of interest to the employees in general. Consideration of such matters may be initiated by the General Body, or by any Committee (provided it has first submitted the matter to the General Body) and the matters are then referred to the appropriate Joint Committee and ultimately to the management of the Company.

Prior to the enactment in 1935 of the National Labor Relations Act a two-thirds vote of the Joint Committee on Rules (one-half of whose membership, as stated above, is comprised of Management's Representatives), or a concurrent majority of the Employees' Representatives and Management's Representatives at an annual conference, was necessary to amend a Plan. After the passage of the Act each Plan was amended to provide that amendments might be adopted by a two-thirds vote of the General Body—except amendments which (i) would materially change the procedure for grievance adjustment, or (ii) might prevent the Plan from operating as a fair method of selecting representatives of all employees and as a fair method of collective bargaining, or (iii) might materially increase the Company's obligations under the Plan.

Prior to the decision on April 12, 1937, of National Labor Relations Board v. Jones & Laughlin Steel Corporation, 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, in which the Supreme Court held the National Labor Relations Act constitutionally applicable to the type of business of the Company petitioner, the Plans uniformly contained provisions obligating the Company to pay Employees' Representatives for time spent at Plan meetings, and to defray necessary Plan expenses.[21] Shortly there-

---

[19] This provision has been deleted under the Bethlehem Plan, February, 1938, amendment.

[20] Referring to such conferences one of the stipulations states: "Thereafter, conferences were held between representatives of the Board and representatives of the Company and an understanding was arrived at which was embodied in a memorandum entitled 'Suggestions Looking Toward an Adjustment of the Bethlehem Award', a photostatic copy of which, marked 'Final draft' shall be admitted in evidence herein and marked Stipulated Exhibit 16."

In Stipulated Exhibit 16 the first paragraph provides: "I. Collective Bargaining: 1. Local boards at present constituted should be eliminated together with the Chairman from the War Department and there should be substituted therefor a small general committee *containing an equal number of employer and employee representatives.* The employee representatives to be selected by the committees already elected from among their number." (Italics supplied)

[21] "For time necessarily occupied through actual attendance at regular or special meetings or conferences held pur-

after each of the Plans, except the Rankin Plan, was amended so as to prescribe that the Company make such payments and defray such expenses only "to the extent permitted by law." I discuss the manner of making these amendments under topic VI. The amendments themselves are set out in the margin.[22] The Rankin Plan was not so amended, but the Company advised the Committee of Representatives under that Plan that, except to the extent permitted by law, it would make no payments to any Employees' Representative under the Plan, and would defray no expense incident to the discharge of the duties of Employees' Representatives under the Plan.

*The operation of the Plans and the conduct of the Company with respect to them.*

(1) Except insofar as certain printed material (including copies of the Bethlehem Review and certain other publications more particularly referred to below) in which reference was made to the Plans or some of them and evidence concerning the distribution or posting of that material at the various Plants and Works may be considered to be evidence regarding the Plans other than the Cambria Plan, the only evidence in the case regarding the operation of such Plans is the following: the documents themselves in which the provisions of the Plans are contained; schedules of grievances handled under each of the agreements, together with copies of the minutes of certain meetings admitted in evidence to supplement these schedules; two stipulations as to the origin, history and development of the Plans which are to the effect among other things that as of the close of the hearing the existing Plans operated in all material respects substantially in accordance with their respective provisions; and a stipulation entered into by counsel for certain of the parties showing that the employees of the Company petitioner during working hours had the amount of spare time stated therein.[23]

(2) The facts appearing in the case concerning the operation of the Cambria Plan and conduct of the Company with respect thereto are few. They comprise in substance and effect the following:

When a new employee came to work, he was given a copy of the Plan by a foreman, was introduced to the Employees' Representative of the department in which he was to work, and was informed that this Representative had been elected at a secret ballot election and that he, the employee, would have opportunity to vote at the next election if he had at that time been employed for sixty days. The foreman explained to the employee that the Company had adopted the Plan as a means of obtaining, so far as possible in a large plant, close personal relationship with its employees, and in order

---

suant to the Plan, Employees' Representatives shall receive from the Company payment commensurate with their respective average earnings, subject to the approval of a majority of the entire membership of the Committee on Rules and the Management's Special Representative." § VII, paragraph 7, of the Cambria, Lackawanna, Maryland, Lebanon, and Concentrator Plans; § VII, paragraph 5, of the Bethlehem, Steelton, Leetsdale, and Rankin Plans.

"The Joint Committee on Rules shall arrange a suitable place or places at which meetings of the General Body [or Committee of Representatives, as the case may be] and of the several Committees and Joint Committees may be held, and the Company shall defray such expenses as are necessarily incident to the discharge of duties under the Plan, subject to the approval of a majority of the entire membership of the Committee on Rules and the Management's Special Representative." § VII, paragraph 11, of the Cambria, Bethlehem, Lackawanna, Steelton, Maryland, and Lebanon Plans; § VII, paragraph 10, of the Concentra-

tor Plan; and § VII, paragraph 9, of the Leetsdale and Rankin Plans.

[22] "To the extent permitted by law, Employees' Representatives shall be entitled to receive from the Company for time necessarily occupied through actual attendance at regular or special meetings or conferences held pursuant to the Plan payment commensurate with their respective average earnings."

". . . To the extent permitted by law the Company shall defray such expenses as are necessarily incident to the discharge of duties under the Plan subject to the approval of a majority of the entire membership of the Committee on Rules and the Management's Special Representative."

[23] Included within items of evidence mentioned in the record concerning the Plans are copies of certain letters having reference to the amendments and changes made in 1937 in the provisions of the Leetsdale Plan. These letters refer to the 1937 amendments explained above in this topic under the description of the structure of the Plans, and, as there stated, I discuss the manner of making them in topic VI.

that it might have a clear idea of the employees' working conditions. The foreman told the employee also that he might take up with his foreman any matter which he thought required adjustment, and that the Plan provided a means for taking such a matter higher. The foreman impressed the employee with the idea that the Plan was not merely for the purpose of handling grievances, but rather was a medium of bringing the management and employees closer together, and told him that the Company would welcome suggestions from the employees for the betterment of the Plant and working conditions.

The elected chairman of each Joint Committee of the Cambria Plan was usually a Company superintendent. The Management's Special Representative was often present, by invitation of the Employees' Representatives at Committee meetings and meetings of the General Body. There has been no interference by the management with the holding of, or the transacting of business at, Committee meetings, and no attendance at such meetings by Management's Representatives except upon invitation. Neither prior to 1935 nor thereafter have Management's Representatives ever opposed any amendment proposed by or acted on favorably by the General Body.

There has been no transfer of employees from one department to another, or promotion to supervisory positions, on account of collective bargaining activities.

(3) Facts appearing in the case concerning the operation of all of the Plans (that is, both the Cambria Plan and the others) and the conduct of the Company with respect thereto are the following:

Counsel for the Company cooperated in preparation of the form of the amendments of 1937 in respect of contributions by the Company to the support of the various Plans. I discuss this in topic VI.

At various times since the installation of the Plans, both the Cambria Plan and the others, the Company has praised them and their accomplishments to the employees, and has contrasted the Plans and their advantages with the claimed advantages of outside unions and with the disadvantages of outside unions as described by the Company. This was done by means of statements in the Bethlehem Review, a paper published by the Corporation petitioner and distributed by the Company petitioner to its employees, statements in a booklet entitled "Ten Years'

Progress in Human Relations, A Review of Some Accomplishments Under the Bethlehem Plan of Employee Representation," also distributed to the employees, and by a "Message" to employees. The "Message" was in the following terms:

"A MESSAGE

"To Our Employees:
"In their effort to get you to join their union, the C. I. O. organizers are saying—
—that you must join their union in order to hold your job;
—that there is a rush to join their union, therefore you had better sign up before it is too late;
—that responsible Government officials want you to join their union; and
—that your Employees' Representation Plan does not provide a legal or effective method of collective bargaining with the management.

"Do not be deceived by such false statements; there is no truth in them.

"Your Employees' Representation Plan does constitute a legal method of collective bargaining and the effectiveness of it over the past many years is a matter of record, reflecting the good conditions which have been attained without the loss of a day's wages through strikes or disorder.

"There is no law or rule of government that requires you to join a union or to surrender your rights, individually or through your representatives, to negotiate directly with the management on all conditions of employment. Outsiders have not been necessary in the past—nothing has happened to make them necessary now.

"To make sure that there is no doubt in your minds regarding the Company's employment policy, we will again state its fundamental principles. They are:

"1—No employee has to join or pay tribute to any organization to get or hold a job with this Company.

"2—Employment with us does not depend upon membership or non-membership in any organization.

"3—The right to belong or not to belong to any organization is an individual personal right which is guaranteed by the Federal Constitution and is recognized by this Company as a fundamental principle under your Representation Plan.

"4—Advancement in or the holding of a job with this Company depends on individual merit, efficiency and length of service.

"5—This Company believes in and for many years has practiced true collective bargaining with you or your freely chosen representatives. It will continue to do so.

"These are fundamental American principles to which, in the interests of yourselves, your families, our stockholders, and the public, this Company will steadfastly adhere.

"BETHLEHEM STEEL COMPANY
"January 15, 1937."

The first two pages of the booklet "Ten Years' Progress in Human Relations" contained the following material:[24]

---

[24] The booklet was "inscribed" to the employees in the following terms:

"THE HUMAN SIDE OF OUR BUSINESS

"Employees at three of the Bethlehem plants joined with the management ten years ago in laying the foundation of a new kind of structure in American industry. Employees in other plants have since built wisely and firmly upon this foundation. The cooperative efforts of all have brought the undertaking to a success which fully justifies the faith of its pioneers.

"This structure is built not of steel and brick and mortar. Its cornerstone is men. Its pillars and walls are the human relations that exist today between Bethlehem and its employees, that join together the activities and agencies which make this a business of men, not merely of machines.

* * *

"It was ten years ago that the Bethlehem Plan of Employee Representation was inaugurated in Bethlehem's plants. In that period the principles adopted in the formulation of this Plan have grown into a broad, enlightened policy covering all the human relations properly involved in an industrial company of more than 70,000 employees.

"The same ten years have witnessed significant changes generally in the attitude of employers and employees toward each other and toward their mutual responsibility for the success of their joint efforts. It has come to be realized on the part of the management that industry depends for its success largely upon human beings. This applies not only to the quality and quantity of production; it is true also of the market for industry's products which requires the continuing purchasing power of those who work for wages. On the part of the employees this new attitude is reflected in a more intimate knowledge of their company and its objectives, in a better understanding of their part in production and distribution and in a willingness to play fair with employers who treat them fairly and justly as friends and partners as well as fellow workers.

* * *

"It is not enough, however, that all this be realized by employers and employees. It must be translated into a practical working policy which takes into account two fundamental considerations: First, the right of employers to expect that employees will produce efficiently and economically; and second, the right of employees to expect that their reasonable needs and desires as human beings will be satisfied in so far as it is possible for industry to do so.

* * *

"Bethlehem's policy in dealing with its employees is based on the sound business principle that the employees and the management, the stockholders and the public, are all benefited by efficiency and economy in production and distribution and by a fair consideration of their common interests in the enterprise in which they are all engaged.

"What are these interests in so far as employees are concerned? What are the reasonable wants of employees which they have a right to see satisfied to the extent that conditions in industry will permit? They concern:

"*First,* the job itself, steady uninterrupted employment, and the payment of fair wages for faithful, efficient service.

"*Second,* a voice in the management to the extent at least of jointly determining the regulations under which men are asked to work.

"*Third,* good, safe physical working conditions and provision against accident, sickness and death.

"*Fourth,* an opportunity to acquire financial independence through saving, home ownership, the purchase of stockholder's interest in the business, relief in case of need and pensions in old age.

"These four factors, the pillars of Bethlehem's human relations, have been reared on the foundation laid ten years ago when the Plan of Employee Representation began to operate. It is fitting at this time to review the progress which has been made in this eventful decade and to pay a deserving tribute to the men whose cooperation has achieved such notable success.

"It is interesting to note that when the Plan was first inaugurated the hope was expressed that the broad, constructive features which have since grown out of it would be realized.

"After the first elections in 1918 President Grace said in a letter to the employees:

"'Not only has the representation plan been inaugurated for the settlement of grievances but in order to attain a lasting success it must be utilized in a constructive manner. Not alone does the Plan provide a channel through which the employee may reach the management but the management feels that it now has an opportunity of presenting to the employees questions upon which their assistance and advice are desired.

"'The stockholders and the management realize that to a very large extent the success attained by the Bethlehem Steel Corporation depends upon the degree of cooperation which exists between the management and its employees and it is with a real sense of responsibility I say to our employees that the management stands ready to do its part and welcomes the reciprocal spirit which the employees have evidenced in their sincere and enthusiastic acceptance of the features provided in the Plan of Employee Representation.'"

Additional material contained in "Ten Years' Progress in Human Relations" emphasized "Faith in Each Other," that is, between employees and management, as the

"Progress as a great steel company and progress as an organization of men working together for a common interest have been recorded in the last decade of Bethlehem Steel Corporation. Real achievement can be measured not only in terms of modernized plants and widening markets but also in terms of cooperative undertakings which benefit all who are engaged in this business. It has been a decade of joint endeavor in which Bethlehem employees have contributed a generous share both to the corporate results and to the upbuilding of a sound policy of employee-management relations.

"To the men who have represented the employees in this accomplishment during the past ten years this booklet is gratefully inscribed."

keynote of employees' representation and its accomplishment; stressed the uninterrupted employment at fair wages which had been accomplished, safety conditions in the Plants, including accident prevention methods, first aid, safety instruction and medical care; and referred to benefits to employees and their families through assistance in saving, home acquisition, old age security (pensions), stock ownership, sickness, accident and death benefits. The issue of the Bethlehem Review of July 3, 1936, contained a bulletin entitled "Security of Employment," reading thus:

## "SECURITY OF EMPLOYMENT

"To the Employees:

"I am sure we all agree that your welfare and that of your families and of the communities in which you live depends upon uninterrupted operation of our plants, and that anything that disturbs our present condition will imperil the interests of all. Undoubtedly you have seen that professional labor leaders have publicly announced a campaign to unionize the employees of the steel industry.

"The employees in the industry have enjoyed a long era of industrial peace during times when other industries dominated by labor unions have been torn with strife. However it may be described, the real purpose of the unionization campaign is to force the 'closed shop' on all employees in the steel industry and thus to compel you and all other employees in the industry to join and pay dues to a union in order that you may hold your jobs. We believe that no worker should be required to pay tribute to anyone or to any organization for the right to work.

"Realizing its obligation to the employees, to the owners and to the public, after careful consideration of all phases of the threatened drive, the industry issued through the American Iron and Steel Institute the statement reprinted in this number of the REVIEW. Our management firmly believes in the views expressed in that statement. They express the policies which have controlled our dealings and relationships for many years.

"The effectiveness of your existing Representation Plans, for the proper settlement of all questions arising between any of you and the management throughout 17 years of uninterrupted operation has been outstanding, and the results speak for themselves. It is unnecessary to review them in detail here. They are well known by all of us. Experience has shown that no question can arise between us that cannot be equitably adjusted. There have been no strife or strikes, no loss of jobs or time, and no dues or fines.

"I am convinced that employees know their own problems better than anyone else can know them and that no outsiders can deal with those problems as effectively and intelligently as can the employees themselves.

"In addressing you as I have, I do not have any thought that you desire any change in our present relationships or that you will be misled by any appeal that may be made to you in the announced campaign. My purpose rather is to assure you that we will assist you in every way to continue the present proven method of dealing with our mutual problems, and that we will use our resources to the best of our ability to protect you and your families from interference, intimidation and coercion from any source.

"E. G. GRACE,
"*President.*"

The statement referred to in the foregoing, as having been issued through the American Iron and Steel Institute, was in the following terms:

"TO THE PUBLIC AND THE EMPLOYEES IN THE STEEL INDUSTRY:

"A campaign to unionize the employees of the Steel Industry has been announced.

"In order that the employees and the public may know the position of the Steel Industry in the face of the threatened drive, the Industry makes this statement through the American Iron and Steel Institute.

"Persons and organizations not connected with the Industry have taken charge of the campaign.

"There are many disturbing indications that the promoters of the campaign will employ coercion and intimidation of the employees in the Industry and foment strikes.

"The objective of the campaign is the 'closed shop,' which prohibits the employment of anyone not a union member. The Steel Industry will oppose any attempt to compel its employees to join a union or to pay tribute for the right to work.

"No employee in the Steel Industry has to join any organization to get or hold a job. Employment in the Industry does not depend upon membership or nonmembership in any organization. Advancement depends on individual merit and effort. These are fundamental American principles to which the Industry will steadfastly adhere.

"The Steel Industry believes in the principles of collective bargaining, and it is in effect throughout the industry.

"The overwhelming majority of the employees in the Steel Industry recently participated in annual elections under their own representation plans and elected their representatives for collective bargaining. The elections were conducted by the employees themselves by secret ballot. One of the purposes of the announced campaign is to overthrow those plans and the representatives so elected.

"The Steel Industry is recovering from six years of depression and huge losses, and the employees are now beginning to receive the benefits of increased operations. Any interruption of the forward movement will seriously injure the employees and their families and all businesses dependent upon the Industry, and will endanger the welfare of the country.

"The announced drive, with its accompanying agitation for industrial strife, threatens such interruption.

"The Steel Industry will use its resources to the best of its ability to protect its employees and their families from intimidation, coercion and violence and to aid them in maintaining collective bargaining free from interference from any source.

## "AMERICAN IRON AND STEEL INSTITUTE."

In an issue of the Bethlehem Review dated September 25, 1933, published after the enactment of the National · Industrial Recovery Act in June of the same year, the following statement was made by Mr. Grace:

"The Plan has become vital in the administration of our business . . . .

"No outside agency could possibly take the place of our Employees' Representation Plan, without destroying that all-essential direct contact and relationship so necessary to insure to employees the best possible working and living conditions . . . .

" . . . Meeting the requirements of the N.I.R.A. our Employees' Representation Plan continues to serve as the medium of representation just as it has in the past. I urge all employees to continue to use to the full the facilities of the Plan for presenting their needs and views. . . . "

The announced policy of the Company since installation of the Plans has been in favor of collective bargaining and self-organization of employees. The Company has not discriminated against its employees for union membership or activity. The Board dismissed its charge of discrimination.[25] The Plans have operated as effective bargaining agencies as shown by the adjustment, satisfactory to the employees, of thousands of grievances and differences as to wages, hours, and other working conditions.

Annually, beginning with the years in which the Plans respectively originated, the employees have participated in large majorities in nominations and elections conducted under the Plans for the purpose of electing Employees' Representatives. The election ballots contained a statement to the following effect:

"By using this ballot the voter approves the holding of the Nominations and Election as stated in the posted notice of this Election issued by the Employees' Committee on Rules under the plan of Employees' Representation at this Plant and expresses the desire to be represented for collective bargaining and the other purposes stated in the notice by Employees' Representatives elected under the Plan.[26]"

The elections were conducted by secret ballot in such manner as to avoid interference with the voter and as to see to it that none of the employees entitled to vote was deprived of an opportunity to vote if he desired to do so.

*The contentions of the Board concerning domination and interference.* The Board contends that the finding of ultimate fact— that the petitioners dominated and interfered with the formation and administra-

---

[25] The Board had charged in paragraph 12 of its complaint that at Johnstown, and at Bethlehem, Pennsylvania, and Sparrows Point, Maryland, from about July 1, 1936, down to the date of the issuance of the complaint on August 26, 1937, the petitioners had discharged, laid off and refused to reinstate employees, and had demoted and transferred employees to jobs involving less pay and less desirable working conditions, and had by other acts discriminated against employees for joining or assisting S.W. O.C. and engaging in concerted activities with other employees for the purposes of collective bargaining and other mutual aid and protection. The Board also charged in paragraph 14 of its complaint that the petitioners had maintained arms in their plants and hired and utilized the services of men as police and guards with the intention and effect of interfering with, restraining and coercing their employees in the exercise of the rights guaranteed by the National Labor Relations Act. This charge was also dismissed.

A charge was made in paragraph 11 of the complaint that the petitioners, from on or about July 1, 1936, to the time of the issuance of the complaint, had threatened to discharge, lay off, or de-mote certain of their employees in the event that they should join or assist S.W.O.C. This charge is not discussed in the briefs. In his intermediate report the examiner made no mention of the charge, and the Board made no subsidiary or ultimate finding of fact or conclusion of law in respect of it and made no mention of it in the course of its decision. Therefore, although there is no formal dismissal, this part of the charge must be taken as having been disregarded by the Board. This is an additional illustration of the defective form of the Board's findings. It should not be necessary to make a detailed search to determine what action if any the Board has taken in respect of a charge. The Board should state its action in respect of each of its charges.

[26] The nominations ballot contained a similarly worded statement: "The voter by using this ballot approves the holding of the Nominations and Election as stated in the posted notice issued by the Employees' Committee on Rules under the Plan of Employees' Representation at this Plant, and expresses his desire that those elected shall represent him in collective bargaining and for the other purposes stated in the notice."

tion of the labor organizations of their employees—follows by reasonable inference from the subsidiary facts, which I have set out above, as to the origin, structure, and operation of the Plans and the conduct of the Company petitioner concerning them. The Board's contentions subdivide themselves as follows:

(1) The origin of the Plans. In this aspect of its case, the Board makes a single argument, to wit, that the fact that the Plans originated with the Company petitioner proves that they were forced upon the employees. As put in the Board's brief, the contention is that because the Plans were "formulated and installed in each of the ten plants without reference to the wishes of its employees, the Plans from the very outset were the creatures of the Company."

The assertion that the Plans were formulated and installed without reference to the wishes of the employees begs the question. And it is, in my opinion, in respect of certain of the Plans without support in the undisputed facts, and as to the others refuted by them.

So far as the Plans at the Bethlehem, Maryland, Steelton, and Lebanon Plants are concerned, the undisputed facts set forth above show that they came into existence as the immediate result of a proceeding before the War Labor Board in 1918, that that Board directed the installation of a collective bargaining system in the Bethlehem Plant and proposed the ideas to be contained in, and the objectives of, such a system, and that the Company acquiesced and proceeded to carry such ideas and objectives into effect, not only with respect to the Bethlehem Plant concerning which specifically the Board's direction had been made, but in respect also of the Maryland, Steelton, and Lebanon Plants. All that the record shows as to the details of installation in the Maryland, Steelton, and Lebanon Plants is the following: A notice of October 1, 1918, was posted by the Company, in which it was stated that the general principles of a system of employees' representation to deal with working conditions having been developed, they would be "submitted to the employees." Copies of a printed booklet entitled "Representation of Employees in Plants of the Bethlehem Steel Corporation," and containing the form of plan thus suggested were distributed among the employees. This plan became effective as the Plan of Employees' Representation in each

of these three Plants; and elections of Employees' Representatives were held thereunder in each of such Plants.

I cannot agree that these facts can be said reasonably to support an inference that the Plans originated in the Maryland, Steelton, and Lebanon Plants without reference to the wishes of the employees. It could with equal reason be inferred from such facts that the employees desired the Plans as referred to in the posted notice and described in the booklets distributed. The facts are therefore equivocal. Only by an assumption that the employees did not wish such Plans to be established can the fact that they were suggested, were distributed, and became effective, as above set forth, be made the foundation of a reasonable inference that they were forced upon the employees. In respect of these three Plans the record is silent as to such details, concerning the manner of election of Employees' Representatives and the manner of making effective the Plans, as might indicate the attitude of the employees towards the Plans and their adoption. The burden of proof was upon the Board, not upon the petitioners. The silence of the record cannot take the place of evidence.

In its contentions concerning the probative effect of the origin of the Plans, the Board particularizes its charge in respect of the Bethlehem Plan by asserting that a form of Plan agreed to by the War Labor Board was put into effect but that after the dissolution of that Board the Plan agreed to was superseded "by the Plan rejected by the Board." Only by distortion of the facts concerning the origin of the Bethlehem Plan and by omitting to consider all of them can such a statement have countenance. Under a fair consideration of the whole of the facts in this aspect of the case the plan originally drawn up under the advice of Mackenzie King was not "rejected," it was waived and its going into effect postponed by the Board on account of an emergency situation. In summary, the undisputed facts, set forth above in respect of the origin of the Plans, show that: The Plan ultimately adopted in the Bethlehem Plant went into effect as the result of negotiations between the Company, Bethlehem employees' representatives, who had been selected under the War Labor Board craft plan, acting through a drafting committee, and the War Labor Board itself, and that the Plan thus negotiated, with minor additions proposed by the Board, was accepted

by the employees' drafting committee and the Company on May 1, 1919, and was distributed by the Company in a booklet with the names of the employees' representatives who had signed it, among all the employees at the Bethlehem Plant. There was a revision in January, 1920, by mutual agreement between the Company and a Temporary Rules Committee appointed by the Employees' Representatives. This revision, it is true, followed the dissolution of the War Labor Board in August, 1919. But there is nothing in the record to indicate that this revision materially altered the Plan accepted May 1, 1919; and, as revised, the Plan was in its essentials like the Maryland, Steelton, and Lebanon Plans, which followed the form of the original Bethlehem plan devised by Mackenzie King. Since thus the Bethlehem Plan, including the revision of January, 1920, became effective as the result of the action of representatives of the employees and their committees, it cannot reasonably be concluded that the Plan was foisted upon the employees without consulting their wishes, unless these employees' representatives were themselves forced upon unwilling employees. The facts refute that—since these representatives were selected under the auspices of the War Labor Board. It would affront reason to conclude that that Board forced the craft plan upon unwilling employees through representatives unfairly selected. It will have been noted from the statement of the facts concerning the origin of the Bethlehem Plan that the good faith of the Bethlehem Company, in respect of the continuation after the Armistice of the principle of collective bargaining, questioned in the War Labor Board's letter of December 6, 1918, was vindicated by the Board at its meeting of April 11, 1919.

As to the Cambria Plan: Again the stipulated facts refute the finding of the Board. They show that the Plan, after being suggested to the employees by a posted notice recognizing the right of wage earners to bargain collectively and inviting the adoption of a plan of representation free from interference by the Company, was negotiated between the Cambria Steel Company and representatives of its employees who had been elected by all of the employees for the purpose, and that after an amendment it was approved by the War Labor Board.

In respect of the Lackawanna, Leetsdale, Rankin, and Concentrator Plans: As appears above, all that the stipulated facts show was that there was submitted to the employees at the various Plants and Works a form of plan of employee representation containing provisions based largely on those of the Plans at the Bethlehem, Maryland, Steelton, and Lebanon Plants, and that sometimes with and sometimes without modification this form was accepted by the employees through their designated representatives and by voting in the first nominations and elections held thereunder. Here again, as in respect of the Maryland, Steelton, and Lebanon Plans, the record is silent as to the manner of selecting the designated representatives and as to the manner in which they accepted the Plans. Again the barrenness of the record cannot be made evidentially fruitful. Only by an assumption that the employees in these Plants did not desire to adopt the Plans but were nevertheless compelled to do so by the Company petitioner can a coercive origin of these Plans be spelled out.

Thus the statement in the Board's brief that the Plans were formulated and installed without reference to the wishes of the employees and were from the outset the creatures of the Company, and the finding of the Board that the petitioners dominated and interfered with the formation of the Plans, are seen to be without justification. It is true, except with respect to the Bethlehem Plan in the drafting of which an employees' drafting committee participated, that the Plans were not actually drafted by the employees in original form and that they were accepted by the employees through representatives rather than by direct vote. But the circumstance that one party to an agreement has drafted it is, without more, no evidence that the other party was forced to accept it. And the fact that the employees acted through representatives rather than directly is no predicate for an inference that the Plans were forced upon them. Nothing in the National Labor Relations Act forbids employees to act through agents, rather than directly, in entering into an agreement with an employer concerning the adoption of a form of labor organization and system of collective bargaining. On the contrary, the Act expressly presupposes action through representatives. If it may be inferred that the origin of the Plans at the Bethlehem, Maryland, Steelton, and Lebanon Plants was iniquitous because the Company peti-

tioner proposed them to the employees, it may with equal ease be reasoned that the Company would have been in the position of defying the direction of the War Labor Board if it had not proposed them. The facts concerning the origin of the Plans, when dispassionately scrutinized, are, in my opinion, unproductive of any reasonable inference that the Plans came into being as a result of pressure upon, or corruption of, the will of the employees. Indeed, in my view, the inference reasonably to be drawn from the facts as a whole concerning the origin of the Plans is that they derived from a cooperative endeavor by the companies and employees to put into effect wholesome employee organization and collective bargaining ideas.

(2) The structure of the Plans. The argument of the Board that the structure of the Plans reasonably supports its finding that through them the petitioners have dominated and interfered with the administration of the employees' labor organizations, divides itself into several specifications:

(a) The Board contends that the provisions in the Plans limiting Employees' Representatives to employees and thus excluding representation by persons not employees or by organizations of persons not employees, and requiring Employees' Representatives to be adult citizens of the United States employed by the Company petitioner for one year, evidences domination and interference. These provisions are in my opinion colorless in such respect. There is nothing inherently coercive of the will of employees in such provisions looked at alone. Indeed it would seem absurd to say that just because an Employees' Representative is an adult American citizen employed by the Company petitioner for a year, he is not qualified to represent the employees. Only if it had been shown by evidence in the case that the employees desired to alter such provisions in the Plans so as to permit representation by persons not employees or by organizations of persons not employees, or by aliens or minors, but were prevented by the petitioners or by provisions of the Plans themselves from accomplishing such alteration, could it be reasonably concluded that there was domination or interference. But there is no evidence of such prevention, and such a predicate for an inference to domination cannot be supplied by assumption. The provisions of the Plans do not forbid such amend-

ments, which, it is to be noted, would relate solely to the labor organization aspect of the Plans. I discuss more specifically below the contention of the Board with respect to the provisions of the Plans concerning amendments.

(b) It is urged by the Board that the absence in the Plans of provisions for initiation fees, dues, and application cards, and of provisions for meetings of the employees as a body or by departments, or for meetings for discussion with, or instruction of, representatives, supports the finding of domination and interference with the administration of the Plans. The absence of these provisions is colorless. Only if the fact were that the employees desired such provisions but could not, either because of employer pressure or because of restriction of the Plans themselves on amendments, embody them in the Plans, would the finding be warranted. But the record does not show that to be the fact. Again, a predicate necessary for the Board's conclusion cannot be supplied by assumption. There is no evidence that the Plans, for lack of initiation fees, dues, and application cards, were unable to operate. Prior to the amendments of 1937, the expenses of the Plans were defrayed by the Company petitioner; since then they have been borne by the employees themselves. It is not reasonably inferable from the absence of provisions for meetings that the Plans did not lend themselves to operation free from employer domination. In view of the fact that the employees under each Plan were concentrated at a particular plant and resided in the same community—which is apparent from the record—and had therefore natural opportunity for discussion with each other and for consultation with their representatives, the employees may have felt provisions for formal meetings unnecessary. It is at least as readily inferable from the absence of provisions for such meetings that the employees did not regard them as necessary as it is that they desired them. In this aspect the evidence is equivocal and therefore not substantial.

(c) The Board argues that the provisions of the Plans for equality of membership and voting power on the Joint Committees evidence domination and interference by the petitioners with the administration of the Plans. In my view, this item in the Board's case, on the contrary of reasonably proving domination and interference, lends itself more probably to an oppo-

site conclusion. In the ordinary case all that can be done at collective bargaining negotiations between committees or agents chosen by employees and employer, respectively, is to carry on discussions and attempt to reach an agreement. So far as effectiveness and independence of employee bargaining is concerned, the arrangement in the Plans for Joint Committee equality of membership and voting power provides a superior method. As a result the employees have a real voice in adjusting differences and determining policies. The Act does not require that the employees shall have a preponderance of voting power in collective bargaining conferences any more than it permits the employer to have such a preponderance. What the Act requires is independence. Equality of membership and voting power on the Joint Committees accomplishes independence for both employees and employer. The Board objects that tie votes in a Joint Committee may block action. Equally may inability to reach agreement block action in any collective bargaining conference.[27] The Act requires good faith bargaining, but does not require the reaching of agreements. The principle of equal representation upon Joint Committees of employees and employers was recognized by the War Labor Board. This I have mentioned in the description above of the structure of the Plans.

(d) It is asserted by the Board that the Plans as a matter of structure dominate and interfere with the administration of the employees' labor organizations because under their provisions the Company has a voice in the amendment of the Plans. As shown by the description of the structure of the Plans, they provided, after 1935, for amendment by a vote of two-thirds of the entire membership of the General Body (or the Committee of Representatives, as the assembly thereof is called under some of the Plans), except as concerns amendments of three types, which are not to be effective until approved by the Joint Committee on Rules. This leaves the employees free to amend the Plans as they see fit, and without Company participation, so far as all amendments, except the three types referred to, are concerned. But since on the Joint Committee on Rules there is equal representation and voting power as between Employees' Representatives and Management's Representatives, management does have a voice in respect of the three types of amendments in question. Such amendments are those which (i) would materially change the procedure provided for the adjustment of grievances, or (ii) might prevent a Plan from operating as a fair method of selecting representatives and of collective bargaining, or (iii) might materially increase the obligation imposed upon the Company by a Plan.

The limitation on amendments which would materially change the procedure for the adjustment of grievances or which might materially increase the obligation imposed upon the Company is, I think, clearly a proper one. Nothing in the Act requires either employers or employees to submit to a given method of adjusting grievances or a given obligation unless they have consented thereto; it follows that if they have consented to one method or obligation, a unilateral change therein would have no force.

As to amendments which might prevent a Plan from operating as a fair method of selecting representatives for the whole body of employees or as a fair method of collective bargaining: If an amendment were proposed by employees which the Company thought might not result in a fair method of selecting Employees' Representatives or a fair method of collective bargaining, it would not, in my view, be bound under the Act to accept such an amendment except through the direction of a court. Although an employer may not interfere in the self-organization of his employees, he has a right to be certain when asked to deal with those who assume to represent them in the manner provided for by the Act that the representatives with whom he is to deal shall fairly represent them. As said by Gardner, Circuit Judge, in Hamilton-Brown Shoe Co. v. National Labor Relations Board, 8 Cir., 1939, 104 F.2d 49, 56, "We are of the view that it would be arbitrary and unfair, and not in keeping with either the letter or the spirit of the Act, to require the employer and its employees to conduct their negotiations through an agency not fairly representing a majority of the employees." And as to fair methods of collective bargaining, obviously the employer

---

[27] It is to be noted that tie votes do not necessarily block action in all respects under the Plans, for, as appears from the description of the structure of the Plans above set forth, a tie vote in a Joint Committee on Appeals may be referred to the president of the Company.

has a proper interest in them. But the Board contends that the result of this is to make the judgment of the Company as to what is fair a final criterion. That is not, I think, a supportable contention. If a difference of opinion between the employees and the Company should arise in respect of such a point, that disagreement could be taken by either party to the courts for determination of the question whether the proposed amendment would result in the selection of representatives who would fairly represent the majority of the employees and in a fair method of collective bargaining—in view of the agreement as a whole and its objectives. The case would be orthodox for a declaratory judgment declaring the rights of interested parties to a contract—the right, or the absence thereof, under the Plans, including the amendment provisions, to put such a proposed amendment into effect. Or, putting it otherwise, an amendment of this type proposed by employees, if contended by the employer not to be effective because not fair, would present a dispute as to the meaning of a contract—because what the contract is would depend upon whether or not the amendment was effective as a part of it.[28] If a court concluded that a proposed amendment would result in the selection of representatives who would fairly represent the employees and in a fair method of collective bargaining, the Company could not prevent the amendment. The fact that a contract contains a term the application of which may require court interpretation cannot condemn it. It is to be finally noted with respect to the amendment provisions of the Plans that there is no evidence in the case that the Company petitioner ever opposed any amendment proposed by the employees either before or after the 1935 changes in the amendment provisions.

(e) It is suggested by the Board that, even if the amendment provisions of 1935 are proper, still, since prior to 1935 all types of amendments required action by the Joint Committee on Rules, the employees must be said to have been under restraint and that this restraint will in its effect have continued despite the 1935 amendments. This argument fails because there is no evidence that any amendments proposed by the employees prior to 1935 (or afterwards) were opposed by the Company petitioner. But even if it be assumed that, prior to the 1935 changes, the employees were not free under the Plans because they could not alter them without Company consent, still it cannot reasonably be concluded that the employees have not become free in the four years intervening between the amendments of 1935 and the date of the Board's decision. In view of the strict enforcement of the Act by the Board, the liberal attitude of the courts in construing the Act, and the frequency of strikes against employers, it is opposed to realities and assumes unintelligence on the part of the employees to contend that they are not now free.

(f) The Board argues that the Plans do not "severably" set up a labor organization and an agreement for collective bargaining. But as pointed out in the discussion of their structure, if substance is regarded rather than form the Plans do set up a labor organization with separate and independent Committees (as distinguished from the Joint Committees) as well as a collective bargaining system. A labor organization under Section 2(5) of the Act is "any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers . . . ." It seems to me not possible to say on the facts concerning the structure of the Plans that they do not set up a labor organization within that definition. And it is to be seen also from the description of the structure of the Plans that they do set up a collective bargaining system in the Joint Committees.

---

[28] The Federal Declaratory Judgment Act provides, so far as immediately pertinent: "(1) In cases of actual controversy except with respect to Federal taxes the courts of the United States shall have power upon petition, declaration, complaint, or other appropriate pleadings to declare rights and other legal relations of any interested party petitioning for such declaration, whether or not further relief is or could be prayed, and such declaration shall have the force and effect of a final judgment or decree and be reviewable as such." Act of March 3, 1911, c. 231, § 274d, as added by Act of June 14, 1934, c. 512, 48 Stat. 955; as amended by Act of August 30, 1935, c. 829, § 405, 49 Stat. 1027, 28 U.S.C.A. § 400(1).

One of the accepted functions of declaratory judgment statutes is to afford an opportunity for determination of rights and liabilities under contracts. See Borchard, Declaratory Judgments (1934) at p. 405; 16 Am.Jur. 305, § 31.

Nothing in the Act requires that there be separate charters for labor organizations and for collective bargaining systems, or requires that in a single charter for both a labor organization and a collective bargaining system the provisions for each shall be separately stated.

(g) Finally, the Board contends in respect of the structure of the Plans that substantial identity in the provisions of the various Plans evidences a single scheme of the Company petitioner to dominate and interfere with the administration of the labor organizations of all of its employees. Examination of the Plans demonstrates that they are not identical in detail, although they are substantially the same in the essential provisions which have the object of forming a labor organization and providing a means of collective bargaining. But this identity is equivocal so far as evidence of domination and interference is concerned. If it can be said to support an inference of a single scheme of domination, it can with equal reason be said to support an inference that the Company and the employees at the various Plants were sincerely and cooperatively interested in embodying in each of the Plans the wholesome ideas for the creation of a labor organization and a collective bargaining agency which had their source in the direction of the War Labor Board. As has been commented above, evidence which is equivocal is not substantial.

Thus the attack of the Board on the structure of the Plans as supporting an inference of domination and interference with the administration of the employees' labor organizations fails. In my opinion the structure of the Plans shows that they constitute a labor organization which fulfills the definition of the Act and a system of collective bargaining calculated to operate so as to express the will of the employees in connection with such bargaining.

(3) The operation of the Plans and the conduct of the Company petitioner in relation to them. The finding of the Board, so far as all of the Plans other than the Cambria Plan are concerned, that the operation of the Plans and the conduct of the Company with respect to them spell interference, must rest, except insofar as copies of the Bethlehem Review and certain other publications which I discuss below in paragraph (e) of this topic (in connection with another contention of the Board which relates to all of the Plans), upon the following: the stipulated schedules of grievances handled under each of the Plans, together with copies of minutes of certain meetings admitted in evidence to supplement these schedules; the stipulation to the effect that as of the close of the hearing, the existing Plans operated in all material respects substantially in accordance with their respective provisions; and the stipulation showing that the employees during working hours had the amount of spare time stated therein.[29] This evidence, on the contrary of reasonably supporting an inference of domination and interference with the administration of the employees' labor organizations at the Plants other than the Cambria Plant, reasonably supports only an inference of freedom from interference. The structure of the Plans, as I have just pointed out, shows that they constitute a labor organization which fulfills the definition of the Act and a system of collective bargaining calculated to operate so as to express the will of the employees. The effect of the stipulation that the Plans operated in all material respects substantially in accordance with their respective provisions is, therefore, that they operated as a lawful labor organization and that in collective bargaining they did express the will of the employees. And the effect of the stipulation is further that the Plans operated without discrimination against any employee because of his belonging to or not belonging to any union or other organization, without discrimination against Employees' Representatives on account of their activities as such, that nominations and elections were conducted by the employees themselves in accordance with the rules prescribed by their Committee on Rules, with only such assistance by the management as might be requested by that Committee, and that they were conducted by secret ballot in such manner as to avoid interference with voters and as to prevent fraud in the casting or counting of ballots—for each of the Plans provided against such discrimination and provided for nominations and elections so conducted.

---

[29] I omit from this list of items reference to the stipulations as to the origin, history, and development of the Plans for the reason that they have not to do with operation of the Plans or conduct of the Company petitioner in respect of them.

The contention of the Board that the operation of the Cambria Plan and the conduct of the Company petitioner in respect of it evidence domination and interference, divides itself into the following specifications:

(a) The Board urges that the fact that the Management's Special Representatives under the Cambria Plan from time to time attended meetings of Committees (as distinguished from Joint Committees) evidences coercion. This contention is based upon a partial statement of the facts. It is without dispute that under the provisions of the Cambria Plan there was to be no such attendance except upon invitation, and there is nothing in the facts which shows that the Management's Special Representatives ever attended any Committee meeting except upon invitation. When this is considered, the fact of attendance is colorless. As said in Texas & New Orleans Railroad Company v. Brotherhood of Railway & Steamship Clerks, 1930, 281 U.S. 548, 568, 50 S. Ct. 427, 74 L.Ed. 1034, from which I have quoted in topic IV, the Act does not prevent the normal relations and innocent communications between employer and employee which reasonable men should not regard otherwise than as proper.

(b) It is asserted by the Board that the manner in which new employees were introduced to the Plan at the Cambria Plant by the foremen as described above is iniquitous. This item can evidence pressure upon the employees only by an assumption of the very point in issue. If overriding the will of the employees were otherwise proved, then of course for a foreman to inform an employee concerning the Plan would be to introduce him to domination and interference. But if the Plan operated lawfully, then to inform new employees concerning it would itself be lawful. Therefore, the foremen's action alone proves nothing.

(c) The Board attacks the holding of annual conferences by Management's Representatives and Employees' Representatives at the Cambria Plant as evidencing domination and interference. In the absence of such conferences, it could with equal cogency be contended that the Company was refusing to cooperate in collective bargaining activities and relationships. The circumstance is thus palpably equivocal, and therefore constitutes no substantial evidence. Moreover such conferences constitute normal relations.

(d) The Board claims that the holding of nominations and elections at the Cambria Plant on Company property and with ballot boxes and booths furnished by the Company evidences coercion. I think that this is an equivocal item. It can with equal reason be inferred that it was a matter of practical convenience for 16,000 employees. As stated above the War Labor Board craft plan election of 1918 at the Bethlehem Plant was thus held.

(e) It is contended by the Board that the Company's statements concerning the Plans and outside unions in the "Message," "Ten Years' Progress in Human Relations" and the Bethlehem Review evidence domination and interference with the labor organizations of the employees. This contention is made in respect not only of the Cambria Plan but also in respect of the other Plans, since it was stipulated that this matter was distributed at the other Plants also. Examination of these publications, which, in order that the character of the statements therein made may be seen, I have set forth in some detail in the statement of facts in this topic, discloses that the material contained in them is an expression of employer opinion. There is nothing in the National Labor Relations Act which expressly forbids expressions of opinion by employers concerning the merits of labor disputes, labor organizations and the like. If such expressions are forbidden by the Act it is because they are within the category of interference or coercion denounced by the Act. Moreover, if the Act should be construed to forbid employers the right to express themselves, short of statements of such nature or statements made under such circumstances as will corrupt or override the will of their employees, or of statements of a defamatory character, the Act would run afoul of the First Amendment to the Constitution. The Supreme Court in Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093, and in Carlson v. California, 1940, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104, has made clear that employees are free to express themselves concerning the merits of labor disputes through peaceful distribution of handbills, the making of speeches, and peaceful picketing, the Court holding that such expressions of view by employees are protected by the First Amendment. The protection of that Amendment extends to employers as well as to employees. As was said in Midland

Steel Products Co. v. National Labor Relations Board, 6 Cir., 1940, 113 F.2d 800, 804:

". . . Unless the right of free speech is enjoyed by employers as well as by employees, the guaranty of the First Amendment is futile, for it is fundamental that the basic rights guaranteed by the Constitution belong equally to every person."

Several other Circuit Courts of Appeals have ruled that the Act does not, and cannot constitutionally, forbid to an employer the right to express himself to his employees on the merits of various labor organizations and to express preferences between them, so long as he does not override the will of his employees. National Labor Relations Board v. Union Pacific Stages, Inc., 9 Cir., 1938, 99 F.2d 153; Continental Box Company v. National Labor Relations Board, 5 Cir., 1940, 113 F.2d 93; Midland Steel Products Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Ford Motor Company, 6 Cir., 1940, 114 F.2d 905; National Labor Relations Board v. Falk Corporation, 7 Cir., 1939, 102 F.2d 383; Jefferson Electric Company v. National Labor Relations Board, 7 Cir., 1939, 102 F.2d 949. These courts have variously sustained the right of an employer or his representatives: to express a general opinion that an employee would find it more to his advantage not to belong to a union;[30] to read a statement to his employees, shortly before the conduct of a consent election, setting forth the employer's policy on various points including several subjects normally the subject of negotiation where there is collective bargaining, and expressing his opposition to the closed shop;[31] to say to the financial secretary of a union that the men in the employer's employ are "disgusted with unionism" and "have lost all of their incentive to do good work";[32] and to express to employees the employer's preference for a local over an outside union.[33] In National Labor Relations Board v. Ford Motor Company Mr. Ford had distributed to his employees a pamphlet containing his views on labor. In refusing to sanction the Board's finding that this was an unfair labor practice, the Circuit Court of Appeals said:

"Nowhere in the National Labor Relations Act is there sanction for an invasion of the liberties guaranteed to all citizens by the First Amendment. The Board, however, urges that these rights are qualified and not absolute, and that there are circumstances under which an expression of view upon labor policies by an employer is within the condemnation of the statute as constituting interference and coercion, and that the present situation, set against a background of publicly declared opposition by Mr. Ford to the unionization of his plant, brings the challenged publications within the definition. We do not ignore the view that 'any sort of influence exerted by an employer upon an employee, depending upon his employer for means of livelihood, may very easily become undue in that it will coerce the employee's will in favor of what the employer desires against his better judgment.' Virginian R. Co. v. System Federation No. 40 et al., 4 Cir., 84 F.2d 641. This holds the employer forever suspect and in practical application must necessarily silence him whose opinion may be the best informed, no matter how honestly his views may be entertained, or how truthful may be his observations. If the concept that an employer's opinion of labor organizations and organizers must, because of the authority of master over servant, nearly always prove coercive, ever had validity, it is difficult now to say, in view of the National Labor Relations Act, its adjudication as constitutionally valid, its strict enforcement by the National Labor Relations Board, and the liberal attitude of the courts in construing it so as best to effectuate its great social and economic purpose, that the concept is still a sound one. The servant no longer has occasion to fear the master's frown of authority or threats of discrimination for union activities, express or implied." [114 F.2d at page 914.]

The statements in the publications which the Board has interdicted in the instant case praise the Plans and their accomplishments and contrast the Plans and their advantages with the claimed advantages of outside unions and with the disadvantages of outside unions as described by the Company. I am unable to see anything of a corrupting or overriding nature in this material. And there is no evidence that the publications were distributed under such circumstances as would cause them to override or corrupt the will of the employees; and there is no contention that the statements were defamatory or untrue. Therefore the Company petitioner had a right to make the statements that it did and the making of them was not an unfair labor practice or evidence thereof. I think that an interpretation of the Act which would hold the making of such statements to be an unfair labor practice or evidence thereof would render it to that extent unconstitutional, as an invasion of the right of free speech guaranteed by the First Amendment.

---

[30] National Labor Relations Board v. Union Pacific Stages, Inc.

[31] Continental Box Company v. National Labor Relations Board.

[32] Midland Steel Products Co. v. National Labor Relations Board.

[33] National Labor Relations Board v. Falk Corporation.

There has been no direct ruling on this question by the Supreme Court. In Virginian Railway Co. v. System Federation No. 40, 4 Cir., 1936, 84 F.2d 641, the Circuit Court of Appeals affirmed a decision of the District Court (D.C.E.D.Va.1935, 11 F.Supp. 621) that the Railway had violated the Railway Labor Act by circulating among employees a statement, signed by a superintendent, urging the employees to give careful consideration to the subject of representation for collective bargaining, and indicating that the Railway preferred them to choose a certain independent association as their representative rather than the American Federation of Labor. This case was affirmed upon other points in Virginian Railway Co. v. System Federation, 1937, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789. The Supreme Court decision constitutes no ruling on the question under discussion.[34]

It is thus seen that the several contentions of the Board—that the origin, the structure, and the operation of the Plans, together with the conduct of the Company petitioner in relation to them, show domination and interference by the petitioners with the formation and administration of the labor organizations of the employees—fail, and with them fails the ultimate finding of the Board on this subject, for lack of substantial support in the evidence.

The insubstantiality of the Board's case is even more clear when the facts relied upon by the Board in support of its finding are viewed in the light of other items in the record of which the Board apparently did not take account. I refer to the undisputed continuous policy of the petitioners over a period of approximately twenty years in favor of collective bargaining, the absence during the same period of discrimination against employees on account of union activities, the accomplishment under the Plans of uninterrupted employment and of wholesome labor conditions, and the annual expression by the employees, since the adoption of the Plans, of their approval of the same by voting thereunder. Board supervised elections are one means of determining employees' satisfaction with labor organization and collective bargaining arrangements, but they are not the only means. Employees may indicate their approval by other conduct. The annual voting in the instant case may not be conclusive, but it is persuasive and therefore cannot be ignored.

It is of further distinct significance in respect of the case under the issue of domination and interference that, despite the Board's freedom from restrictions upon the use of subpoenas, and despite the fact that the Plans had been in operation for substantially twenty years, the Board, so far as the Plants other than the Cambria Plant are concerned, called from among many thousands of employees none to testify to any acts of coercion, intimidation or discrimination by the Company against employees or Employees' Representatives. "It is well settled that if a party fails to produce the testimony of an available witness on a material issue in the cause, it may be inferred that his testimony, if presented, would be adverse to the party who fails to call the witness." 20 Am.Jur. 192, § 187. And see 22 C.J. 115, § 55; 1 Jones, Evidence (4th ed.1938) § 19. So far as the Cambria Plant is concerned, at which alone there were 16,000 employees, the Board called four witnesses,[35] one of whom testified that his inspector told him to vote in 1937, another that his foreman had done the same in 1935, and two more who testified that by a paymaster and foreman respectively they had been told to vote before they could get their pay. But the testimony of these witnesses was flatly contradicted by the inspector, foremen and paymaster in question,[36] and the Board in its decision accepted the contradictions as true and made no finding of coercion in respect of voting. The Board points to no other witnesses called to testify to any acts of coercion, intimidation or discrimination by the Company against employees or Employees' Representatives at the Cambria Plant. Moreover, as I have pointed out in topic II, the Board excluded offered testimony for the petitioners by Employees' Representatives that they had never been subjected to coercion.

*The Board's order of disestablishment.* Since there was no substantial evidence of

---

[34] There is a helpful review of the cases in the Illinois Law Review, December, 1940, Volume XXXV, No. 4, pp. 409 et seq., under the title "Freedom of Speech and the National Labor Relations Act," by Lewis H. Van Dusen, Jr.

[35] Jose Jaime, Houston Underwood, Edgar Rupert, and George Fetzko.

[36] Louis F. Midderhoff (inspector), William Marley, Lawrence M. McDowell (foremen), and Michal Singel (paymaster).

domination and interference with the formation and administration of the Plans, there is no basis in the case for the order disestablishing them. Disestablishment is a measure which the Supreme Court has held within the power of the Board if necessary to effectuate the policy of the Act to free employees from coercion or restraint of their will in respect of self-organization and collective bargaining through representatives of their own choosing. National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Pacific Greyhound Lines, 1938, 303 U.S. 272, 58 S.Ct. 577, 82 L.Ed. 838. As phrased in the latter case, employees must be released from "compulsions," "the employee's impulse to seek the organization which would most effectively represent him" must be set free. But if, as in the instant case, there is no evidence that the employees' impulse had been coerced, overridden or corrupted, then the factual predicate for disestablishment has failed.

*The authorities relied upon by the Board.* I find nothing in the cases principally relied upon by the Board which requires a result different from that which I reach in this topic. Such cases are: National Labor Relations Board v. Pennsylvania Greyhound Lines, cited above; National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co., 1939, 308 U.S. 241, 60 S.Ct. 203, 84 L.Ed. 219; Westinghouse Electric & Mfg. Co. v. National Labor Relations Board, 2 Cir., 1940, 112 F.2d 657, affirmed per curiam by the Supreme Court, March 10, 1941, 61 S.Ct. 736, 85 L.Ed. ——. In each of these cases, disestablishment by the Board of an employees' association was affirmed.

In National Labor Relations Board v. Pennsylvania Greyhound Lines the Board had found that the Pennsylvania Greyhound Lines, Inc., and the Greyhound Management Company, an affiliate, "had engaged in unfair labor practices by interfering with, restraining, and coercing employees in the exercise of their rights, guaranteed by § 7, in that they had dominated and interfered with the formation and administration of a labor organization of their employees, Employees Association of the Pennsylvania Greyhound Lines, Inc., and had contributed financial and other support to it in violation of § 8(1), (2)." There was no challenge in the case either of these ultimate findings or of the subsidiary findings upon which they were based, and the only questions ruled on were first, whether the Board had power under the Act to disestablish an employees' association and, second, whether under the findings of the Board, disestablishment was warranted. Upon a review of the legislative history of the Act, including, as known to the Congress, Texas & New Orleans Railroad Company v. Brotherhood of Railway & Steamship Clerks, 1930, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034, in which disestablishment of a local association as an appropriate means of preventing interference with the rights secured to employees under the Railway Labor Act of 1926 was upheld, the Court held as to the first question that disestablishment was an instrument within the armamentarium of the Board within the meaning of Section 10(c) of the National Labor Relations Act, directing that when the Board finds that any person has engaged in an unfair labor practice, it "shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action . . . as will effectuate the policies of this Act. . . ." As to the second question, the Court held that upon the findings made in the case the Board's order of disestablishment was supportable. In short, the Court held merely that as a matter of law, disestablishment is within the authority of the Board as a means of effectuating the policies of the Act, and that where domination of and interference with the formation and administration of labor organizations has occurred, disestablishment is warranted. The Court did not, because the findings of domination and interference were not challenged, pass upon what constitutes domination and interference. Therefore the case, so far as its actual holding is concerned, is of no aid in determining whether in the instant case the inference of domination and interference drawn by the Board from the undisputed subsidiary facts is supportable. It is true that the Court remarked that the subsidiary findings of fact sustained the ultimate finding that the Greyhound Lines and the Management Company "had engaged in unfair labor practices, by active participation in the organization and administration of the Employees Association, which they dominated throughout its history, and to whose financial support they had contributed; and that they had interfered with, restrained and coerced their employees in

the exercise of the rights confirmed by § 7 to form for themselves a labor organization and to bargain collectively through representatives of their own choosing." And in discussing the question whether the facts found warranted the order of disestablishment, the Court emphasized that: the Greyhound Lines and the Management Company had initiated the project for organization of the employees under company domination, and had through officers or other representatives been active in promoting the Association, in urging employees to join, in preparing details of organization, including the by-laws, in presiding over organization meetings and electing employee representatives; there was an absence in the Association by-laws of provisions for meetings of members or for a procedure whereby employees could instruct their representatives or receive reports from them; under the by-laws grievances could not be appealed to a joint reviewing committee unless there was a joint submission by employee and management representatives; change of by-laws without employer consent was precluded because amendment required a two-thirds vote of the joint reviewing committee which was made up equally of management and employee representatives; the Association functioned only to settle individual grievances, and on the only recorded occasion when the employees sought a wage increase the company representatives prevented its consideration; and when certain of the employees organized a local A. F. of L. union, the company officials warned the employees against joining and threatened them with discharge if they should join, and kept the union meetings under surveillance.

The material differences between these items and the facts under present consideration are obvious: In the instant case the Plans were initiated under the aegis of the War Labor Board of 1918; under the Bethlehem and Cambria Plans the employees duly elected their own representatives to act in respect of adopting the Plans, and so far as the other Plans are concerned there is no showing that the representatives who acted in respect of their adoption were not duly elected by the employees; and the facts show no presiding over organization meetings by officials of the petitioners; in the Pennsylvania Greyhound case the employees were scattered throughout many different states[37] and could have had, therefore, only occasional opportunity for consulting with their representatives or even with fellow employees, so that some procedure for disseminating information by representatives and communicating the ideas of employees to their representatives might have been essential, whereas in the instant case, where the employees under each Plan are concentrated in a single plant and all live in the same community, there is natural opportunity for consultation between employees and for dissemination of ideas between them and their representatives. Under the Plans in the instant case a grievance, after being first taken up with the employee's foreman, is next submitted to the superintendent of the department in which the employee is employed, and if satisfaction fails in this stage, submission may be made to the Management's Special Representative, then to the Plant manager, and then through the Employees' Representative to the Joint Committee on Appeals, and finally, if a settlement is not effected there satisfactory to the employee, the Company president may be notified and the matter may be referred to arbitration, if the president and a majority of the representatives on the Joint Committee on Appeals agree. Again, on the present record the Plans function to settle not merely individual grievances but also differences concerning groups of employees with respect to wages, hours, conditions of work, and the like. Further, there is here no evidence of discrimination against other labor organizations or against employees in respect of their relationship to the same, and no evidence that surveillance was carried on in a manner constituting an unfair labor practice. Finally, under the Plans in the instant case the provisions for amendments since 1935 require no Company consent except in respect of three categories of amendments concerning which, as I have shown, the Company had a right not to be bound without its consent, unless in respect of one category a court otherwise ruled.

In National Labor Relations Board v. Newport News Shipbuilding & Dry Dock Co. the Board's order of disestablishment of an employees' labor organization, known as the Employees' Representative Committee, was based upon ultimate findings that the Company had dominated and interfered with the formation and adminis-

---

[37] This does not appear from the face of the decision in the Supreme Court, but it does appear from the record in the case.

tration of the Committee, had contributed to its financial and other support, and was at the time of the findings still dominating and interfering with the Committee contrary to Section 8(1) and (2) of the Act. The sole issue was as to the propriety of the order of disestablishment. The subsidiary findings of fact were not the subject of serious controversy but the ultimate findings above stated were attacked by the Company as not justified by the subsidiary findings. The latter were to the following effect: As the plan was originally instituted in 1927 administration was vested in joint committees consisting of five representatives elected by the employees and five chosen by management from among the employees; a provision calling for the arbitration of differences became operative only upon concurrence of the Company president; amendment of the plan required either an affirmative vote of two-thirds of the full membership of a joint committee on rules or an affirmative vote of all of the employees' representatives and representatives of management at an annual conference; the employees' representatives were paid $100 per year extra compensation for acting as such. Under a revision of the plan in 1931 administration was placed in a general joint committee—instead of in several joint committees—composed of two representatives to be elected by the employees from each department and of an equal number of management representatives appointed by the Company, the majority of each class of representatives constituting a quorum; there was also an executive committee consisting of five elected employees' representatives and five representatives of management; finality of action by the general joint committee was dependent upon the approval of the Company president; to amend the plan required a two-thirds vote of the entire general joint committee and amendments were to become effective only upon approval of the Company president; the extra compensation paid employees' representatives was reduced to $60 annually. In 1937 the plan was again amended with the following features significant: administration was placed in an employees' representative committee which was substituted for the general joint committee and the executive committee existing under the 1931 form; finality of action taken by the employees' representative committee was possible only if the Company agreed; amendment of the plan was to

be by two-thirds vote of the entire employees' representative committee, but the Company could prevent the amendment from becoming effective by disapproving it within fifteen days after passage.

The foregoing makes plain that the plan in the Newport News case was materially different from that in the instant case. In the Newport News case during all of the period between the institution of the plan in 1927 and until the 1937 changes were made (and this was up until the very time when the Board's complaint was filed, June 12, 1937), the employees had nothing in the nature of a separate labor organization over which they had independent control. The entire administration was by joint committees, and even after the creation in 1937 of the employees' representative committee finality of action was in all respects subject to Company consent. In the instant case there has been a separate labor organization the administration of which was within the control of the employees from the beginning. Under the Newport News plan the employees' representatives were paid by the Company for acting as such. There was no such extra payment in the instant case. Again, the amendment provisions in the instant case have been free from any proper objection since 1935 when the National Labor Relations Act went into effect, whereas in the Newport News case during the whole of the ten-year period mentioned up to the filing of the Board's charges, the plan could not be amended in any respect if the Company disapproved the amendment. This point was especially emphasized by the Supreme Court in the Newport News case. The Court said that such control of the form and structure of the organization deprived the employees of the complete freedom of action guaranteed by the Act and justified the order of disestablishment. The case therefore as decided upon the facts shown in the record supports disestablishment of a plan fundamentally different from the Plans in the instant case.

It is true that the opinion of the Court states that, after a hearing in the Circuit Court of Appeals, that court had been advised in a brief that the Newport News plan had been amended by striking out the objectionable restriction upon amendments and that the lower court had therefore concluded that its prior existence was immaterial. The Supreme Court said that the Court of Appeals could not consider that fact, that the case had to be decided on the

record certified by the Board. It is true also that the Court nevertheless remarked that if the record did disclose such an alteration of the plan, the order of disestablishment could not be held erroneous; that where an organization has existed for ten years and has functioned in the way that the Employees' Representative Committee had functioned, with joint control vested in management and men, the effects of the long practice could not be eliminated and the employees rendered entirely free to act upon their own initiative, without complete disestablishment of the plan. This statement, however, is but a dictum, since it assumes the existence of a fact which the Court had stated could not be considered in deciding the case. The instant case is not to be decided upon the basis of dicta; the parties have a right to a decision upon the basis of actual holdings. Moreover, the dictum is based upon facts distinguishable from those in the instant case. Under the facts assumed by the dictum the employees in the Newport News case had never been free until after the hearing in the Circuit Court of Appeals to adopt such form of organization or representation as they wished, because the amendment restriction forbade it; whereas in the instant case the employees were free after 1935 to have such form of labor organization as they saw fit, and so far as representation was concerned, were free of any restriction upon amendments to the Plans except in three categories of amendments which, as I have demonstrated, properly require Company consent. Also, the dictum is in part based upon the record fact that there was from the beginning in all aspects of the plan a joint control vested in management and men. This, as I have shown, has never been true in the instant case: from the beginning there has been a separate labor organization the administration of which was solely within the control of the employees through Committee, as distinguished from Joint Committee, action.

In Westinghouse Electric & Mfg. Co. v. National Labor Relations Board the Company had organized in 1933 a "plan" which had governing committees made up equally of elected representatives of the employees and of "management employees" appointed by the Company. The Company's share in the plan's management and direction was apparently—it is not detailed in the opinion—such as the National Labor Relations Act forbids. In March 1937 some of the employees organized a local of the C. I. O. and later secured a charter. After the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, cited above, had declared the Act constitutional, the Westinghouse Company itself decided that the plan was unlawful and, through its plant manager, announced to the "joint conference committee" under the plan that the Company would no longer support it and that it would be discontinued; and the plant manager stated that he was not interested in what plan the employees adopted—that that was their business. But this announcement was not made to the employees generally by the Company. The employees themselves then organized an "Independent" union which petitioned the Board for recognition as an exclusive bargaining agency and also attempted to secure recognition from the Company, failing, however, to obtain recognition from either. The Board filed a complaint charging unfair labor practices by the Company and after a hearing made three specific findings of discrimination against the C. I. O. local. These findings were that: in a talk between a Company superintendent and the president of the C. I. O. local the superintendent asked the president whether his job was more important to him than the union; the Company had refused to allow the C. I. O. local to use the Company recreation room for an address by a C. I. O. organizer because he was not an employee, although the "Independent" had been allowed to use that and other rooms; and the Company had refused to permit the C. I. O. local to use its bulletin boards. The Board in its decision also criticized the constitution of the "Independent" because it provided that an officer or member of a governing committee must be an employee of the Company with the result that, if discharged, he *ipso facto* lost his position on the governing committee. The Circuit Court of Appeals found nothing material in this criticism, or in the refusal to allow use of the bulletin boards. It did confirm the other two items of discrimination, saying, however, that they would be insufficient to support the Board's order except for the decision of the Supreme Court in the Newport News case. Commenting upon that case the Circuit Court of Appeals said that the theory is that:

". . . in cases . . . where an unaffiliated union seems to the employees at large to have evolved out of an earlier joint organization of employer and employees, the Board

may take it as datum, in the absence of satisfactory evidence to the contrary, that the employees will suppose that the company approves the new, as it did the old, and that their choice is for that reason not as free as the statute demands. How substantial such a fear really is, it is not for us to say; upon how much evidence the Board may insist to make public the change, the court did not declare; nor need we here; for the company did not make any effort to make it plain to the employees generally that the 'Independent' was not a revision, or amendment, of the 'Plan' . . . ." [112 F.2d at page 660.]

In short, the gist of the decision in the Circuit Court of Appeals, and presumably, therefore, of the per curiam decision in the Supreme Court affirming it, was that since the announcement of the Company that it would no longer support and would discontinue the original "plan" was made only to representatives of the employees, rather than to the employees at large, the latter might still think that the Company preferred the "Independent" to the C. I. O. local, and therefore the Board might insist that before an election should take place "the decks should be cleared of the 'Independent' because it stood in the path of an untrammeled choice." Putting it otherwise, the Westinghouse case holds that failure on the part of the Company to advise all of the employees, as distinguished from a committee of representatives, that the Company was indifferent as to whether they joined the newly formed "Independent" or the C. I. O. local, was sufficient to warrant disestablishment. The rationale of the case therefore is that the Board has power through disestablishment, before an election held to choose between two newly formed labor organizations one of which has succeeded an unlawful company union, to free the mind of employees of doubts as to whether their employer may not prefer the successor organization, where the employer has not clearly announced to the employees generally its indifference. It is plain that the case is so different on its facts from the instant case that it constitutes no precedent.

It is to be commented further in respect of each of the three cases above discussed that the Supreme Court does not in them assume to lay down a final touchstone or criterion for the determination of issues of domination, interference and disestablishment. Whether or not there is domination and interference with the formation and administration of labor organizations of employees and if so whether or not disestablishment is warranted as an effectuation of the policies of the Act, are questions of

fact which must be determined upon the facts in each case as it arises. None of the decisions in the Supreme Court constitutes in my view a binding precedent.

The Board urges also Bethlehem Shipbuilding Corporation v. National Labor Relations Board, 1 Cir., 1940, 114 F.2d 930. That case is on its facts similar to the instant case so far as the issue of domination and interference is concerned—except that it does not appear that the plan of employees' representation therein involved was instituted under the aegis of the War Labor Board of 1918. But for the reasons which have caused me to reach the conclusion to which I have come in the instant case with respect to the issue of domination and interference, I do not find the case persuasive.

## VI

### Contribution of Support to the Plans

The Board found that the Company petitioner "has contributed support" to the "Plans of Employees' Representation at its various plants," and it made a similar finding in respect of the Corporation petitioner. It made no finding as to when such contribution began or ended. The Board concluded, however, that "by contributing support [to the Plans] . . . the respondents [petitioners] have engaged in and *are engaging in* unfair labor practices within the meaning of Section 8(2) of the Act." (Italics supplied) And in paragraph 1(a) of its order, the Board required the petitioners to cease and desist "from contributing support to the said Plans of Employees' Representation or to any other labor organization of the employees." The Board's conclusions and order were dated August 14, 1939. Section 8(2) of the Act makes it an unfair labor practice "to . . . contribute financial or other support to" any labor organization, but further provides that "an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay."

The facts upon which the Board's finding must be justified are these: Until shortly after April 12, 1937, the date the Supreme Court decided National Labor Relations Board v. Jones & Laughlin Steel Corporation, cited above, each of the Plans, as appears from the description of their structure in topic V, provided that Employees' Representatives should receive "for time necessarily occupied through actual attendance at regular or special meetings or con-

ferences held pursuant to the Plan . . . payment commensurate with their average earnings," and provided further that the Company should "defray such expenses as are necessarily incident to the discharge of duties under the Plan." In view of the stipulation in the case concerning the Plans other than the Cambria Plan—that they operated in accordance with their provisions—it is to be taken, in respect of such Plans, that the payments and expenses referred to in the quoted provisions were made and defrayed from the time of the adoption of such provisions up until the time of their amendment shortly after April 12, 1937. As to the Cambria Plan, it is without dispute that, until shortly after April 12, 1937: the Company petitioner omitted to deduct from the pay of Employees' Representatives at the Cambria Plant for time spent by them in Plan activities, whether they were engaged in conference with Management's Representatives or not; the Company permitted Employees' Representatives to attend Plan meetings during working hours, permitted employees to take time to vote without loss of pay during working hours, permitted the holding of nominations and elections on Company property and furnished voting booths and ballot boxes without charge; the Company provided, without charge, rooms and a headquarters office in a Company garage building for the Plan, printed and distributed at Company expense schedules of dates of meetings for the General Body, furnished the services of a clerk to write up the minutes of the Committee meetings and meetings of the General Body;[38] and at an annual conference between Employees' Representatives and Management's Representatives followed by a banquet, the Company paid the cost of the banquet.

After April 12, 1937, when the Supreme Court decided in National Labor Relations Board v. Jones & Laughlin Steel Corporation that the Act was constitutionally applicable to such a manufacturing business as that of the petitioners, written inquiries were received by the Company petitioner from employee officials under the Plans, requesting information as to the effect of recent Supreme Court decisions, including the Jones & Laughlin decision, upon the Plans. These inquiries stated that it was the desire of the employees that the Plans

comply with the law, and asked for help and advice in respect of any necessary changes, so that amendments could be made. In a letter of reply signed by a Management's Representative, the Company called attention to Section 8(2) of the Act, and to those two paragraphs of the Plans which provided for the payments referred to, and then stated:

"In view of the provisions of paragraph (2) of Section 8 of the Act to which I have referred above, it would appear to be necessary that those two paragraphs . . . be changed so as to bring them strictly within the provisions of such paragraph (2) of Section 8 of the Act. You will note that the provisions of such paragraph (2) do not prohibit the employer (that is, in your case, Bethlehem Steel Company) from conferring with its employees during working hours without loss of time or pay to such employees. Bethlehem Steel Company is, therefore, willing to comply with the provisions of your Plan to the extent that they require the Company to pay the Employees' Representatives under the Plan their regular wages for the time during the working hours that such Representatives shall use in conferring with the Management in the performance of their duties under the Plan, subject, of course, to any rules and regulations that may be made and published by the Labor Board.

"As to the expenses of the Plan which the Company under the Act cannot pay, I think I should add that I do not believe that they will be found burdensome to the employees and I believe that you will be able to prepare provisions to be put into your Plan by amendment that will take care of such expenses at a comparatively small cost per employee. I have made some inquiry as to what has been done under other plans in effect among the employees of other companies and have been advised that the total charge per employee under some of the plans has been as low as One Dollar a year.

"I have again carefully read your Plan of Employees' Representation in the light of the decision of the Supreme Court in the J. & L. case and of discussions I have had with counsel and I believe that it will not be necessary for you to adopt any amendments to the Plan other than those to which I have referred above, in order that you may make it strictly comply with the provisions of the Labor Relations Act.

"It, however, may well be that you and the other Employees' Representatives will think it advisable to make some other changes in your Plan, such as, for instance, to provide for a Treasurer under the Plan and how moneys held by him may be paid out . . . ."

In accordance with the views expressed in this letter and as has been explained in the description of their structure in topic V, all of the Plans other than the Rankin Plan were shortly amended so as to provide that

---

[38] There is no contention that the minutes thus written did not produce an accurate record or that improper control was exercised as to what should be in them.

the Company make payments and defray expenses "only to the extent permitted by law." Although the Rankin Plan was not formally so amended, the Company advised the Committee of Representatives under that Plan that except to the extent permitted by law, it would make no further payments and defray no further expenses. After the amendments, and after this statement by the Company in respect of the Rankin Plan, all contributions to any of the Plans ceased, except such as were lawful. At the Cambria Plant after the amendments, the Plan paid the Company for headquarters office space in the garage building and for the use of a clerk for the preparation of minutes.

The Board attacks the advice given in the letter above printed as a form of "other support" under Section 8(2). This attack is not, I think, sustainable. In my opinion the Act cannot properly be construed to prohibit an employer party to a collective bargaining agreement from advising his employees what he, the employer, may or may not lawfully do under the agreement.

The facts above stated show that the Company petitioner had, indirectly, contributed financial support to the Plans prior to the time of their amendment and of the discontinuation of payments under the Rankin Plan, and the facts therefore do support the finding of the Board that the Company petitioner "has contributed support." But they do not support the conclusion of the Board that the petitioners "are engaging in unfair labor practices" by contributing support to the Plans, because the contribution ceased shortly after April 12, 1937. Moreover, the facts show that the contribution was not covert or in bad faith, but was made in accordance with the obligations of the Plans prior to their amendment. Since this is true, and since contribution was promptly discontinued upon determination by the Supreme Court that the Act was constitutionally applicable to such a business as that of the petitioners, there is in my opinion no predicate in the case for a cease and desist order in respect of contribution. Since the contribution was not in bad faith and was promptly discontinued once the law was settled, there is no basis for inferring that it might be repeated. And since there has been no contribution for more than two years prior to the Board's order there is no present act or practice against which a cease and desist order can

operate. That cannot be stopped which has already ended.

## VII

### CONTRIBUTIONS TO THE CITIZENS' COMMITTEE AND TO THE MAYOR OF JOHNSTOWN

It is without dispute in the case that between June 17 and July 28, 1937, the Company petitioner paid to a Citizens' Committee of Johnstown, Pennsylvania, $32,078.25, and that on July 22, it paid to the Mayor of Johnstown $4,372. The Board's decision stated, in respect of the Citizens' Committee, that "its prime function was that of vilifying the union [S. W. O. C.] organization and engendering public hostility and opposition to the strikers." In respect of the payments to the Citizens' Committee the decision stated that "The Company was thus implementing and strengthening an agency which was seeking to defeat the efforts of the union organization and to destroy that organization by creating hostility toward it." The Board made an ultimate finding that, in violation of Section 8(1) of the Act, "the Company, by making the payments described above, has interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed by Section 7 of the Act." The decision of the Board did not particularize the manner in which the Company, by making the payments described, interfered with, restrained or coerced its employees in their rights of self-organization, collective bargaining and concerted activities guaranteed by Section 7. And the decision expressly stated: "We do not find that the respondents [petitioners] induced or participated in the formation of the Citizens' Committee."

The facts upon which the Board's statements and finding must be justified in this aspect of the case are largely without dispute and are in substance as follows: A strike was called by S. W. O. C. on June 11, 1937, at the Cambria Plant of the Company petitioner at Johnstown. The Plant is situated partly in Johnstown and partly in adjoining boroughs. The population of Johnstown and these boroughs was at that time approximately 125,000 persons, of which 70,000 were in the city itself. There were 16,000 employed at the Cambria Plant, with monthly earnings of over two and one-half million dollars. The city and surrounding boroughs were largely dependent for economic existence upon the continuous operation of the Plant. The residents and city officials of Johnstown, and the repre-

sentatives of the Company petitioner in charge of operations at the Cambria Plant, had reason to fear that the strike would be accompanied by disorder and violence and by hardship to the residents of the city and adjacent boroughs, including the employees of the Company. Other strikes which had been recently called by S. W. O. C. in Wisconsin, Ohio, Pennsylvania, Indiana, Illinois, Michigan and New York, had been characterized by extreme disorder and violence. Violence in connection with the strike commenced at Johnstown on Sunday, June 13, and continued until June 19, when the Governor of Pennsylvania declared martial law and closed the Cambria Plant. The strike as such continued until sometime in July. Employees were stoned and beaten as they endeavored to enter the various gates of the Plant; street cars and automobiles carrying employees to and from work were stoned and some automobiles upset; automobiles toured the vicinity of the Plant, their occupants attacking and beating employees on their way to and from work; employees and their families were threatened with personal injury and property damage in the event that such employees should continue to work. The police department of Johnstown was unable to cope with the emergency, and the police of the borough and the sheriff of the county in which Johnstown was located and the Pennsylvania State Police did not bring the lawlessness under control. On Sunday June 13 a Citizens' Committee was voluntarily organized by a group of Johnstown residents who met at the Fort Stanwix Hotel. The members were respectable citizens not connected with the petitioners. The Board found that "the existence of violence and the apprehension of violence induced by newspaper reports of violence and strikes at other steel plants were two of the factors leading to the formation of the Citizens' Committee." The purposes of the Committee, as described by the Reverend John H. Stanton, a Presbyterian minister in the community who conceived the idea of calling citizens together to form a committee and who himself became a member, by Francis C. Martin, vice-president of the United States National Bank in Johnstown, who became chairman of the Committee, by Carl Geis, a business man in Johnstown, by Rabbi Abram M. Granowitz, of Beth Zion Temple in Johnstown, and by Reverend George W. Nicely, minister of the First Lutheran Church, were, as variously expressed:

"To form an organization that would support necessary efforts to maintain law and order in Johnstown and vicinity and to foster the rights of those who wanted to work, to do so.

\*     \*     \*

"To maintain law and order in Johnstown and to give every man the right to work who wanted to work, which we regarded as his constitutional right.

\*     \*     \*

". . . to come together and consider ways and means whereby we might help the Mayor of the city to maintain law and order, and also he referred to the fact that men were not allowed to go to work because of threats and violence, thought we ought to do something about that.[39]

\*     \*     \*

". . . The fundamental purpose was to keep the situation peaceful in Johnstown, to do everything in our power to keep it peaceful.

\*     \*     \*

". . . we felt that we were as much interested in the rights of the one party to strike as we were in the rights of the other, and that we had to take a strictly neutral course as long as the strike continued peacefully and orderly.

\*     \*     \*

". . . the Citizens' Committee was created for one specific function, to maintain law and order . . . ."

During the period from the formation of the Citizens' Committee on June 13 until the cessation of violence on June 19, the Committee attempted to persuade the leaders of S. W. O. C. to control violence by members, and to persuade state and local officials to provide police protection in the community; the Committee solicited and collected money and spent the same for its purposes; and it furnished money to the Mayor to meet expenses which he incurred during the emergency. The Committee held a public meeting at the Elks' Club on Monday evening, June 14. It published an advertisement in the Johnstown Democrat on Thursday, June 17, and held a meeting in the auditorium of the Central High School on the same day. After June 19 the Committee directed its efforts largely towards inducing the Governor to reopen the Cambria Plant by revoking his proclamation of martial law.

The Committee's methods included, in addition to the holding of public meetings and the publication of statements and of advertisements in papers, the sponsoring of radio programs and the employment of publicity and public relations firms to prepare

---

39 Here the Reverend Nicely was describing a statement by the Reverend Stanton.

advertising copy and radio speeches. The statements, advertisements, speeches and the like, are exemplified by the following: At a Citizens' Committee meeting on June 14 the Reverend Stanton endorsed a proclamation by the Mayor, referred to below, and stated that his heart went out to the men who wanted to work and were being deprived of that right and that it was necessary to back up the Mayor and preserve the right to work. The Committee gave publicity to the conditions which prevailed during the strike and when the Governor closed the Cambria Plant. A full page advertisement of the Citizens' Committee stated: "We Will Preserve Law and Order!" "It is the Constitutional Right of every man to work if he so desires and if there is work for him." "Johnstown Is Our City! Johnstown Is Our Home! Johnstown Is Our Greatest Interest! Will You Allow Outsiders to Come In and Destroy It?" Another advertisement by the Committee began: "We Will Keep Johnstown Safe for Johnstowners," and ended "Let all the cars within hearing distance and several out of hearing distance know and be assured that the Citizens Committee means Business; it means to preserve Law and Order; it means to preserve the lives of Johnstowners; it means to make its streets as well as its homes safe for its Mothers, Fathers, Daughters and Sons. That is the obligation of the Citizens of Johnstown and the Citizens Committee is taking the lead to uphold that American obligation!"

In respect of the Mayor's activities: On June 14 the Mayor issued a proclamation which was printed in the newspapers, in which he spoke of "arousing" the citizenry to a "proper sense of responsibility," referred to "men not residents of our community creating disturbances," and stated that his "oath of office to uphold the Constitutions of the United States and Pennsylvania" bound him "to protect your lives, homes and properties against all foreign enemies." I print the proclamation in full in the margin.[40] On June 16 the Mayor

---

[40] Law and Order Must Prevail at All Times, Mayor Declares

Assuming the same leadership which characterized his handling of the emergency which arose following the Johnstown Flood of March 17, 1936, Mayor Daniel J. Shields has addressed himself to the people of Johnstown relative to the steel strike. He said:

"Because of the existence of a major labor disturbance in the industry which is the backbone of our community, it becomes necessary for me to present to you facts which may arouse you to your proper sense of responsibility.

"A number of men not residents of our community—have been here for some months representing certain labor organizations. They have seen fit to call a cessation in our principal steel manufacturing plant. Because of this discontinuance, certain disturbances have taken place which so far have been of a minimum character.

"In my official capacity as mayor I feel justified in warning you that trouble of a serious character appears inevitable. I took the oath of office to uphold the Constitutions of the United States and Pennsylvania. Particularly does that oath make binding upon me to protect your lives, homes and properties against all foreign enemies.

"Unencumbered and independent I am prepared to undertake the task before me. In this your mayor has the fullest cooperation of Sheriff M. J. Boyle, highest peace officer in the county. Efforts of forces headed by the mayor and the sheriff are coordinated.

"The men who came here to head the present movement have given assurance they will not permit outside influences to come to Johnstown to promote or stimulate the present labor disturbance.

"However, for the benefit of the citizens of Johnstown and Cambria County, I herewith set forth my policies as your mayor. I shall rise or fall, but strictly adhere, to these policies:

"FIRST—It is the right of every American citizen to traverse our streets and highways without molestation.

"SECOND—It is the right of every American citizen to join any organization, labor or fraternal, of his or her choice.

"THIRD—To me the right of an American citizen to worship as he sees fit is inalienable.

"FOURTH—Your mayor will insist that none shall cause any person to become a member of any labor, fraternal or religious organization by use of coercion, threat or intimidation.

"FIFTH—I regard as sacred the right to go to my employment and by the sweat of my brow earn a livelihood to provide necessities and comforts for my wife and children.

"SIXTH—I term it a dastardly act on the part of any man who attempts to deprive me of the right to feed my family when he uses threats, coercion and intimidation in seeking his objective.

made a radio address in which among other things he stated:

"Some months ago a gentlemen came to our community and as a result of his presence, many homes are sad today, and these homes will continue in that gloom until we rise up and do the things that all red-blooded Americans should do. . . . Communism and anarchy are in evidence in our city today . . . men desiring to work have had their clothes taken from them and forced to stand naked in the principal streets. . . . As your mayor, I am thoroughly convinced that the majority of our citizens want work and are opposed to the dictation of outsiders. Were Johnstown not invaded by undesirables, peace would reign at this time . . . . From this moment on a 'Back to Work Movement' will gain momentum. You wives, mothers, and sisters of our steel workers, fear not. Idle threats are being made, by cowards, but let me assure you that I, as your mayor, am in a position to crush the lawless, the Communist, and anarchist, and preserve and protect the homes of you good citizens . . . ."

S. D. Evans, an assistant general manager of the Cambria Plant, stated at the Citizens' Committee meeting on June 14 that the Company had decided to keep the Plant open during the strike because of its responsibilities to the employees who wanted to work, and because it was fair to the citizens of Johnstown. Evans also issued a press release in the following terms:

"S. D. Evans announced: The plant is continuing to operate in all departments. Employes want to work and given proper protection going to and from their jobs, there should be no difficulties. This is the responsibility of every citizen in the community. The public authorities have given assurance that the employes will be protected persisting in their right to work. The citizens in general are rallying to their support and we have been assured by various groups of citizens that the efforts of outsiders to force a shut-down will be repelled by a united effort. There was some disorder on the turn last night but conditions are much improved this morning. Work was interrupted in only one division of a department. In some departments we have more men today than at any time since the strike started. The classes of material made here include wire products, plates, bars, cars, wheels and axles. The continued operation of the plant is essential to the welfare of Johnstown and its people as all products of this plant are in competition with mills elsewhere, many of which are located near to the market. Johnstown's industries and industrial population have been enjoying prosperity for the first time in seven years. They are just recovering from the losses of the 1936 flood and industrial peace is essential to business revival. To insure the need is simply the preservation of law and order."

There was no finding by the Board that the petitioners assumed any control over the Committee or its members or over the Mayor. No representative of the petitioners suggested that any member or representative of the Citizens' Committee do, or refrain from doing, anything in connection with the issuance of public statements or advertisements or speeches or solicitations or expenditures of funds, or any activities. This was testified to both by members of the Committee and by representatives of the petitioners. Additional evidence to the effect that there was no accessory connection between the Citizens' Committee and the petitioners was offered, but, as I have pointed out in topic II, was rejected by the examiner and the Board.

The contributions received by the Citizens' Committee from the Company petitioner totalling $32,078.25, were made on June 17 and 18 and July 9 and 28 in various amounts and all were made through S. D. Evans. He conditioned the contributions upon the money being used for the preservation of law and order. The payment of $4,372 on July 22, 1937, to the Mayor, was made by C. R. Ellicott, general manager of the Cambria Plant, to meet bills the Mayor said would have to be paid. The Mayor had attempted to reach Martin, the chairman of the Citizens' Committee, but he was out of the city and Ellicott, in connection with S. D. Evans, furnished the money to the Mayor. The detail of the bills does not appear, although the record does show that the Mayor deputized a large number of special police and secured equipment for them, rented a number of taxicabs and other automobiles, and that at least some of these expenses were not paid by the city. No accounting was made by the Committee or the Mayor as to items of expenditure. There was no evidence that any of the money furnished either to the Committee or to the

"SEVENTH—I deem it within the rights of my brother and neighbor to interest me in any cause, provided the process is gentlemanly, orderly and lawful.

"Your mayor and members of city council are impartial, unprejudiced and neutral as far as the present situation is concerned.

"At a conference here today Governor Earle made available a sufficient number of State Police to assist in maintaining order at all times.

"As mayor of your city I am determined that law and order shall prevail in Johnstown. I earnestly seek your cooperation."

Mayor was used for any purpose except the preservation of law and order.

As a basis for its finding that the prime function of the Citizens' Committee was that of vilifying the union organization and engendering public hostility and opposition to the strikers, the Board in its decision referred to the article mentioned in topic I, assumed to have been written by one H. G. Andrews, which appeared on the editorial page of the Johnstown Democrat of February 24, 1938, some eight months after the strike had taken place. The Board emphasized the statements in that article that the Citizens' Committee was organized for the purpose of breaking the strike and that S. D. Evans of the Bethlehem Company knew of this. As I point out in topic I, this article was admitted in evidence by the examiner for the limited purpose of proving that the statements therein contained had been made and not for the purpose of proving the truth of the same. It is pure hearsay and cannot therefore constitute a foundation for the finding.

Despite the absence of evidence—apart from the circumstance of the contributions, if they may be said to be evidence—and despite the absence of a finding that the petitioners directed or controlled the activities of the Citizens' Committee or the Mayor, I will assume in discussing the charge in this aspect of the case that the petitioners were responsible for such activities. I nevertheless think it not possible to conclude, under the facts above set forth, that the petitioners were guilty of any violation of law.

The charge is a violation of Section 8(1) of the Act which declares it an unfair labor practice to interfere with, restrain, or coerce employees in the exercise of the rights of self-organization, collective bargaining and engagement in concerted activities for the purpose of collective bargaining or other mutual aid or protection, guaranteed by Section 7. Nothing in the Act expressly makes it an unfair labor practice for an employer to contribute funds in aid of the activities of a citizens' committee or of a public official. Therefore the petitioners can be guilty of a violation of the Act only if the activities of the Committee and the Mayor actually interfered with, restrained or coerced the employees in the exercise of their rights.

Under the evidence in the case the purpose of the Citizens' Committee and of the Mayor was to maintain law and order, to protect both the right to work and the right to strike and the right to join or not to join any organization. If successfully carried into effect such a purpose would accomplish the opposite of interfering with, restraining or coercing employees in the exercise of their rights under the Act. And there is in my opinion no showing in the case either directly or by warrantable inference that the will of any employee or group of employees was corrupted or overridden by the utterances or advertisements of the Committee and the Mayor or by the deputizing and equipping of special police, or the renting of taxicabs and other automobiles by the Mayor, or by the attempts of the Committee to persuade the leaders of S.W.O.C. to control violence by its members. In this connection it is to be noted that the Board itself dismissed:

"... those allegations in the complaint which allege that the respondents [petitioners] ... caused the streets of Johnstown and surrounding communities to be patrolled by armed men for the purpose of interfering with, restraining and coercing their employees; interfered with peaceful picketing by their striking employees; caused union members and organizers to be unjustly arrested, detained and sentenced; and caused union members to be brutally attacked and beaten in its Johnstown plant ...."

The Board points to no evidence that, and particularizes no instance in which, any employee or group of employees did anything which he or they wished not to do or refrained from doing anything which he or they desired to do as a result of anything said or done by either the Committee or the Mayor. In saying this I am not unmindful of the reference in the Mayor's proclamation to "foreign enemies" or of the statement in his radio address that he was in a position to "crush the lawless, the Communist, the anarchist." But there is nothing in the facts which indicates that by the use of these terms he reasonably intended, or could reasonably have been thought to intend, to describe employees, or that employees were coerced into action or into refraining from action by his use of these terms. That lawless persons were in the community the facts make clear; and there is nothing to show that it was untrue to state that communists and anarchists were there. I bear in mind also the statement of the Mayor in his radio address that a " 'Back to Work Movement' will gain momentum." Nothing in the Act

forbids a back to work movement any more than it prevents a strike movement, unless coercively induced. Moreover, so far as this is concerned, again the Board itself dismissed:

" . . . those allegations in the complaint which allege that the respondents [petitioners] offered inducements to certain of their employees not to join or assist the union; conducted a so-called 'back-to-work' movement of their employees in a manner to interfere with, restrain, and coerce their employees in the exercise of the rights guaranteed by Section 7 of the Act . . . ."

Concerning the statements of the Board that the prime function of the Citizens' Committee was that of vilifying the union organization and engendering public hostility and opposition to the strikers, and that the Company was, through the Committee, seeking to defeat the efforts of the union organization and to destroy that organization by creating hostility towards it: In my opinion nothing in the facts of the case warrants such statements. There is nothing of a vilifying character in the utterances and advertisements of the Committee, and if the same may be said to have engendered public hostility and opposition it must have been to violence and lawlessness by whomsoever committed, not to strikers as such. And the facts do not show an effort by the petitioners through the Committee to defeat the efforts of the union organization and to destroy it. The effort was to restrain violence by whomsoever committed, whether union or not. It is to be noted further that since the utterances and advertisements of the Committee and the Mayor were not shown to have been false and defamatory or coercive, they are protected by the Constitutional guarantee of freedom of speech. If employers are not disabled by the National Labor Relations Act to express themselves, short of coercive or false and defamatory statements in respect of the merits of a labor dispute, as I have pointed out in topic V, *a fortiori* they are not disabled so to express themselves against violence.

If the employees at the time of the strike at the Cambria Plant were not participating in unlawful activities, they were not the subject of the purposes or efforts of the Citizens' Committee or the Mayor to restore law and order. If they were participating in unlawful activities, they were outside the protection of the National Labor Relations Act and of the law generally. In National Labor Relations

Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599, the Supreme Court affirmed a decree of the Circuit Court of Appeals for the Seventh Circuit insofar as it set aside an order of the Board directing the Corporation to reinstate certain of its members who had been discharged because of participation in a sit-down strike. The Supreme Court held that the Act is not to be construed as compelling employers to retain persons in their employ regardless of their unlawful conduct; that where a strike, even though actuated by unfair labor practices of an employer, is initiated and conducted in lawlessness, the employees lose the protection of the Act. The Court said:

" . . . But reprehensible as was that conduct of the respondent, there is no ground for saying that it made respondent an outlaw or deprived it of its legal rights to the possession and protection of its property. The employees had the right to strike but they had no license to commit acts of violence or to seize their employer's plant. We may put on one side the contested questions as to the circumstances and extent of injury to the plant and its contents in the efforts of the men to resist eviction. The seizure and holding of the buildings was itself a wrong apart from any acts of sabotage. But in its legal aspect the ousting of the owner from lawful possession is not essentially different from an assault upon the officers of an employing company, or the seizure and conversion of its goods, or the despoiling of its property *or other unlawful acts in order to force compliance with demands.* To justify such conduct because of *the existence of a labor dispute or of an unfair labor practice would be to put a premium on resort to force instead of legal remedies and to subvert the principles of law and order which lie at the foundations of society.*

\*　　　\*　　　\*

"We think that the true purpose of Congress is reasonably clear. Congress was intent upon the protection of the right of employees to self-organization and to the selection of representatives of their own choosing for collective bargaining without restraint or coercion. National Labor Relations Board v. Jones & Laughlin Steel Corp. . . . [301 U.S.] page 33, 57 S.Ct. page 622 [81 L.Ed. 893, 108 A. L.R. 1352]. To assure that protection, the employer is not permitted to discharge his employees because of union activity or agitation for collective bargaining. Associated Press v. National Labor Relations Board [1937, 301 U. S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953]. *The conduct thus protected is lawful conduct.* Congress also recognized the right to strike,—that the employees could lawfully cease work at their own volition because of the failure of the employer to meet their demands. Section 13 provides that nothing in the Act 'shall be construed so as to interfere with or impede or diminish in any way the right to strike.' *But this recognition of 'the right to strike'*

*plainly contemplates a lawful strike,—the exercise of the unquestioned right to quit work. . . ."* [Italics supplied] [306 U.S. at pages 253, 255, 256, 59 S.Ct. at page 495, 496, 83 L.Ed. 627, 123 A.L.R. 599.]

Accordingly, if any of the employees of the petitioners were participating in unlawful activities in connection with the Cambria strike, they were no more immune than anyone else in the community from the exercise of efforts by citizens and officials to restore law and order.

I think the finding of the Board that the petitioners interfered with, restrained or coerced its employees at the Cambria Plant, through the Citizens' Committee and the Mayor, in the rights of self-organization, collective bargaining and concerted activities guaranteed them by Section 7 of the Act, is without rational support in the facts of the case, and I think therefore that the conclusion of the Board that the petitioners, by such interference, restraint or coercion, had violated Section 8(1) of the Act is without warrant in law. And I think that the Board's decision in this aspect of the case unwarrantedly assumes to deny to an employer the right to participate with citizens and public officials in the preservation of law and order.

## VIII

### SURVEILLANCE

The Board found "that the Company employed Pinkerton's National Detective Agency, Inc., for the purpose, inter alia, of obtaining information relating to union activity and organization," and that thus the petitioners "interfered with the employees in their right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection," in violation of Section 8(1) read in connection with Section 7. The Board did not find that information relating to union activity and organization was actually obtained by the petitioners, but in its decision it refers to evidence to the effect that reports were delivered by the Agency to representatives of the Company.[41] For the purpose of discussion of this topic, I will assume a supportable finding that reports were so delivered and that they contained information relating to union activity and organization. The Board did not find that the employees knew that they were under surveillance and that as a result the exercise of their rights under the Act was in any way interfered with or restrained, or that the employees were, through such surveillance and the knowledge thereof, in any manner coerced in the exercise of their rights, or that the petitioners used any information obtained to do anything constituting an unfair labor practice. The Board's decision in effect conceded that there was no evidence upon which such a finding might be based, and there was none.[42]

In this aspect of the case there is therefore a single question of law: Does the mere securing of information by an employer, through the use of detectives, concerning union activities (including organization) constitute under the Act an unfair labor practice? I think this question should be answered in the negative. The Act does not in terms make it an unfair labor practice for an employer to secure information, either through detectives or otherwise, concerning union activities. Therefore, the securing of information can become an unfair labor practice only as any other act

---

[41] In a previous topic I have referred to the defective form of the findings and to the difficulty thereby presented in understanding and dealing with this case.

[42] The concession appears from the following excerpt from the Board's decision:

"The respondents [petitioners] contend, with respect to the hiring of the detective agency, that the Act in no way forbids surveillance with respect to union activities per se. They argue that such surveillance can be in contravention of the Act only (1) if the employees know they are under surveillance and, as a result, are intimidated into exercising or refraining from exercising any of the rights guaranteed by the Act, or (2) if

the employer uses the information obtained by the surveillance to do something which constitutes an unfair labor practice. The respondents then state that in this case the employees had no knowledge of the employment of the Agency and that the record does not show that the respondents used the information obtained from the Agency to commit any unfair labor practice.

"These contentions are without merit. In our view, surveillance of union organization constitutes an interference with the employees' right to self-organization, even though there is no showing that the specific information obtained was used in the commission of an unfair labor practice."

can, to wit, by operating either alone or concurrently with other acts to interfere with, restrain or coerce employees in the exercise of the rights guaranteed by the Act. If, for example, employees knew that they were under surveillance and on that account felt unable to express themselves freely in a union meeting, or if, as a result of obtaining information concerning union activities of employees, the employer discharged or discriminated against them, an unfair labor practice would have been committed. But the proposition that surveillance without more constitutes a violation of the Act which may be enjoined as no support in the language of the Act, and no support of which I am aware in any of the cases decided under the Act. Indeed, in the only case which rules directly upon the question, the decision was to the contrary. In National Labor Relations Board v. National Motor Bearing Company, 9 Cir., 1939, 105 F.2d 652, the Board found that a Company official (the secretary-treasurer and plant manager) had loitered in an automobile in front of the headquarters of a union during its first organization meeting —apparently for the purpose of taking down the names of the employees who had attended the meeting—and held this to be a violation of the Act, and accordingly directed the employer to cease and desist from maintaining surveillance of the meetings and activities of the union or any other labor organization of its employees. The Circuit Court of Appeals refused to enforce this provision of the order, saying:

" . . . Though surveillance may constitute an unfair labor practice [citing authorities] it is not such unless it interferes with, restrains or coerces respondent's employees in the exercise of the rights guaranteed in section 7, or dominates or interferes with a labor organization as prohibited by section 8(2). . . . " [105 F.2d at page 657.]

The Board relies upon six cases in the United States Supreme Court: National Labor Relations Board v. Link-Belt Co., January 6, 1941, 61 S.Ct. 358, 85 L.Ed. ——; National Labor Relations Board v. Fansteel Metallurgical Corp., 1939, 306 U.S. 240, 251, 59 S.Ct. 490, 83 L.Ed. 627, 123 A.L.R. 599; Consolidated Edison Company v. National Labor Relations Board, 1938, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126; National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U.S. 261, 270, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307; National Labor Relations Board v. Fruehauf Trailer Co., 1937, 301 U.S. 49, 54,

57 S.Ct. 642, 630, 81 L.Ed. 918, 108 A.L.R. 1152; and National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 1937, 301 U.S. 58, 75, 57 S.Ct. 645, 630, 81 L.Ed. 921, 108 A.L.R. 1352.

In National Labor Relations Board v. Link-Belt Co. the Supreme Court, surveying the evidence which it held made credible a finding that freedom of choice of the Company employees in organizing an Independent union was forestalled—by the maintenance of a company union by the employer until its abandonment would coincide with recognition of the Independent —referred to the "declared hostility towards an 'outside' union, the long practice of industrial espionage, the quick recognition of Independent," and other circumstances, This was the only mention made of surveillance in the opinion of the Court. The case does not rule upon the question whether it is necessary, in order to constitute surveillance an unfair labor practice, that there shall have been knowledge of the espionage by the employees or that information obtained by the employer shall have in fact been used to interfere with union activities. In the opinion of the Circuit Court of Appeals in the case[43] it appears that an employee of the Link-Belt Co. had from 1915 to 1936 made monthly reports to the Company on the efficiency and attitude of fellow employees and that he was also in the employ of the National Metal Trades Association, that in January 1937 he joined a C. I. O. union but resigned in May after it had become known that he was in the employ of the Trades Association. This indicates that the employees knew that they were under surveillance.

In National Labor Relations Board v. Fansteel Metallurgical Corp. the Board found that by anti-union statements and actions on the part of a Corporation superintendent, by a campaign to introduce into the plant a company union, and "by the employment and use of a 'labor spy' " the Corporation had interfered with its employees and restrained and coerced them in the exercise of their rights to self-organization guaranteed in Section 7 of the Act, and the Board concluded that the Corporation had thus engaged in an unfair labor practice contrary to Section 8(1). The Court held that this conclusion was supported by the finding and that the finding had substantial support in the evidence. But no question was raised

---

43 7 Cir., 1940, 110 F.2d 506.

in the case as to whether the Corporation made use for illegal purposes of information obtained by the "spy," nor whether the employees knew of the use of the "spy," and the case does not therefore rule on the question whether surveillance without more is an unfair labor practice.

In Consolidated Edison Company v. National Labor Relations Board nothing is said concerning the use of detectives except the following:

"  . . .  With respect to industrial espionage, the companies say that the employment of 'outside investigating agencies' of any sort had been voluntarily discontinued prior to November, 1936, but the Board rightly urges that it was entitled to bar its resumption. . . ." [305 U.S. at page 230, 59 S.Ct. at page 217, 83 L.Ed. 126.]

It does not appear what use was made of "outside investigating agencies," whether or not information secured by them, if any, was used as a basis for the commission of an unfair labor practice, or whether the employees knew that they were under surveillance. This case again therefore constitutes no holding that surveillance *per se* is an unfair labor practice.

In National Labor Relations Board v. Pennsylvania Greyhound Lines the only reference to surveillance is in the following statement of the Court:

"  . . .  Before and after that day [July 5, 1935—the date of passage of the Act], respondents' officers were active in warning employees against joining the union and in threatening them with discharge if they should join, and in keeping the union meetings under surveillance." [303 U.S. at page 270, 58 S.Ct. at page 576, 82 L.Ed. 831, 115 A.L.R. 307.]

Examination of the record of the case in the Supreme Court shows that the Board found that the Companies "threatened such employees with discharge if they became or remained members of such organization [a union organized by the employees] and have maintained surveillance of the meetings and meeting places of such organization and of the activities of their employees in connection with such organization." No question was raised in the Supreme Court as to whether surveillance without the knowledge of the employees or without illegal use of information obtained constitutes an unfair labor practice, and this case therefore constitutes no ruling on the issue under discussion.

In National Labor Relations Board v. Fruehauf Trailer Co. the opinion of the Court states:

"  . . .  Early in 1934, respondent hired a detective whose duty it was 'to ferret out the union activities of the men' and to keep the respondent informed. This, as the respondent's vice president stated, was to avoid trouble and 'to keep a steady flow of business.' For purposes of deception, and in order to make the detective eligible for membership in the Union, respondent gave him employment. He joined the Union and became its treasurer. He thus obtained a list of all the members of the Union. He made frequent reports to respondent and with the lists thus obtained respondent's superintendent went about the factory from time to time and warned various employees against union activities. The result of these measures 'caused suspicion, unrest and confusion among the employees.' . . ." [301 U.S. at pages 54, 55, 57 S.Ct. at page 643, 81 L.Ed. 918, 108 A.L.R. 1352.]

The Board had found unfair labor practices committed and the Supreme Court said that the findings were supported by the evidence. The excerpt from the opinion shows that the information obtained by the detective was used by the Company to interfere with union activities on the part of employees whose names had been obtained by him. Obviously, therefore, this case does not on its facts pass upon the question whether surveillance without more is an unfair labor practice.

In National Labor Relations Board v. Friedman-Harry Marks Clothing Co., the only reference in the opinion of the Court to surveillance is this:

"  . . .  Statements of the president of the respondent showing his antagonism to the union were quoted by the Board. At one time he stated to a group of employees that he would discharge every one that attended the union meeting. Similar statements were made by respondent's secretary. Respondent's management 'has maintained surveillance over union meetings and activities.' . . ." [301 U.S. at page 75, 57 S.Ct. at page 647, 81 L.Ed. 921, 108 A.L.R. 1352.]

It appears also in the case that there were actual discharges of employees for union membership and activity. It is thus made obvious that information obtained by surveillance as to the identity of employees attending a union meeting was being used to discourage union activity. This case does not rule on the question under discussion in the instant case.

Examination of the cases cited by the Board from various Circuit Courts of Appeals discloses that in none of them is there a ruling that mere surveillance is an unfair labor practice.[44]

---

[44] Kansas City Power & Light Co. v. National Labor Relations Board, 8 Cir.,

It is to be noted further in respect of the use of detectives in the instant case that it is without dispute that there has never been any discrimination against employees of the petitioners on account of union membership or activity. That being the case, there could have been no use of information concerning union activities for discrimination.

Although as above pointed out there was no finding by the Board that the employees had knowledge of surveillance, the Board's brief attempts to aid the case in this aspect by asserting that:

"The contention [that the employees had no knowledge of surveillance] disregards the fact that the employment by the Company of Pinkerton's Agency for industrial espionage became public following Pinkerton's testimony in September 1936 before the Senate Sub-Committee Investigating Violations of the Right of Free Speech, etc., hence the Company's employees may be presumed to have been coerced by such knowledge. . . ."

This is an assumption, not a presumption. There is no presumption of fact that testimony before a Senate Subcommittee shall actually have come to the attention of persons to whom it might have been of interest had they known of it. There is no evidence that it actually came to their attention.

Finally, it is to be noted that the finding of the Board that the Company petitioner "employed Pinkerton's National Detective Agency, Inc., for the purpose, inter alia, of obtaining information relating to union activity and organization," is a distortion of the evidence. According to the evidence, the employment agreement between the Company petitioner and the Pinkerton Agency provided that Pinkerton's representatives should not enter any of the plants of the Company, and the Company informed the Agency at both the outset of and during the employment that it did not desire to have an investigation made or to receive reports as to whether any of its employees were members of any union; and the evidence fails to show that Pinkerton's made any reports to the Company petitioner which mentioned the names of members of any union or which mentioned what occurred at any meetings of any union. Moreover, the record shows that the Pinkerton Agency was retained by the Company petitioner "to protect their [petitioners']

plants, and the lives—or their employees against violence," occurring as a result of "communistic or racketeering or unlawful acts by any agency"; or, as otherwise expressed, for the purpose of obtaining information on "the activities of various men who are trying to annoy and disturb their employees," and for the purpose of obtaining information concerning "the arrival and activities of radicals and outside disturbers." In an attempt to prove that the Agency had been retained particularly for the purpose of investigating S. W. O. C. or the C. I. O., counsel for the Board, examining the witness Stiles, a division manager of Pinkerton's, put, among other questions, the following:

"Q. (By Mr. Keller [counsel for the Board]) Mr. Stiles, now Mr. Dykes [a Company representative] didn't simply say—'I want you men to investigate the C. I. O.,' did he? A. No.
"Q. Well, what did he say about that? A. No. There was, as I have already testified, a lot of unrest and violence throughout the country, and the company, as I understood it, anticipated that they may have trouble, and they wanted to know what was going on in the vicinity of their plants.
"Q. Including the activities of the C. I. O.? A. Certainly,—all groups. That is as I understood it, yes."

Stiles also testified that the Company desired to engage the services of the Agency to protect its plants and the lives of the employees from outside communists and labor racketeers defined (apparently by Company representative Dykes) as "people that get control of legitimate labor organizations and shake down the employer and the employee too." The testimony thus shows that the Detective Agency was employed for a much broader purpose than that of obtaining information relating to union activity and organization, and that the purpose was legitimate. Neither the National Labor Relations Act nor any law forbids a property owner and employer from securing information for the purpose of aiding in the protection of property and employees against violence by whomsoever committed.

IX

Breadth of the Order

As I have indicated above I think that the order of the Board in this case is without warrant in either facts or law. Assuming, to the contrary of this, that there is a

1940, 111 F.2d 340; Republic Steel Corp. v. National Labor Relations Board, 3 Cir., 1939, 107 F.2d 472, 474; North Whittier Heights Citrus Ass'n v. National Labor Relations Board, 9 Cir., 1940,

109 F.2d 76, 78; Atlas Underwear Co. v. National Labor Relations Board, 6 Cir., 1941, 116 F.2d 1020, 1023; Montgomery Ward & Co. v. National Labor Relations Board, 8 Cir., 1940, 115 F.2d 700.

basis in the record for an order, I think the order issued by the Board is too broad in two particulars.

Paragraph 1 (c) of the order requires the petitioners to cease and desist from:

"In any other manner interfering with, restraining, or coercing the employees in the exercise of their rights to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection as guaranteed in Section 7 of the National Labor Relations Act."

This restrains violation of Section 8(1) of the Act read, as it must be in view of its terms,[45] in connection with Section 7.

In National Labor Relations Board v. Express Publishing Company, March 3, 1941, 61 S.Ct. 693, 85 L.Ed. ——, the Board had found the Publishing Company guilty only of refusal to bargain collectively in violation of Section 8(5), but the Board's cease and desist order was phrased in the broad terms of paragraph 1(c) in the instant case. The Supreme Court held it too broad. The gist of the Court's ruling is as follows:

" . . . It is obvious that the order of the Board, which when judicially confirmed, the courts may be called on to enforce by contempt proceedings, must, like the injunction order of a court, state with reasonable specificity the acts which the respondent is to do or refrain from doing. It would seem equally clear that the authority conferred on the Board to restrain the practice which it has found the employer to have committed is not an authority to restrain generally all other unlawful practices which it has neither found to have been pursued nor persuasively to be related to the proven unlawful conduct.

\* \* \*

"It is a salutary principle that when one has been found to have committed acts in violation of a law he may be restrained from committing other related unlawful acts. But we think that without sacrifice of that principle, the National Labor Relations Act does not contemplate that an employer who has unlawfully refused to bargain with his employees shall for the indefinite future, conduct his labor relations at the peril of a summons for contempt on the Board's allegation, for example, that he has discriminated against a labor union in the discharge of an employee, or because his supervisory employees have advised other employees not to join a union. . . ." [61 S.Ct. at pages 698, 699, 700, 85 L.Ed. ——.]

The order was held too broad by the Court because as phrased it covered, as the Court said in the second paragraph of that portion of the opinion above quoted, discrimination by an employer "against a labor union in the discharge of an employee, or because his supervisory employees have advised other employees not to join a union," to wit, a violation of Section 8(3), although the Board had not found a violation of that section or of any other except Section 8(5). Thus the case necessarily holds that an order drawn to restrain violation of Section 8(1) read in connection with Section 7, is broad enough to include any of the unfair labor practices specifically denounced by the Act. The decision could not be otherwise because obviously the unfair labor practices denounced in Section 8(2), (3), (4) and (5) of the Act are species of the generic unfair labor practice defined in Section 8(1) read in connection with Section 7.[46] Art Metals Construction Company v. National Labor Relations Board, 2 Cir., 1940, 110 F.2d 148, 150, 151.

The order in the instant case because drawn in the terms of Section 8(1) read in connection with Section 7 is broad enough to restrain commission not only of the class of unfair labor practices specifically found by the Board to have been committed in violation of Section 8(1) and (2) of the Act, but also to restrain commission of acts of a wholly different type, unrelated to the unfair practices found, in violation of Section

---

[45] The terms of Section 8(1) appear in footnote 46.

[46] To spell this out: Section 7 provides: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection." Section 8(1) makes it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7." To dominate or interfere with the administration or formation of any labor organization or to contribute financial support to it in violation of Section 8(2) is obviously an interference with the rights guaranteed by Section 7, as is also discrimination in regard to hire or tenure of employment, or any term or condition of employment, to encourage or discourage membership in any labor organization, in violation of Section 8(3), as is also discharge or discrimination against an employee because he has filed charges or given testimony under the Act, in violation of Section 8(4), and as is also refusal to bargain collectively with representatives of employees in violation of Section 8(5).

8(3), (4) and (5). The order thus goes so far as to restrain the commission of acts not even charged (refusal to bargain collectively—a violation of Section 8(5), and discharge of or discrimination against an employee because he has filed charges or testified under the Act—a violation of Section 8(4) ), and also acts charged but with respect to which the charges were dismissed by the Board (discrimination against employees in order to discourage membership in a labor organization—a violation ·of Section 8(3) ). The decision of the Supreme Court in the Express Publishing Company case I think puts beyond doubt that the order in the instant case is too broad. A similarly phrased order was held too broad by this court in Press Company v. National Labor Relations Board, December 9, 1940, — App.D.C. —, 118 F.2d 937, certiorari denied 61 S.Ct. 1118, 85 L.Ed. —.

The order of the Board is phrased to apply to "Bethlehem Steel Company and Bethlehem Steel Corporation, and each of them, and their officers, agents, *successors, and assigns* . . .." (Italics supplied) There was no charge, evidence or finding in the case to the effect that any. successor or assign of the petitioners had committed any unfair labor practice, or that there was any plan or purpose on the part of the petitioners to evade the strictures of the Act or of the order by an assignment of the petitioners' interest in their Plants. Indeed there was no charge, evidence or finding in the case concerning successors or assigns at all. Section 10(b) of the Act requires a charge of engaging in unfair labor practices, and Section 10(c) requires the orders of the Board to be based upon evidence and findings. Moreover, the principles of due process preclude the Board from making an order affecting persons as to whom there is no evidence in the record and who are not even afforded notice of, or an opportunity to be heard in, the proceeding before the Board upon which the order is based. Chase National Bank v. City of Norwalk, 1934, 291 U.S. 431, 54 S.Ct. 475, 78 L.Ed. 894; Scott v. Donald, 1897, 165 U.S. 107, 17 S.Ct. 262, 41 L.Ed. 648. Moreover, the inclusion of successors or assigns within the order was not necessary. Any

proper purpose which the Board seeks to achieve by the inclusion of those terms can be accomplished through the term "agents," which also appears in the order. National Labor Relations Board v. Hopwood Retinning Co., Inc., 2 Cir., 1938, 98 F.2d 97; Ex parte Lennon, 6 Cir., 1894, 64 F. 320, affirmed, 1897, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110. Even without the term "agents" an attempt to evade the order by the formation or utilization of the corporate form would, under familiar principles permitting disregard of the corporate fiction, be ineffectual. Except for United Gilpin Corporation v. Wilmore, 1937, 100 Colo. 453, 456, 68 P.2d 34, 36, which I think not persuasive, none of the cases cited by the Board to support the inclusion of the terms "successors and assigns" in the order holds that such inclusion is proper.[47]

The order of the Board in paragraph 1 (a) is drawn so as to apply to "any other labor organization of employees." Assuming a.foundation in the record for an order to cease and desist from dominating or interfering with the administration of the Plans, this language is, I agree, permitted by the ruling of the Supreme Court in the Express Publishing Company case above referred to. In its context the reference to employees is intended to mean employees of the· petitioners. To forbid "Dominating or interfering . . . with the formation or administration of any other labor organization of employees" of petitioners is to forbid "other related unlawful acts" as permitted by the ruling in the Express Publishing Company case. An order similarly including within its restraint "other labor organizations" was approved in National Labor Relations Board v. Swift & Company, 7 Cir., 1940, 108 F.2d 988, cited by the Supreme Court in the Express Publishing Company case.

## X

### CONCLUSION

I have believed it my duty to discuss in detail the many errors which I think were committed during the extended hearing [48] in this case. In my view they were prejudicial to the rights of the petitioners and of the intervening employees' associations, and

---

[47] Chase National Bank v. City of Norwalk, supra; Sidway v. Missouri Land & Live Stock Co., C.C.S.D.Mo.1902, 116 F. 381, 390; G. & C. Merriam Co. v. Saalfield, 6 Cir., 1911, 190 F. 927; National Labor Relations Board v. Hopwood Retinning Co., Inc., supra; National Labor

Relations Board v. Colten, 6 Cir., 1939, 105 F.2d 179, 183.

[48] The original typewritten record filed in this court consisted of 21,717 pages. The designation of record for printing resulted in a printed record of 11,072 pages.

also to the rights—substantially, although not by formal intervention, involved—of the employees in the petitioners' Plants. Furthermore, I think the errors were the product of such fundamental and far-reaching misconceptions on the part of the Board as ought to be the subject of judicial comment and correction, in order that confidence on the part of litigants in a public tribunal—the only ultimately effective sanction for its orders—shall not be impaired.

The fundamental misconceptions to which I refer, and which I think are apparent from the record, are two: a point of view on the part of the Board that it was not bound to regard in its proceedings the essential requirements of the adjective law; and a misconception on the part of the Board of the principles of substantive law governing the case, as declared in the Constitution, judicial decisions, and the National Labor Relations Act itself.

From both necessity and duty the Board was obliged to regard the essential requirements of the rules of pleading, procedure and evidence which are comprised in the adjective law. That law is not a congeries of dispensable technicalities; on the contrary, in an art which assumes to apply its substantive principles in an efficient, orderly and impersonal manner, it is indispensable. Every art has, in addition to a substantive aspect embracing organized information and principles, a technique through which the same are carried into effect.[49] The substantive law may be likened to water in a reservoir. Unless the water passes out through canals, laterals, and still smaller channels it never with precision reaches a particular tract of land to make it fruitful. True, the channels may be made too many, too long, or too tortuous, and the water thus seep or evaporate before it reaches the land toward which it has been directed. But it is equally true that, if there are no channels through which it may flow, it will never reach that land. Likewise, the substantive law must pass through the channels of pleading, procedure and evidence so that it may precisely apply itself to the solution of a particular controversy in respect of which it is apt. Like those in the figure these adjective channels may also be over-refined. But while Congress—minded to avoid this —by committing largely to the discretion of the Board the manner in which its proceedings should be carried on, and by providing that in those proceedings the rules of evidence should not be controlling, evinced its intention that proceedings of the Board should be informal, Congress is not to be taken to have intended to relieve the Board from the obligation to apply that minimum of adjective requirements necessary if hearings are to be orderly and thus effective to accomplish the ends of justice. And under the due process clause of the Constitution, the Congress could not relieve the Board from applying the essentials of adjective law because in them are embraced the essential safeguards to fair hearing. Because of the guarantee[50] of the due process clause, a commis-

---

49 The engineering art does not accomplish the change of raw matter into forms which satisfy human wants, through mere knowledge of the principles of mathematics, physics, and chemistry; these must be carried into action through formulae, blueprints, measuring devices, and the myriad of processes which the engineering art has in practice devised. Only thus does iron in the ground become bridge or battleship, or coal and air, a fabric. Again, in the medical art the principles of biology, anatomy, physiology, and pathology would be of no avail for the relief of human suffering and the prolongation of human life, were it not for exact diagnostic, therapeutic, surgical and sanitation procedures through which such principles are made effective. No more than other arts can the juristic art escape the demands of necessity.

50 Cf. Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 1937, 301 U.S. 292, 304, 305, 57 S.Ct. 724, at pages 730, 731, 81 L.Ed. 1093, where the Supreme Court said: "Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts *when it has been reached with due submission to constitutional restraints.* West Ohio Gas Co. v. Public Utilities Commission (No. 1) [1935] 294 U.S. 63, at page 70, 55 S.Ct. 316, 320, 79 L.Ed. 761; West Ohio Gas Co. v. Public Utilities Commission (No. 2), 294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773; Los Angeles Gas & Electric Corp. v. Railroad Commission, 289 U.S. 287, 304, 53 S.Ct. 637, 643, 77 L.Ed. 1180. Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed. All the more insistent is the need, when power has been bestowed so freely, that the *'inexorable safeguard'* (St. Joseph Stock

sion, though relieved by legislative action from application of the so-called strict rules of evidence, must nevertheless not depart from the imperative "obligation to preserve the essential rules of evidence by which rights are asserted or defended." Interstate Commerce Commission v. Louisville & N. R. Co., 1913, 227 U.S. 88, 93, 33 S.Ct. 185, 57 L.Ed. 431; United States v. Abilene & Southern Railway, 1924, 265 U.S. 274, 44 S.Ct. 565, 68 L.Ed. 1016.

It was in my opinion failure of the Board in the instant case to regard the essential requirements of the adjective law which resulted in the following errors: Entry of the order of the Board after a hearing conducted before a biased examiner and under illegal restrictions upon the use of subpoenas; the exclusion of competent evidence offered by the petitioners to refute the charges against them; the failure to draw findings in proper form; the omission to follow those established principles of logic and reasoning which test the dependability of inferences and the substantiality of evidence; the decision of the case on the merits (under the issues of domination and interference, disestablishment, contribution to the Citizens' Committee and the Mayor of Johnstown, and surveillance) without substantial evidence—upon the basis of assumption and conjecture and without reference to the burden of proof upon the Board; the issuance of an order against contributing support to the Plans when such contribution had long since ceased, and when there was no probability of repetition; the issuance of a final order binding the petitioners against the future commission of acts neither charged nor found to have been committed.

As to the substantive law—like all tribunals under our system, the Board is bound by the concepts expressed in the Constitution, statutes and judicial deci-

sion. In my view the Board mistakenly construed the National Labor Relations Act to: forbid equality of membership and voting power on joint collective bargaining committees; deny to an employer a voice, subject to the ultimate direction of a court, in amendments of collective bargaining plans which would materially change procedure for grievance adjustment, or which might prevent a plan from operating as a fair method of selecting representatives and of collective bargaining, or which might materially increase the employer's obligation under a plan; require separate charters for labor organizations and collective bargaining systems, or separate statement in a single charter of the provisions relating to labor organization and to collective bargaining arrangements, respectively; condemn friendly cooperation, normal relations, and innocent communications between employer and employees; deny to employers, in contravention of the First Amendment to the Constitution, that freedom of expression concerning the merits of labor disputes and organizations which has been recognized by the Supreme Court as guaranteed to employees; forbid an employer to participate with citizens and public officials in efforts to preserve law and order; and restrain an employer from securing information for the purpose of aiding in the protection of employees and property against violence.

Finally, *implicit in the decision of the* Board is a theory that the Act condemns local unions as such, and compels their destruction without reference to the will of affected employees, requiring the latter, if they are to be organized at all, to join a national union. There being no substantial evidence in the case of domination or interference with the formation or administration of the Plans, the order of disestablishment can find justification

---

Yards Co. v. United States, 298 U.S. 38, 73, 56 S.Ct. 720, 735, 80 L.Ed. 1033) *of a fair and open hearing be maintained* in its integrity. Morgan v. United States, 298 U.S. 468, 480, 481, 56 S.Ct. 906, 911, 80 L.Ed. 1288; Interstate Commerce Commission v. Louisville & N. R. Co., [1913, 227 U.S. 88, 33 S.Ct. 185, 57 L. Ed. 431]. The right to such a hearing is *one of 'the rudiments of fair play'* (Chicago, M. & St. P. Ry. Co. v. Polt, 232 U.S. 165, 168, 34 S.Ct. 301, 58 L. Ed. 554) assured to every litigant by the Fourteenth Amendment as a minimal re-

quirement. West Ohio Gas Co. v. Public Utilities Commission (No. 1), (No. 2), supra; Brinkerhoff-Faris Co. v. Hill, 281 U.S. 673, 682, 59 S.Ct. 451, 454, 74 L. Ed. 1107. Cf. Norwegian Nitrogen Co. v. United States [1933, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796]. There can be no compromise on the footing of convenience or expediency, or because of a natural desire to be rid of harassing delay, when that minimal requirement has been neglected or ignored." (Italics supplied)

in such a theory alone. This, in my view, is unwarranted under the Act. Not only does the Act not in terms condemn local associations, but, on the contrary, it impliedly warrants their existence. In Section 2(5) the definition of "labor organization" includes an "employee representation committee or plan," and in Section 7 employees are given the right to bargain collectively through representatives "of their own choosing." Moreover, the Supreme Court said, in a case involving a local union: "We may assume that there are situations in which the Board would not be warranted in concluding that there was any occasion for withdrawal of employer recognition of an existing union before an election by employees under § 9(c), even though it had ordered the employer to cease unfair labor practices...." National Labor Relations Board v. Pennsylvania Greyhound Lines, 1938, 303 U. S. 261, 270, 58 S.Ct. 571, 82 L.Ed. 831, 115 A.L.R. 307. And see Ballston-Stillwater Knitting Co. v. National Labor Relations Board, 2 Cir., 1938, 98 F.2d 758, 762, where the court stated: "A union limited to the employees of a single employer is as legal as any other...."

This record evidences no dissatisfaction with the present Plans on the part of the employees, and no election—which the Board may within its discretion conduct under Section 9(c) of the Act—to determine whether the employees desire to perpetuate or to discontinue the Plans. Certainly the primary purpose of the National Labor Relations Act was to make the will of the employees the sole criterion for determination of the character of their labor organization and collective bargaining arrangements. The premise of the Act is that workmen are competent to govern themselves, and that they have a right, and should be made free, to do so. Yet, without the will of the employees having been consulted, the local associations are ordered destroyed.

I think that the order of the Board accomplishes injustice both for the petitioners as employers and for the employees themselves and that it should be set aside.